## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THOMAS S. NEUBERGER; JERRY L.          :
MARTIN; WILLIAM R. HAGUE, JR.;         :
DELAWARE STATE SPORTSMEN'S             :
ASSOCIATION, INC; and BRIDGEVILLE      :
RIFLE & PISTOL CLUB, LTD.,             :
                                       :
      Plaintiffs.                 :
                                       :
      v.                          :   Civil Action No.
                                       :
DELAWARE DEPARTMENT OF                 :
SAFETY AND HOMELAND SECURITY;          :
NATHANIAL MCQUEEN, JR., in his         :
official capacity as Cabinet Secretary, :
Delaware Department of Safety and      :
Homeland Security; and COL. MELISSA    :
ZEBLEY, in her official capacity as    :
superintendent of the Delaware State Police, :
                                       :
      Defendants.                 :
                                       :

## COMPLAINT FOR DECLARATORY AND
## INJUNCTIVE RELIEF

Plaintiffs Thomas S. Neuberger; Jerry L. Martin; William R. Hague; Jr.;

Delaware State Sportsmen's Association (DSSA); and Bridgeville Rifle and Pistol

Club, Ltd. (BRPC) (collectively, "Plaintiffs"), by and through undersigned counsel,

bring this complaint against Defendants, Delaware Department of Safety and

Homeland Security; Secretary Nathanial McQueen, Jr., Cabinet Secretary of the

Delaware Department of Safety and Homeland Security; and Col. Melissa Zebley,

as the top law enforcement officer at the Delaware State Police, all of whom are Delaware state officials responsible for enforcing and implementing Delaware's laws and regulations—including those that are infringing the right of law-abiding citizens to keep and bear commonly possessed firearms for defense of self and family, and for other lawful purposes.

This is a case about vindicating fundamental civil rights being trampled on by overbearing legislation that defies controlling legal authority.

## INTRODUCTION

1.     The United States Supreme Court and a unanimous Delaware Supreme Court have recognized that the fundamental right to self-defense includes the right to keep and bear firearms both inside and outside of the home. The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear arms." U.S. CONST., amend. II; *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Article I, Section 20 of the Delaware Constitution affords even broader protections than provided under the United States Constitution. The Delaware Constitution recognizes that: "[a] person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." DEL. CONST., art. I, § 20; *see Doe v. Wilmington Housing Authority*, 88 A.3d 654, 665 (Del. 2014) ("On its face, the Delaware provision is intentionally broader

than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation.").

2.      In defiance of this established and unassailable authority, the State of Delaware recently enacted into law Senate Substitute 1 for Senate Bill 2 ("SS 1 for SB 2") ("Permit-to-Purchase"), which flouts the fundamental civil rights of Delawareans, by requiring a permit before being allowed to exercise one of their most exalted rights enshrined in both the Delaware Constitution and the United States Constitution. SS 1 for SB 2 criminalizes purchases of handguns and their transfer (sale, gift, or delivery) to someone without a Permit-to-Purchase.

3.      Further, if one's handgun permit is revoked for any reason, the State Police and/or local police shall purportedly have "probable cause" to effect the "surrender" or removal of the handguns from the individuals' home,[1] which is a violation of not only the Second Amendment, but also the Fourth Amendment protection against unreasonable searches and seizures. A copy of SS 1 for SB 2 is attached as Exhibit "A".[2]

---

[1] Defendant McQueen testified before the Legislature during debate on SS 1 for SB 2 that all firearms in the home would be removed even if the permit issue only applied to one firearm.

[2] § 1448A "(a)(2) A transferor may not sell, transfer, or deliver from inventory to any person, other than a licensed [importer, manufacturer, dealer, or collector] unless the buyer or transferee has a valid handgun [] purchaser permit issued." Transferor in this statute means one with a license to sell firearms. § 1448A(b)(3)(b).

140285994.1

4.      Defendants' enforcement of the provisions at issue in SS 1 for SB 2 inflicts irreparable harm upon the Plaintiffs, law-abiding citizens wishing to exercise the right to purchase a handgun for self-defense. SS 1 for SB 2 unlawfully restricts fundamental rights to keep and bear arms in common use for lawful purposes, as guaranteed by the Second and Fourteenth Amendments to the United States Constitution, and Article I, Section 20 of the Delaware Constitution.

### Delaware Criminalizes Lawful Behavior by Law-Abiding Citizens

5.      SS 1 for SB 2 was signed into law on May 16, 2024. It criminalizes the purchases of handguns, for self-defense or otherwise, by law abiding citizens without a permit. *See* 11 *Del. C.* § 1448D (Restricting the sale, purchase, or transfer of handguns only to those who undertake the rigorous licensing requirements to exercise a constitutional right.).

6.      SS 1 for SB 2 also purports to authorize the Delaware State Police or a local law-enforcement agency to "take action to ensure surrender or removal" of any handguns possessed by any law-abiding Delawarean whose permit is revoked, regardless of the reason.[3]

---

[3] One basis for permitting the State to revoke a license and authorize the police to take action to effect the surrender and removal of a Delawarean's firearms is if the Director of the State Bureau of Identification, an unelected bureaucrat, determines that the Delawarean "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." SS 1 for SB 2 provides no information on what standard and/or criteria is used by the Director to make this determination.

140285994.1

7. The State of Delaware's laws, regulations, policies, practices, and customs individually and collectively deny hundreds of thousands of individuals who reside in Delaware, including Plaintiffs, their members, and others like them, their fundamental, individual right to keep and bear common arms through the Permit-to-Purchase requirement and arduous application and licensing process.

8. Plaintiffs seek declaratory and injunctive relief on the basis that the Permit-to-Purchase requirement violates their rights under the Second, Fourth, and Fourteenth Amendments to the U.S. Constitution, and based on the fact that the Permit-to-Purchase requirement violates their rights under the Delaware Constitution at Article I, § 20.

**The Permit-to-Purchase Requirement Relies Upon Pre-*Bruen* Precedent**

9. SS 1 for SB 2 relies upon precedent formulated before the U.S. Supreme Court's landmark decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

10. In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's

'unqualified command.'" *Id*. at 17 (citing *Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n.10 (1961)).

11.    In so doing, the *Bruen* Court repudiated the "means-end" scrutiny, and the two-step test for review of restrictions on Second Amendment rights that had developed in lower courts after *District of Columbia v. Heller*, 554 U.S. 570 (2008). But SS 1 for SB 2 draws its inspiration from exactly those types of flawed, now repudiated review standards.

12.    *Bruen* reinforced the approach to assessing a Second Amendment challenge that the Court had established in *Heller*. That approach requires only: (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Second Amendment to demark the limits on the exercise of that right.

13.    "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

14.     *Bruen* first requires an answer to the question of whether SS 1 for SB 2 regulates conduct protected by the Second Amendment's plain text. *Bruen*, 597 U.S. at 18. Once it is established that the law in question does regulate conduct protected by the Second Amendment's plain text as SS 1 for SB 2 does, the law is presumed invalid, and the burden shifts to the State to provide historical analogues from the time of the Nation's founding that demonstrate that SS 1 for SB 2 is consistent with the Nation's tradition of firearm regulation.   *Id.* at 19 ("The government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.")

15.     Across the country, legislation that relied upon the type of flawed, now repudiated reasoning that was formulated before *Bruen* has been challenged in the decision's wake. SS 1 for SB 2 is no different. [4]

16.     SS 1 for SB 2 largely mirrors a Maryland statute: Md. Code Ann., § 5-117.1.  This statute was recently struck down using *Bruen*'s framework, in a panel decision, now pending *en banc* review, by the U.S. Fourth Circuit Court of Appeals

---

[4] One such case was decided by the U.S. Court of Appeals for the Third Circuit. The Court of Appeals held that a federal law prohibiting all felons from purchasing or owning firearms violated the Second Amendment under the *Bruen* test. *Range v. AG United States*, 69 F.4th 96, 107 (3d Cir. 2023)(*en banc*)(cert. petition before the U.S. Supreme Court pending). The court's concurring opinion added that statutes should only regulate those who are a danger to civil society, and therefore Range's offense did not disqualify him from rights under the Second Amendment. *Id.* at 113 (Ambro, J., concurring).

140285994.1

for its violation of the Second Amendment. *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1046 (4th Cir. 2023) .[5]

17.     Handguns and/or pistols subjected to the rigorous licensing requirement for purchase and/or ownership by SS 1 for SB 2 are "indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 597 U.S. at 8 (citing *Heller*, 554 U.S. at 629); *see also Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1269 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)("[H]andguns—the vast majority of which today are semi-automatic— . . . have not traditionally been banned and are in common use by law-abiding citizens.").

18.     The State will not be able to meet its burden to demonstrate, by historical analogue from the time of this Nation's Founding, that SS 1 for SB 2 is consistent with this Nation's historical tradition of firearm regulation. *Md. Shall Issue, Inc.,* 86 F.4th at 1046 ("Indeed, Maryland admitted at oral argument that it had not presented a proper historical analogue for the challenged law, noting that it had identified no Founding-era laws that 'required advance permission' before a citizen could purchase a firearm.")(internal citations omitted).

---

[5] The case is now pending a decision *en banc*, which will naturally supersede the panel decision.

## JURISDICTION AND VENUE

19.    This Court has subject-matter jurisdiction over the claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

20.    Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201 and 2202; 42 U.S.C. §§ 1983 and 1988; the U.S. Constitution's Second and Fourteenth Amendments; and Article I, Section 20 of the Delaware Constitution.

21.    Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

22.    Plaintiff Thomas S. Neuberger is a 77-year-old attorney licensed to practice law in the State of Delaware and a resident of New Castle County, just outside of the Wilmington city limits. From 1947 to 2009 he resided in Wilmington. As the bird flies, his present residence is less than a mile from the home of President Biden. He often rides by large protests at the intersection of Center Road (Route 141) and Barley Mill Road, near the home of current U.S. President, designed to influence the President on domestic and international issues.

23.    He has a history of rifle shooting and won merit badges for shooting while a Boy Scout at St. Anthony of Padua Grade School in Wilmington, Delaware.

24.    The civil unrest nationwide and in Wilmington at the end of May 2020 caused him great concern for his safety and that of his wife. At that time, Interstate I-95 was blocked, vehicle traffic halted and shut down for a time. And more recently

the Golden Gate Bridge in San Francisco, and the access road to O'Hare Airport in Chicago, among other places, have been shut down by violent and non-violent protesters, among other places nationwide.

25.     In Wilmington, rioters in May of 2020 reportedly traveled more than 6 miles through the city. Windows were smashed and businesses looted along Market and other downtown streets. Police in riot gear had to cordon off downtown streets. By 7 p.m., the protestors had moved out of downtown and through the Trolley Square area, arriving down Delaware Avenue and turning onto North DuPont Street toward Pennsylvania Avenue, where Neuberger had previously lived just a few years ago.

26.     Out of fear for his life and safety and that of his wife, Neuberger then purchased a shotgun in July of 2020 to insure their safety and lives. He received safety training with firearms and the shotgun from a retired State Tropper who previously commanded the Delaware State Police firearms range and who trained Troopers in gun safety. Neuberger considered purchasing a handgun at that time and discussed it with the State Trooper who provided him with recommendations for his self-defense needs with a handgun which will be useful when the time comes to purchase a handgun.

27.     Presently, with nationwide protests and threats against the American Jewish community in colleges and universities, and even other spreading locations,

140285994.1

he fears renewed rioting can erupt at any time in the foreseeable future in Delaware or near his residence. There have been at least two recent protests over policies towards Israel along Center Road where he travels. If his vehicle is trapped because Center Road has been closed and the protests turn violent he would need a handgun to protect himself. Carrying a shotgun in his VW beetle vehicle for self-defense is impracticable since the vehicle is too small to carry a shotgun.

28.     Neuberger also reasonably fears renewed violence locally and nationwide in connection with the presidential election in November of 2024. Neuberger fears rioting similar to May of 2020 will again break out in Wilmington or elsewhere. Since the Wilmington police and police in other jurisdictions stood down in the face of violent rioting in May of 2020, he reasonably expects that could happen here in Delaware and he would need a handgun to protect himself traveling in his vehicle or at home.

29.     Neuberger also reasonably fears other terrorist attacks on the United States akin to 9/11 in New York City. What better place for an attack on innocent civilians than near the U.S. President's home where Neuberger lives. Because of the impact of wars and the threats of war in the Middle East, Neuberger fears that as the imminence of such a possible attack increases he will need a handgun for self-protection.

140285994.1

30.     If the permit-to-purchase law is in effect when he decides to purchase a handgun for further protection or for any of the reasons stated above, Neuberger will not obey the new Delaware gun permit law and he will secure a handgun by any means possible to protect himself and his wife rather than suffer a several months' delay in securing the permission of the State to purchase a handgun for self-defense.

31.     He believes a handgun would be more useful in the defense of his home or his vehicle if rioters turn violent than a shotgun or in case of a terrorist attack. He fears the new legislation will prevent him from buying a handgun when he is most in need to protect himself, his wife, his home or vehicle.

32.     Neuberger, in the past, has been threatened with physical harm due to his pro bono civil rights work. Today, with the social fabric unraveling in the country, his fears of violence are even greater.  He remembers when Dr. Martin Luther King's family and home were first bombed in Alabama and Dr. King sought to obtain a handgun to protect his family.  But Alabama had a handgun permit law then and the Governor refused him a permit for a handgun.

33.     When Neuberger will need a handgun it will be because of a reasonably expected emergency.  He will not have the time to go through a lengthy and arduous 11-point process to timely get that handgun and await approval from a government official when it is needed.  Indeed, he has made a career of suing elected and appointed officials at the state and local levels, and it is reasonable for him to expect

140285994.1

12

delay if not outright hostility to any handgun permit application filed by him when he experiences his emergency need for a handgun. He has sued the two offices who are defendants herein probably a dozen or more times.

34.     As a practicing civil rights attorney, Neuberger does not need the threat of criminal charges being filed against him either, as that would impact his ability to practice law and those underserved individuals he seeks to represent.

35.     Jerry L. Martin is the President of the Bridgeville Rifle and Pistol Club, Ltd. Additionally, he is a member of the Delaware State Sportsmen's Association. Martin competes in Cowboy Action, a competitive shooting sport. He regularly purchases and collects firearms and will continue that practice in the future. Martin continues to represent a group of individuals who wish to lawfully and safely exercise their right to bear arms. Additionally, he fears the challenged legislation will impact his ability to purchase firearms when he needs them in the future.

36.     William R. Hague, Jr., is an 18-year-old Delawarean. He is a member of Bridgeville Rifle and Pistol Club, Ltd. He fears the challenged legislation will impact his ability to purchase firearms when he needs them in the future.

37.     The Delaware State Sportsmen's Association (DSSA) was founded in 1968 as the official state-level affiliate of the National Rifle Association of America, and its membership currently consists of approximately 4,500 individual members and constituent clubs.

140285994.1

38.    Bridgeville Rifle and Pistol Club, Ltd (BRPC) was formed in the early 1950's by a group of veterans returning from World War II and the Korean Conflict for the purpose of establishing and providing a venue where its members and their guests might lawfully and safely exercise their right to keep and bear arms for lawful purposes. BRPC membership currently stands at approximately 1,600 individual members and their families. BRPC serves as a competitive shooting club that conducts education, training and competitive shooting events drawing competitors and participants from throughout the United States.

39.    DSSA and BRPC are organizations whose members will be subjected to the Permit-to-Purchase requirement. Members of DSSA and BRPC have many of the same fears as Neuberger and are subjected to the same lengthy, arduous and arbitrary 11-point process in order to "request permission" to purchase and possess a handgun—the "quintessential self-defense weapon" in this Nation.  SS 1 for SB 2 leaves these members vulnerable to attack without the ability to defend themselves and their families.

40.    Defendant Delaware Department of Safety and Homeland Security is a department within the State of Delaware that oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including the Permit-to-Purchase requirement. Its enforcement of the Permit-to-Purchase's ban on purchasing or obtaining a handgun without a license against

Delaware residents places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Permit-to-Purchase requirement, which leaves them unable to purchase common firearms without unconstitutional restrictions.

41.     Defendant Nathanial McQueen, Jr., is the Cabinet Secretary of the Delaware Department of Safety and Homeland Security. This suit is brought against Defendant McQueen in his official capacity as Cabinet Secretary. In such capacity, Defendant McQueen oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including the Permit-to-Purchase requirement. Defendant McQueen's ongoing enforcement of the Permit-to-Purchase's ban on purchase or possession without a handgun Permit-to-Purchase license places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Permit-to-Purchase, which leaves them unable to keep constitutionally protected handguns.

42.     Defendant Col. Melissa Zebley is the Superintendent of the Delaware State Police. This suit is brought against Defendant Zebley in her official capacity as Superintendent of the Delaware State Police. In such capacity, Defendant Zebley executes and administers the State's laws, including the Permit-to-Purchase. Defendant Zebley's ongoing enforcement of the Permit-to-Purchase's ban on purchase or possession without a handgun Permit-to-Purchase license places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the

140285994.1

Permit-to-Purchase, which leaves them unable to keep constitutionally protected handguns.

43.     Defendants' enactment and enforcement of the provisions at issue in SS 1 for SB 2 inflicts irreparable harm upon DSSA, BRPC and individual plaintiff Neuberger, a law-abiding citizen wishing to exercise the right to purchase a handgun for self-defense, by unlawfully restricting their fundamental right to keep and bear arms in common use for lawful purposes, as guaranteed by the Second and Fourteenth Amendments to the United States Constitution, and Article I, § 20 of the Delaware Constitution.

## FACTUAL ALLEGATIONS

### I.     DELAWARE'S UNCONSTITUTIONAL SS 1 FOR SB 2

44.     SS 1 for SB 2 amended the prior version of 11 *Del. C.* § 1448A and B, and added a new § 1448D: "Handgun qualified purchaser permit required to purchase handguns." Among definitions added was a new definition of handgun, which now states: "(2) 'Handgun' means a pistol, revolver, or other firearm designed to be readily capable of being fired when held in 1 hand." All applications must also be processed through one person called the Director: "(1) 'Director' means the Director of the State Bureau of Identification."

45.     SS 1 for SB 2 gives an agent of the government unfettered discretion over who to approve and deny for a permit to purchase handguns.

140285994.1

46.    All individuals, excluding those who hold a valid concealed carry deadly weapons (CCDW) license are required to submit an application for a handgun license. *See* §§ (b)(2) and (c)(2).  Under this law, those with a CCDW license do not have to apply for a Permit-to-Purchase[6]—but upon meeting one of the many criteria in Section f, the State Police and/or local law enforcement have the authority to remove all firearms from their homes without due process. *See* §§ f, k(1)-(3).

47.    The permit requirement includes an exhaustive list of information an applicant must provide, including race, ethnicity, national origin, and a physical description including distinguishing characteristics. § (d)(1). Another requirement is that a person must be at least 21 years of age[7] to be granted a permit, which, is unconstitutional on its face.[8]

48.    Not only is the amount of information the applicant must provide onerous, they also must attend a certified "firearms training course" with 11 different parts—one part more than the course required to obtain a CCDW permit in the State of Delaware. Another requirement is to fire at least 100 rounds of ammunition. The

---

[6] It remains unclear whether a non-resident with a CCDW license from another state—that Delaware recognizes as a valid CCDW license in Delaware—would enjoy this exception.

[7] "(f) Except as otherwise provided under this chapter, the Director may not issue a handgun qualified purchaser permit to any of the following: (1) A person under the age of 21"

[8] This issue of banning firearm purchases by those 18-20 years old is also being litigated in Federal Court at: *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. 22-1624-RGA (D. Del. Complaint filed Dec. 22, 2022); and in state court at *Birney v. Delaware Department of Safety and Homeland Security*, C.A. K23C-07-019 RLG (Del. Super. Ct., First Amended Complaint filed Oct. 18, 2023).

140285994.1

individual must also submit to fingerprinting and undergo a state and national background check. All of this at the applicant's expense. Moreover, the state may delay another 30 days to approve or deny the application before a person is able to exercise an enshrined right in the U.S. Constitution[9].

49.    SS 1 for SB 2 does not explain where the firearm used in these courses will come from if the applicants cannot purchase a handgun. The State appears to have overlooked that applicants would need to possess and own a handgun in order to complete the training courses SS 1 for SB 2 mandates in order to possess and own a handgun.

50.    Further, the final form of SS 1 for SB 2 removed a firearms training course voucher program—in effect, leaving those without the financial means to pay for the required training without a way to purchase a handgun for self-defense. Omission of a voucher program is one of several ways the State discriminates against economically disadvantaged Delawareans through SS 1 for SB 2.

51.    All applications will go through one person, the Director of the State Bureau of Identification, giving an unelected agent of the state government excessive

---

[9] SS 1 for SB 2 also requires that a "NICS" check be run by the State. This is duplicative because everyone purchasing a handgun already must undergo a NICS check initiated by the FFL under federal law.

140285994.1

discretion over approval and denial of permits,[10] and revocation of previously issued permits to purchase handguns.

52.    If the Director revokes a license, the State Police and/or local law enforcement—based on that fact alone—have purported "probable cause" to remove the firearms from the individual's "custody, possession, or control", which is an unconstitutional search and seizure, and a perversion of the term probable cause. *See* § 1448D (k)(3).

53.    Further, during the floor debate in the Delaware House of Representatives for SS 1 for SB 2, on March 7, 2024, Secretary McQueen stated upon revocation of a permit, "all weapons in the home are to be removed." That is, he intends to confiscate even those firearms not purchased with the Permit-to-Purchase license.

54.    Section 5 of the Permit-to-Purchase bill also leaves uncertainty as to when it will be enacted, either "18 months from the date of the Act's enactment," or "[t]he date of publication in the Register of Regulation of a notice by the Director of the State Bureau of Investigation that necessary processes have been established for implementation[.]" § 1448B (b)(5)(1)-(2). Therefore, uncertain timing leaves the public at the mercy of the Director yet again.

---

[10] Generally, a statute or ordinance vesting discretion in administrative officials without fixing any adequate standards for their guidance is an unconstitutional delegation of legislative power. *Hindt v. State*, 421 A.2d 1325, 1331 (Del. 1980) (citing *State v. Durham*, 191 A.2d 646, 649 (1963)).

## II.    PRE-*BRUEN* PRECEDENT

55.    In *McDonald v. City of Chicago*, 561 U.S. 742, 750, 791 (2010), the U.S. Supreme Court confirmed that the rights protected by the Second Amendment are "among those fundamental rights necessary to our system of ordered liberty," and held that the Second Amendment is incorporated as applicable to the states through the Fourteenth Amendment.

56.    The *Heller* Court recognized that the handgun is "the quintessential self-defense weapon" in the United States, and it identified invalidated bans on carrying handguns as among the most "severe restriction(s)" in our Nation's history. *See Heller*, 554 U.S. at 629 (citing, *e.g.*, *Nunn v. State*, 1 Ga. 243, 251 (1846)).

## III.    HANDGUNS ARE PROTECTED UNDER THE *BRUEN* TEST

57.    *Bruen* first requires an answer to the question: whether SS 1 for SB 2 regulates conduct protected by the Second Amendment's plain text. *Bruen*, 597 U.S. at 17.

58.    The Second Amendment extends to "all instruments that constitute bearable arms," *Id.* at 28, i.e., "anything that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581.

59.    *Heller* and *Bruen* establish that the only exception to this broadly protective amendment, is that arms that are both "dangerous and unusual" are not

140285994.1

protected. However, if an arm is "in common use" then it is, by definition, not dangerous *and* unusual.

60.    If the conduct at issue is presumptively protected by the Second Amendment's text, as it is with SS 1 for SB 2, the State has the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. The State must "identify a well-established and representative historical analogue to its regulation." *Id*. at 2133. This feat is not possible for the State to accomplish in this case.

61.    The Third Circuit held earlier this year that the primary focus in identifying purported analogues in this context should be on the time of the Founding. *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2024)[11] ("Although *Bruen* did not definitively decide this issue, it gave a strong hint [in favor of the Founding] when it observed that there has been a general assumption 'that the scope of the protection applicable to the Federal Government and States [under the Bill of Rights] is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.'")(citing *Bruen*, 597 U.S. at 37); *see also id*.

---

[11] A motion for rehearing *en banc* of the *Lara* panel decision was denied. *Lara v. Comm'r Pa. State Police*, 2024 U.S. App. LEXIS 7299, at *5 (3d Cir. Mar. 27, 2024) (*Cf. Range v. AG United States*, 69 F.4th 96, 104 (3d Cir. 2023) (*en banc*) (Considering Reconstruction-era history) (petition for cert. before the United States Supreme Court pending)).

("Accordingly, to maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in 1791.")

62.     *Bruen* examined New York's proper cause requirement for obtaining a carry permit, which "concern[ed] the same alleged societal problem addressed in *Heller:* handgun violence, primarily in urban area[s]." *Bruen,* 597 U.S. 1 at 27 (quotation omitted). In striking down New York's proper cause requirement, the Supreme Court deemed it controlling that the law lacked an analogue from "before, during, and even after the founding[.]" *Id.*

63.     The firearms at issue in this case, handguns, unquestionably fall within the scope of the Second Amendment, as the Supreme Court in *Heller* held that handguns are the most popular weapon chosen by Americans for self-defense. 554 U.S. at 629. In *Heller,* the District of Columbia law at issue "addressed a perceived societal problem—firearm violence in densely populated communities"—by imposing a licensing regime with the result of effectively banning handgun possession in the home. *Bruen,* 597 U.S. at 27.

64.     The Permit-to-Purchase legislation challenged in this case is consistent with the history of racist licensing laws which *Bruen* refused to consider as relevant. *Bruen*, 597 U.S. at 62. This history of licensing laws for possession of firearms (not just carrying) aligns with the ugly racist history of gun-control laws in general,

140285994.1

especially in the 1800s. Delaware law was no exception. *See* 8 LAWS OF THE STATE OF DELAWARE 208 (1841). Nearly a decade later, Delaware began charging "twenty-five cents" for "licenses to negroes to keep a gun." 9 LAWS OF THE STATE OF DELAWARE 430 (1843).[12]

65.     In evaluating the licensing regime challenged in *Heller*, the Supreme Court stated, "the Founders themselves could have adopted [a similar law] to confront that problem," but they did not. *Id.* When striking down the handgun ban in *Heller*, the Supreme Court found it dispositive that no "Founding-era historical precedent" banned handgun possession in the home. *Id.* (citations omitted).

66.     Here, there is also no historical regulation relevantly similar to the Permit-to-Purchase requirement. At the time of the Founding, the preferred means of addressing the threat of violence was to require law-abiding individuals to be armed. States "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." *See* David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine,* 13 CHARLESTON L. REV. 205, 232 (2018) (cited with approval in *Bruen,* 597 U.S. at 30). However, "[u]ntil the early twentieth century, there were no laws that required

---

[12] A few outlier states, such as Oregon and New York, passed laws over a century ago to require a license to purchase pistols or revolvers for the documented purpose of preventing what they viewed as "dangerous classes" such as "freed Blacks" or Italian immigrants from possessing firearms. Robert J. Cottrol & Brannon P. Denning, *To Trust the People with Arms: The Supreme Court and the Second Amendment*, at 57-58 (University Press of Kansas 2023).

that individuals receive government permission before purchasing or borrowing a firearm." David Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy* ("Kopel"), 53 HARV. J. ON LEGIS. 303, 336 (2016).[13]

67.     The Fourth Circuit, reviewing a nearly identical permit statute, and the State of Maryland, in its futile attempt to defend that unconstitutional permit statute, has recognized that there are no analogues relevantly similar to a permit-to-purchase scheme for commonly used arms. *Md. Shall Issue, Inc.*, 86 F.4th at 1046 ("Indeed, Maryland admitted at oral argument that it had not presented a proper historical analogue for the challenged law, noting that it had identified no Founding-era laws that 'required advance permission' before a citizen could purchase a firearm.")(internal citations omitted).

68.     Delaware's SS 1 for SB 2 plainly violates the Second Amendment and is unconstitutional. The conduct SS 1 for SB 2 regulates is protected by the Second Amendment and Defendants cannot establish that the law is consistent with either the Nation's or Delaware's history and tradition of firearms regulation. There is no historical support for a permit-to-purchase.

---

[13] Further, the *Bruen* Court would not recognize laws that were "late-in-time" for establishing a Second Amendment historical analogue. 597 U.S. at 66 n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici."). *Bruen* also instructed that "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen,* 597 U.S. at 36 (quoting *Heller,* 670 F. 3d at 1274, n. 6)(Kavanaugh, J., dissenting).

69.     Furthermore, there is no historical tradition of requiring a training course to possess a handgun in any of the States. *See* George H. Ryden, DELAWARE– THE FIRST STATE IN THE UNION  117 (1938); 3 PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636–1667, at 345 (1965 Reprint); 5 LAWS OF NEW HAMPSHIRE: FIRST CONSTITUTIONAL PERIOD, 1784–1792, at 178– 179 (1916); 1 Hening, THE STATUTES AT LARGE, at 127 (1623 law requiring arms to travel); 6 1 AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 210–11 (Jon Wakelyn ed., 2006) (Concessions and Agreements, Jan. 11, 1664).

## V.     DELAWARE'S CONSTITUTION AND OTHER LAWS

70.     The right to bear arms, including the right of self-defense, "has existed since [Delaware's] founding and has always been regarded as an inalienable right." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 644 (Del. 2017). *Bridgeville* undertook an extensive review of Delaware's legislative history regarding the right to bear arms, noting that:

> Article 25 of Delaware's first constitution (enacted on September 20, 1776) provided that, unless otherwise altered by the State's legislature, the common law of England "shall remain in force. By definition, this included Article VII of the 1689 English Bill of Rights — described by the United States Supreme Court as "the predecessor to our Second Amendment" — which provided: "That the Subjects which are Protestants, may have Arms for their Defense suitable to their Conditions, and as allowed by Law."

*Id*. at 645-646.

140285994.1

71.     Article I, § 20 was passed by supermajorities of two successive Delaware General Assemblies, and became effective in 1987. Its scope is much broader than the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority*, at 665 ("our interpretation of Section 20 is not constrained by federal precedent," and emphasizing that the scope of Section 20 is much broader than the scope of the Second Amendment.); *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1269 (Del. Super. 2018); *Del. State Sportsmen's Ass'n v. Garvin*, 2020 Del. Super. LEXIS 2927 (Del. Super. 2020).[14] ("[T]he enumeration of 'self and family' *in addition to* the home provides an independent right to bear arms outside the home (and not just in it.)." *Id*. at 643.

## **COUNT I**

**42 U.S.C. § 1983 Claim for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution**

72.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

73.     There is an actual and present controversy between the parties.

---

[14] This second *Garvin* decision was not appealed by the State—just as the first *Garvin* decision was not appealed. Undersigned lead counsel successfully argued *Doe*, *Bridgeville,* and both *Garvin* decisions, which are the only decisions that directly address the scope of Article I, Section 20 of the Delaware Constitution outside the home.

74. The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states their fundamental right to keep and bear arms, both in the home and in public.

75. The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

76. The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, own, receive or possess common firearms for all lawful purposes, including self-defense.

77. SS 1 for SB 2 impermissibly restricts the right to purchase a handgun for any lawful purpose, including self-defense, without first following a lengthy and arduous process to obtain a permit to purchase. This includes those 18 years-old through 20 years-old from purchasing and owning, "deadly weapons" that are common firearms. 11 *Del. C.* § 1448(a)(5).

78. SS 1 for SB 2's licensing process further violates the Second Amendment of the United States Constitution because:

> (a)    it denies a constitutional right until a license to exercise that right is issued;

> (b)    the licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome, vague and arbitrary;

(c)    the licensing process, both on the face of the statute and as applied, was designed to deny constitutional rights and make it more burdensome to exercise them, especially those of limited economic means.

79.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

80.    Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of their fundamental Second and Fourteenth Amendment rights in the State of Delaware, including Plaintiffs, Thomas Neuberger, Jerry Martin; William R. Hague, Jr.; DSSA and its members, and BRPC and its members, through Defendants' enforcement and implementation of SS 1 for SB 2.

81.    For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Second Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## COUNT II

### Declaratory Judgment on Deprivation of Plaintiffs' Rights under Article I, Section 20 of the Delaware Constitution

82.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

140285994.1                                    28

83.     Declaratory judgment is proper in this matter, pursuant to 10 *Del. C.* § 6501 as there is a real controversy between the parties, an interest is adversely affected, and the issue is ripe for resolution.

84.     Article I, Section 20 of the Delaware Constitution states that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20.

85.     Article I, Section 20 was adopted by supermajorities of two successive Delaware General Assemblies, became effective in 1987, and is much broader than the scope of the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority,* at 665 ("our interpretation of Section 20 is not constrained by federal precedent," and emphasizing that the scope of § 20 is much broader than the scope of the Second Amendment.)

86.     The Delaware Supreme Court in *Bridgeville Rifle & Pistol Club, Ltd. v. Small,* 176 A.3d 632 (Del. 2017), recognized that "the enumeration of 'self and family' in addition to the home provides an independent right to bear arms outside the home (and not just in it.)." *Id.* at 643.

87.     Article I, Section 20 of the Delaware Constitution guarantees ordinary, law-abiding citizens of the State their fundamental right to keep and bear arms, both in the home and in public.

88.     The right to keep and bear arms under Article I, Section 20 includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms for all lawful purposes, including self-defense.

89.     Under SS 1 for SB 2, the State prohibits the sale, transfer, and purchase of handguns without a Permit-to-Purchase under 11 *Del. C.* § 1448.

90.     Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, Thomas S. Neuberger, Jerry L. Martin, William R. Hague, Jr.,  DSSA and its similarly situated members, and BRPC and its similarly situated members, through Defendants' enforcement and implementation of SS 1 for SB 2.

91.     For all the reasons asserted herein, Defendants have acted in violation of Article I, Section 20 of the Delaware Constitution and continue to act in violation thereof, compelling the relief Plaintiffs seek.

## COUNT III

### 42 U.S.C. § 1983 Claim for Deprivation of Plaintiffs' Rights Under the Fourth Amendment

92.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

93.     The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

94.     The very core of the Fourth Amendment's guarantee is the right of a person to retreat into his or her home and "there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 141 S. Ct. 1596 (2021) (quoting *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013)).

95.     SS 1 for SB 2's Permit to Purchase scheme, in total, has no analogue in the relevant historical tradition of firearms regulation in this Nation and violates the Second Amendment. However, SS 1 for SB 2's provisions for effecting the "surrender" and "removal" of firearms from Delawareans whose permits are revoked also violates the Fourth Amendment.

96.     SS 1 for SB 2 grants the Director of the State Bureau of Identification, an unelected bureaucrat, the power to revoke the permit of any Delawarean who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," and thus effect the "surrender" or "removal" of firearms from that Delawareans home without a warrant.

140285994.1

31

97.     Further, the comments on the House floor by Secretary McQueen indicate that such "surrender" and "removal" would apply to all guns in the home, not just those the State purports to remove pursuant to revocation of a permit.

98.     SS 1 for SB 2's provision for the warrantless removal from the home of firearms based upon the subjective and nebulous "danger of causing physical injury" standard violates the Fourth Amendment's protection against unreasonable search and seizure, and contradicts United States Supreme Court precedent.

99.     In a unanimous opinion in *Caniglia v. Strom*, 141 S. Ct. at 1600 (2021), the Supreme Court held that the warrantless removal of firearms from the home of a man who police determined to be "a risk to himself or others" was a violation of the Fourth Amendment.[15]

100.    SS 1 for SB 2 seeks to codify exactly what the United Supreme Court determined was a Fourth Amendment violation.

101.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

102.    Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of their fundamental Fourth

---

[15] In *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1275 (Del. Super. 2018), a case that the State did not appeal to the Delaware Supreme Court, the Superior Court found a regulation unconstitutional and a Fourth Amendment violation, where in the course of investigation of gun possession in Delaware State Parks, State officials were given "unfettered discretion to stop State Park and Forest visitors…without requiring a scintilla of evidence of criminal activity."

140285994.1

Amendment rights in the State of Delaware, including Plaintiffs, Thomas Neuberger, Jerry L. Martin; William R. Hague, Jr.; DSSA and its members, and BRPC and its members, through Defendants' enforcement and implementation of SS 1 for SB 2.

103.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Fourth Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for the following relief:

(a)   A judgment that SS 1 for SB 2 and all related regulations, policies, and/or customs designed to enforce or implement the same, are a violation of Plaintiffs' fundamental right to keep and bear arms, including purchasing handguns for any lawful purpose without a state issued permit or license, as guaranteed under the Second and Fourteenth Amendments, as well as a violation of their rights under the Fourth Amendment to the United States Constitution, and Article I, § 20 of the Delaware Constitution. Declaratory judgment is proper in this matter, pursuant to 10 *Del. C.* § 6501 as there is a real controversy between the parties, an interest is adversely affected, and the issue is ripe for resolution;

(b)   Relief pursuant to 42 U.S.C. § 1983 for deprivation by Defendants of Plaintiff's federal constitutional rights under color of state law;

(c)   Attorney's fees pursuant to 42 U.S.C. § 1988(b);

140285994.1

(d)     Permanent injunction to enjoin Defendants from implementing and enforcing SS 1 for SS 2.

(e)     Any and all other and further relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper, including attorney's fees and costs.

Respectfully submitted,

LEWIS BRISBOIS
    BISGAARD & SMITH LLP

 */s/ Francis G.X. Pileggi*
Francis G.X. Pileggi (No. 2624)
Scott Cousins (No. 3079)
Andrew A. Ralli (No. 6733)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Scott.Cousins@LewisBrisbois.com
Andrew.Ralli@LewisBrisbois.com

OF COUNSEL:
Joseph G.S. Greenlee
Erin M. Erhardt
National Rifle Association of
    America – Institute for Legislative
    Action
11250 Waples Mill Road
Fairfax, VA  22030
(703) 267-1161
*Counsel for Bridgeville*
*Rifle and Pistol Club, Ltd.*

Dated:  May 16, 2024

140285994.1

34