# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS S. NEUBERGER; JERRY L. MARTIN; WILLIAM R. HAGUE, JR.; DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC; and BRIDGEVILLE RIFLE & PISTOL CLUB, LTD., | : : : : : : |
| Plaintiffs. | : : |
| v. | : Civil Action No. 1:24-cv-00590-MN : |
| NATHANIAL MCQUEEN, JR., in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security; and COL. WILLIAM CROTTY, in his official capacity as superintendent of the Delaware State Police, | : : : : : : : |
| Defendants. | : |

## SECOND AMENDED AND SUPPLEMENTAL
## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs,[1] by counsel, bring this Second Amended and Supplemental

Complaint against Defendants,[2] all of whom are Delaware state officials responsible

for enforcing and implementing Delaware's laws and regulations—including those

---

[1] Thomas S. Neuberger; Jerry L. Martin; William R. Hague, Jr.; Delaware State Sportsmen's Association (DSSA); and Bridgeville Rifle and Pistol Club, Ltd. (BRPC) (collectively, "Plaintiffs").

[2] Secretary Nathanial McQueen, Jr., Cabinet Secretary of the Delaware Department of Safety and Homeland Security; and Col. William Crotty, as the top law enforcement officer at the Delaware State Police.

that are infringing upon the right of law-abiding citizens to keep and bear commonly possessed firearms for defense of self, and for other lawful purposes.

This is a case that challenges overbearing legislation that defies controlling legal authority and tramples on civil rights.

The challenged statute ignores controlling precedent of the U.S. Supreme Court and sacrifices fundamental civil rights enshrined in the Bill of Rights on the altar of the demonstrably false pretext that the challenged statute will reduce violence.

## INTRODUCTION

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST., amend. II. The United States Supreme Court has ruled that the Second Amendment protects the fundamental right to self-defense inside and outside the home. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 10 (2022).

2.      In defiance of this established and unassailable authority, the State of Delaware recently enacted into law Senate Substitute 1 for Senate Bill 2 ("SS 1 for SB 2") ("Permit-to-Purchase"), which flouts Delawareans' fundamental civil rights by imposing an ahistorical and burdensome permitting scheme for acquisition of a

152,368,335

handgun for self-defense. SS 1 for SB 2 criminalizes handgun acquisition by someone without a Permit-to-Purchase.

3.      Further, if one's handgun permit is revoked for any reason, the State Police and/or local police shall purportedly have "probable cause" to effect the "surrender" or removal of the handguns from the individuals' home,[3] which is a violation of not only the Second Amendment, but also the Fourth Amendment protection against unreasonable searches and seizures. A copy of SS 1 for SB 2 is attached as Exhibit "A".[4]

4.      Defendants' enforcement of the provisions at issue in SS 1 for SB 2 inflicts irreparable harm upon the Plaintiffs, law-abiding citizens wishing to exercise the right to purchase a handgun for self-defense. SS 1 for SB 2 unlawfully restricts fundamental rights to keep and bear arms in common use for lawful purposes, as guaranteed by the Second and Fourteenth Amendments to the United States Constitution.

---

[3] Defendant McQueen testified on the record before the Legislature during debate on SS 1 for SB 2 that all firearms in the home would be removed even if the permit infraction only applied to one firearm.

[4] § 1448A "(a)(2) A transferor may not sell, transfer, or deliver from inventory to any person, other than a licensed [importer, manufacturer, dealer, or collector] unless the buyer or transferee has a valid handgun [] purchaser permit issued." Transferor in this statute means one with a license to sell firearms. § 1448A(b)(3)(b).

152,368,335

### Delaware Criminalizes Constitutionally Protected Activity

5.    SS 1 for SB 2 was signed into law on May 16, 2024. It intends to criminalize the purchases of handguns, for self-defense and other lawful purposes, by law-abiding citizens without a permit.[5] *See* 11 *Del. C.* § 1448D (Restricting the sale, purchase, or transfer of handguns only to those who undertake the rigorous licensing requirements to exercise a constitutional right.).[6]

6.    SS 1 for SB 2 also purports to authorize the Delaware State Police or a local law-enforcement agency to "take action to ensure surrender or removal" of any handguns possessed by any law-abiding Delawarean whose permit is revoked, regardless of the reason. *Id.* § 1448A(l)(3).

7.    The State of Delaware's laws, regulations, policies, practices, and customs individually and collectively deny hundreds of thousands of individuals who reside in Delaware—including Plaintiffs, their members, and others similarly situated—their fundamental, individual right to keep and bear common arms through its arduous Permit-to-Purchase scheme.

---

[5] Most of the funding to implement the challenged statute has already been approved. *See* Exhibit "B."

[6] As an analogy, consider the constitutionality of a statute that would require a citizen to obtain a permit before exercising her fundamental First Amendment right to freedom of speech.

152,368,335

8.     Plaintiffs seek declaratory relief on the basis that the Permit-to-Purchase requirement violates their rights under the Second, Fourth, and Fourteenth Amendments to the U.S. Constitution.

**The Permit-to-Purchase Requirement Relies Upon Pre-*Bruen* Precedent**

9.     SS 1 for SB 2 relies upon repudiated precedent formulated before the U.S. Supreme Court's landmark decision in *Bruen*, 597 U.S. 1.

10.     In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 17 (citing *Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n.10 (1961)).

11.     *Bruen* reinforced the approach to assessing a Second Amendment challenge that the Court had established in *Heller*. That approach requires: (1) determining, through textual analysis, that the Second Amendment protected an

individual right to be armed; and (2) relying on the historical understanding of the Second Amendment to demark the limits on the exercise of that right.[7]

12.    "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

13.    *Bruen* first requires an answer to the question of whether SS 1 for SB 2 regulates conduct protected by the Second Amendment's plain text. *Bruen*, 597 U.S. at 18. Once it is established that the law in question does regulate conduct protected by the Second Amendment's plain text as SS 1 for SB 2 does, the law is presumed invalid, and the burden shifts to the State to provide historical analogues from the time of the Nation's founding that demonstrate that SS 1 for SB 2 is consistent with the Nation's tradition of firearm regulation. *Id.* at 19 ("The government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.")

---

[7] The Supreme Court did not establish a separate standard for challenges of statutes requiring permits to exercise Second Amendment rights.

14.    Across the country, legislation that relied upon the type of flawed, now repudiated reasoning that was formulated before *Bruen* has been successfully challenged in the decision's wake. SS 1 for SB 2 is no different.

15.    Handguns and/or pistols subjected to the rigorous licensing requirement for purchase and/or ownership by SS 1 for SB 2 are "indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 597 U.S. at 8 (citing *Heller*, 554 U.S. at 629).

16.    The State cannot satisfy its burden to demonstrate, by historical analogue, that SS 1 for SB 2 is consistent with this Nation's historical tradition of firearm regulation.

17. Specifically, the State will not be able to identify laws or regulations from the relevant historical periods that required law-abiding citizens to satisfy a burdensome and time-consuming permitting scheme before purchasing a firearm.

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over the claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201 and 2202; 42 U.S.C. §§ 1983 and 1988; as well as the U.S. Constitution's Second, Fourth, and Fourteenth Amendments. Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

152,368,335

## PARTIES

19.    Plaintiff Thomas S. Neuberger is a 77-year-old attorney licensed to practice law in the State of Delaware, a recipient of the Leonard L. Williams Criminal Justice Reform Award, Life Member of the NAACP, and a resident of New Castle County, who lives just outside of the Wilmington city limits. From 1947 to 2009 he resided in Wilmington. As the bird flies, his present residence is less than a mile from the home of former President Joseph Biden. He often rides by large protests at the intersection of Center Road (Route 141) and Barley Mill Road, near the home of the former U.S. President, designed to influence the former President on domestic and international issues.

20.    He has a history of rifle shooting and won merit badges for shooting while a Boy Scout at St. Anthony of Padua Grade School in Wilmington, Delaware.

21.    The civil unrest nationwide and in Wilmington at the end of May 2020 caused him great concern for his safety and that of his wife. At that time, Interstate I-95 was blocked, vehicle traffic halted and shut down for a time. And more recently the Golden Gate Bridge in San Francisco, and the access road to O'Hare Airport in Chicago, among other places, have been shut down by violent and non-violent protesters, among other places nationwide.

22.    In Wilmington, rioters in May of 2020 reportedly traveled more than 6 miles through the city. Windows were smashed and businesses looted along Market

152,368,335

Street and other downtown streets. Police in riot gear had to cordon off downtown streets. During that month, the protestors had moved out of downtown at night and through the Trolley Square area, walking down Delaware Avenue and turning onto North DuPont Street toward Pennsylvania Avenue, where Neuberger had previously lived just a few years ago.

23.    Out of fear for his life and safety and that of his wife, Neuberger then purchased a shotgun in July of 2020 to insure their safety and lives. He received safety training with the shotgun and firearms generally from a retired State Trooper who previously commanded the Delaware State Police firearms range and who trained State Troopers in gun safety. Neuberger considered purchasing a handgun at that time and discussed it with the State Trooper who provided him with recommendations for his self-defense Based on these recommendations, Neuberger decided that the Sig Sauer P365 is the best option for him and intends to purchase one when prices are discounted for Black Friday on November 28, 2025.

24.    Because of the 2020 riots and recent nationwide protests and threats against the American Jewish community in colleges and universities, and even other spreading locations, he fears renewed rioting can erupt at any time in the foreseeable near future in Delaware near his residence. There have been at least two recent protests over policies towards Israel along Center Road where he travels. If his vehicle is trapped because Center Road has been closed and the protests turn violent

152,368,335

he would need a handgun to protect himself. Carrying a shotgun in his VW beetle vehicle for self-defense is impracticable since the vehicle is too small to carry a shotgun for self-defense.

26.    Neuberger fears rioting similar to May of 2020 will again break out in Wilmington or elsewhere in light of the heated nature of today's political climate. Since the Wilmington police and police in other jurisdictions stood down in the face of violent rioting in May of 2020, he reasonably expects that could happen here in Delaware and he would need a handgun to protect himself traveling in his vehicle or at home.

26.    Neuberger also reasonably fears other terrorist attacks on the United States akin to 9/11 in New York City. What better place for an attack on innocent civilians than near the former U.S. President's home where Neuberger lives. Because of the impact of wars and the threats of war in the Middle East, Neuberger believes that as the imminence of such a possible attack increases he will need a handgun imminently for self-protection.

27.    Neuberger intends to imminently purchase a handgun restricted by SS 1 for SB 2's permit requirement. He intends to imminently secure a handgun by any means possible to protect himself and his wife and reasonably fears suffering a several months' delay in securing the permission of the State to purchase a handgun for self-defense.

152,368,335

28.    He believes a handgun would be more useful than a shotgun in the defense of his home or his vehicle if rioters turn violent or in case of a terrorist attack. He fears the new legislation will prevent him from buying the handgun he intends to imminently purchase, at a time when he is most in need to protect himself and his wife when they are at home or in his vehicle.

29.    Neuberger, in the past, has been threatened with physical harm due to his pro bono civil rights work. Today, with the social fabric unraveling in the country, his fears of violence are even greater. He remembers when Dr. Martin Luther King's family and home were first bombed in Alabama and Dr. King sought to obtain a handgun to protect his family. But Alabama had a handgun permit law then and the Governor refused him a permit for a handgun.

30.    Neuberger needs a handgun to protect himself and his wife—and does not have the time to go through a lengthy and arduous 11-point process to timely get that handgun and await the subjective and discretionary approval from a government official to obtain that handgun. Indeed, he has made a career of suing elected and appointed officials at the state and local levels, and it is reasonable for him to expect delay if not outright hostility to any handgun permit application filed by him. He has sued the State actors who are defendants herein probably a dozen or more times.

152,368,335

31.    As a practicing civil rights attorney, Neuberger cannot risk criminal charges being filed against him either, as that would impact his ability to practice law and those underserved individuals he seeks to represent.

32.    Jerry L. Martin is the President of the Bridgeville Rifle and Pistol Club, Ltd. Additionally, he is a member of the Delaware State Sportsmen's Association.

33. Martin competes in Cowboy Action, a competitive shooting sport. He regularly purchases and collects firearms and will continue that practice in the future.

34.  Martin intends to  purchase a handgun restricted by SS 1 for SB 2's permit requirement. Specifically, he intends to purchase a Sig Sauer P365 on November 28, 2025, when he expects the price to most favorable. *See Lujan v. Defenders of Wildlife*, 505 U.S. 555, 564 (1992) (a "description of concrete plans" satisfies the imminency requirement for standing). At that time, SS 1 for SB 2 will necessarily be                                                                implemented. *See* https://legis.delaware.gov/json/BillDetail/GenerateHtmlDocumentEngrossment?engrossmentId=25791&docTypeId=6 (stating that SS 1 for SB 2 shall "be implemented" no later than "Eighteen months from the date of the Act's enactment," but it may be implemented earlier if "the necessary processes have been established for implementation.").

35. Martin needs a handgun and does not have the time to go through a lengthy and arduous 11-point process to timely get that handgun and await the entirely

subjective and discretionary approval from a government official to obtain that handgun.

36.    William R. Hague, Jr., is an 18-year-old Delawarean.

37.  Hague intends to  purchase a handgun restricted by SS 1 for SB 2 as soon as he can do so lawfully. However, as an 18-year-old, Hague is not eligible for a permit under SS 1 for SB 2 and will not be able to purchase a handgun in Delaware until he reaches 21, on May 15, 2027.

38. By that time, SS 1 for SB 2's Permit to Purchase requirement will necessarily                                be                             implemented. *See* https://legis.delaware.gov/json/BillDetail/GenerateHtmlDocumentEngrossment?engrossmentId=25791&docTypeId=6 (stating that SS 1 for SB 2 shall "be implemented" no later than "Eighteen months from the date of the Act's enactment," but it may be implemented earlier if "the necessary processes have been established for implementation.")

39. Notably, not later than a date-certain, this year, SS1 for SB2 will be implemented, based on the terms of the legislation quoted above.

40. Hague is a member of Bridgeville Rifle and Pistol Club, Ltd. and the Delaware State Sportsmen's Association.

41.    The Delaware State Sportsmen's Association (DSSA) was founded in 1968 as the official state-level affiliate of the National Rifle Association of America,

152,368,335

13

and its membership currently consists of approximately 4,500 individual members and constituent clubs.

42.    Bridgeville Rifle and Pistol Club, Ltd (BRPC) was formed in the early 1950's by a group of veterans returning from World War II and the Korean Conflict for the purpose of establishing and providing a venue where its members and their guests might lawfully and safely exercise their right to keep and bear arms for lawful purposes. BRPC membership currently stands at approximately 1,600 individual members and their families. BRPC serves as a competitive shooting club that conducts education, training, and competitive shooting events drawing competitors and participants from throughout the United States.

DSSA and BRPC[8] are organizations whose members will be subjected to the Permit-to-Purchase requirement. "An association has standing to bring suit on behalf of its members when its members would otherwise have

_____

[8] DSSA and BRPC, along with undersigned lead counsel have successfully vindicated their members' and similarly situated Delawareans' right to keep and bear arms in all four final decisions challenging the governmental attempts in Delaware to restrict those rights. *See Doe v. Wilmington Housing Authority*, 88 A.3d 654 (Del. 2014); *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 642 (Del. 2017); *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1269 (Del. Super. 2018); *Del. State Sportsmen's Ass'n v. Garvin,* 2020 Del. Super. LEXIS 2927 (Del. Super. 2020).Standing was not defeated in any of those challenges. In fact, DSSA and BRPC have prevailed when the final appeals were decided on the merits, or the state did not appeal a win, in every Delaware challenge they have made based on the right to keep and bear arms—and in none of those cases was standing of DSSA or BRPC successfully challenged.

152,368,335

standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). The individual members of DSSA and BRPC would have standing to bring suit in their own right as individuals who desire to purchase common arms subjected to SS 1 for SB 2, challenging SS 1 for SB 2 is germane to DSSA and BRPC's respective purposes of promoting the safe and lawful exercise of their members' rights to use common arms, including the handguns subjected to SS 1 for SB 2.

43. Organizational plaintiffs must "identify members who have suffered requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Here, Neuberger, Martin, and Hague are all members of DSSA and BRPC and subject to the requirements of SS 1 for SB 2. Other members of DSSA and BRPC have many of the same fears as Neuberger, Martin, and Hague, and are subjected to the same lengthy, arduous and arbitrary 11-point process and the entirely subjective and discretionary approval of a government official required[9] to purchase and possess a

---

[9] §1448(f)(3) provides the following discretionary and ambiguous standard: "…the Director may not issue a handgun qualified purchaser permit to…a person who poses

handgun—the "quintessential self-defense weapon." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008). SS 1 for SB 2 leaves these members vulnerable to attack without the ability to defend themselves and their families.

44. Moreover, Plaintiffs, as firearms purchasers subject to SS 1 for SB 2's requirements, are "object[s] of the action" of the law, in which case "there is ordinarily little question that the action or inaction has caused him injury." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 362 (3d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 61–62 (1992)).

45. All of the plaintiffs—Neuberger, Martin, Hague, and members of DSSA and BRPC—have concrete plans to purchase a handgun covered by SS 1 for SB 2's permit requirement.

46. But, SS 1 for SB 2 vests unbridled discretion in the Director to deny their permit application and, thus, denies them their fundamental rights codified by the Second Amendment. *See Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750 (1988) (citing cases establishing "that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license.")

---

a danger of causing physical injury to self or others by owning, purchasing or possessing firearms."

152,368,335

47. Plaintiffs will be subjected to criminal liability under SS 1 for SB 2 because they intend to imminently purchase a handgun covered by SS 1 for SB 2. SS 1 for SB 2 leaves Plaintiffs with a Hobson's choice—(1) subject themselves to a lengthy and arduous 11-point process and the unbridled discretion of the Director in order to exercise their fundamental Second Amendment rights and apply for a permit; (2) decline to purchase a permit-less handgun out of fear of prosecution, *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S.118, 128-29, (2007) (Where threatened action by *government* is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction."); or (3) attempt to purchase a handgun without applying for a permit and subject themselves to prosecution. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)(plaintiff can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder); *Lozano v. City of Hazleton*, 620 F.3d 170, 185 (3d Cir. 2010) (standing existed where plaintiffs were "direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to

152,368,335

do"), *vacated on other grounds*, 563 U.S. 1030 (2011); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (rejecting the government's argument that "no harm is imminent because no prosecution is pending").

48. The State has indicated its intention to implement and enforce SS 1 for SB 2. Funding for the permitting scheme has already begun, indicating that the State is actively working on implementing the necessary processes. *See*, House Bill 100 (January 10, 2025) and House Bill 101 (January 7, 2025)(allocating nearly $5,000,000 for FY 2005 to implement SS1 for SB 2). And Governor Carney has made clear that the intent of the law is to "prevent [people] from picking up a gun in the first place." Esteban Parra, *Delaware governor signs 'permit to purchase' gun bill into law*, Delaware Online (May 16, 2024, 3:38 PM),

https://www.delawareonline.com/story/news/2024/05/16/permit-to-purchase-gun-law-delaware-john-carney-legal-challenge/73713390007/.

49. Defendant Nathanial McQueen, Jr., is the Cabinet Secretary of the Delaware Department of Safety and Homeland Security. This suit is brought against Defendant McQueen in his official capacity as Cabinet Secretary. In such capacity, Defendant McQueen oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including the Permit-to-Purchase requirement. Defendant McQueen's enforcement of the Permit-to-Purchase's ban on purchase or possession without a handgun Permit-to-Purchase

152,368,335

license places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Permit-to-Purchase, which leaves them unable to keep constitutionally protected handguns.

50.    Defendant Col. William Crotty is the Superintendent of the Delaware State Police. This suit is brought against Defendant Crotty in his official capacity as Superintendent of the Delaware State Police. In such capacity, Defendant Crotty executes and administers the State's laws, including the Permit-to-Purchase. Defendant Crotty's enforcement of the Permit-to-Purchase's ban on purchase or possession without a handgun Permit-to-Purchase license places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Permit-to-Purchase, which leaves them unable to keep constitutionally protected handguns.

51.    Defendants' enactment and enforcement of the provisions at issue in SS 1 for SB 2 inflict harm upon DSSA, BRPC and individual plaintiffs, law-abiding citizens wishing to exercise the right to purchase a handgun for self-defense, by unlawfully restricting their fundamental right to keep and bear arms in common use for lawful purposes, as guaranteed by the Second and Fourteenth Amendments to the United States Constitution.

152,368,335

19

## FACTUAL ALLEGATIONS

### I.    DELAWARE'S UNCONSTITUTIONAL SS 1 FOR SB 2

52.    SS 1 for SB 2 amended the prior version of 11 *Del. C.* § 1448A and B, and added a new § 1448D entitled: "Handgun qualified purchaser permit required to purchase handguns." Among the added definitions was a new definition of handgun, which now states: "(2) 'Handgun' means a pistol, revolver, or other firearm designed to be readily capable of being fired when held in 1 hand." All applications must also be processed through one person called the Director: "(1) 'Director' means the Director of the State Bureau of Identification." §1448D(a)(1)

53.    All individuals, excluding those who hold a valid concealed carry deadly weapons (CCDW) license are required to submit an application for a handgun license. *See* §§ (b)(2) and (c)(2).

54.    All applications will require approval of one person, the Director of the State Bureau of Identification ("the Director"), giving an unelected agent of the state government discretion over approval and denial of permits,[10] and discretionary power over revocation of previously issued permits to purchase handguns. § 1448D(h)(i) ("If the Director determines that a person does not qualify under

---

[10] Generally, a statute or ordinance vesting discretion in administrative officials without fixing any adequate standards for their guidance is an unconstitutional delegation of legislative power. *Hindt v. State*, 421 A.2d 1325, 1331 (Del. 1980) (citing *State v. Durham*, 191 A.2d 646, 649 (1963)).

152,368,335

subsection (b) of this subsection for a handgun qualified purchaser permit, the Director shall deny the application and notify the person in writing…).

55.    SS 1 for SB 2, therefore, gives an agent of the government discretion over who to approve and deny for a permit to purchase handguns.

56.    The Director at his or her sole discretion, is empowered to deny a permit to any person who  "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." § (f)(3).

57.    The Director may also revoke a permit, "at any time," on his or her finding that a person possessing a permit "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." §§ (f)(3); (*l*)(1).

58.    If the Director revokes a license, the State Police and/or local law enforcement—based on that fact alone—have purported "probable cause" to remove the firearms from the individual's "custody, possession, or control," which is an unconstitutional search and seizure, and a perversion of the term probable cause. *See* § 1448D (k)(3).

59.    Further, during the floor debate in the Delaware House of Representatives for SS 1 for SB 2, on March 7, 2024, Defendant, Secretary Nathaniel McQueen, stated upon revocation of a permit, "all weapons in the home are to be removed." That is, he intends to confiscate even those firearms not purchased with the Permit-to-Purchase license.

152,368,335

60.    The permit requirement also includes an exhaustive list of information an applicant must provide, including race, ethnicity, national origin, and a physical description including distinguishing characteristics. § (d)(1). Another requirement is that a person must be at least 21 years of age[11] to be granted a permit, which is unconstitutional on its face.[12]

61.    Not only is the amount of information the applicant must provide onerous, but they also must attend a certified "firearms training course" with 11 different parts—one part more than the course required to obtain a CCDW permit in the State of Delaware. Another requirement is to fire at least 100 rounds of ammunition. The individual must also submit to fingerprinting and undergo a state and national background check. All of this at the applicant's expense. Moreover, the state may delay another 30 days to approve or deny the application before a person

---

[11] "(f) Except as otherwise provided under this chapter, the Director may not issue a handgun qualified purchaser permit to any of the following: (1) A person under the age of 21" § (f)(1).

[12] This issue of banning firearm purchases by those 18-to-20-years-old is also being litigated in Federal Court at: *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. 22-1624-RGA (First Amended Complaint filed Oct. 18, 2023), and in state court at *Birney v. Delaware Department of Safety and Homeland Security*, C.A. K23C-07-019 RLG (First Amended Complaint filed Oct. 18, 2023).

152,368,335

is able to exercise an enshrined right in the U.S. Constitution.[13] *See* §§ 1441;

1448D(f)(4)(a)-(k).

62.   SS 1 for SB 2 does not explain where the firearm used in these courses

will come from if the applicants cannot purchase a handgun. The State appears to

have overlooked that applicants would need to possess a handgun in order to

complete the training courses SS 1 for SB 2 mandates in order to possess and own a

handgun.

63.   Further, the final form of SS 1 for SB 2 that was enacted into law

removed a firearms training course voucher program—in effect, leaving those

without the financial means to pay for the required training without a way to

purchase a handgun for self-defense. Omission of a voucher program is one of

several ways the State discriminates against economically disadvantaged

Delawareans through SS 1 for SB 2.

64.   Section 5 of the Permit-to-Purchase bill also leaves uncertainty as to

when it will be fully implemented, either "18 months from the date of the Act's

enactment," or "[t]he date of publication in the Register of Regulation of a notice by

the Director of the State Bureau of Investigation that necessary processes have been

established for implementation[.]" § 1448B (b)(5)(1)-(2). Therefore, uncertain

---

[13] SS 1 for SB 2 also requires that a "NICS" check be run by the State. This is duplicative because everyone purchasing a handgun already must undergo a NICS check initiated by the federal firearms licensee (FFL) under federal law.

152,368,335

timing of its implementation leaves the public at the mercy of the Director yet again.[14]

## II.    PRE-*BRUEN* PRECEDENT

65.    In *McDonald*, 561 U.S. at 750, 791, the U.S. Supreme Court confirmed that the rights protected by the Second Amendment are "among those fundamental rights necessary to our system of ordered liberty," and held that the Second Amendment is incorporated as applicable to the states through the Fourteenth Amendment.

66.    The *Heller* Court recognized that the handgun is "the quintessential self-defense weapon" in the United States, and that a ban on handgun possession violated the Second Amendment. *See Heller*, 554 U.S. at 627, 629 (citing, *e.g.*, *Nunn v. State*, 1 Ga. 243, 251 (1846)).

## III.    HANDGUNS ARE PROTECTED ARMS

### A.    The *Bruen* Standard

67.    *Bruen* first requires an answer to the question: whether SS 1 for SB 2 regulates conduct protected by the Second Amendment's plain text. *Bruen*, 597 U.S. at 17.

---

[14] *See* Exhibit "B" (Most of the funding to implement SS 1 for SB 2 has already been authorized).

152,368,335

68.    The Second Amendment extends to "all instruments that constitute bearable arms," *id.* at 28, i.e., "anything that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581.

69.    *Heller* and *Bruen* establish that the Second Amendment protects possessing and carrying handguns. *Bruen*, 597 U.S. at 32-33 ("[W]e remarked in *Heller* that the need for armed self-defense is perhaps "most acute" in the home […] we did not suggest that the need was insignificant elsewhere.") The exception to this fundamental right is to arms that are both "dangerous and unusual," but if an arm is "in common use" then it is, by definition, not dangerous *and* unusual. *See Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016)(Alito, J. concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual.").

70.    *Heller* and *Bruen* held that handguns were in "common use" and protected by the Second Amendment. *Heller*, 554 U.S. at 628; *Bruen*, 597 U.S. at 10.

71. Further, the right to "keep and bear arms" protected by the Second Amendment "surely implies the right to purchase them." *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 23-20033, Slip Op. at 9 (5th Cir. January 30, 2025) (citing *Luis v. United States*, 570 U.S. 5, 26 (2016) ("Constitutional rights…implicitly protect those closely related acts necessary to their exercise.");

(*Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." (quoting *Ezell v. City of Chicago*, 651 F. 3d 684, 704 (7th Cir. 2011)); Antonin Scalia & Bryan A. Garner, *Reading Law; The Interpretation of Legal Texts* 96 (2012)) (When "a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act.")

72.    If the conduct at issue is presumptively protected by the Second Amendment's text, as it is with SS 1 for SB 2, the State has the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 23.

73. The State must "identify a well-established and representative historical analogue" to its regulation. *Id*. at 30. This feat is not possible for the State to accomplish in this case.

74. The Supreme Court has demonstrated that this historical analysis and review of prospective analogues should focus on the time of the Second Amendment's ratification, warning that "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 36; *see also United States v. Rahimi*, 602 U.S. ___, *78 (2024)(Barrett, J., concurring) ("evidence of 'tradition' unmoored from original meaning is not binding law.")

152,368,335

26

68.    *Bruen*, therefore, made the "general [] assum[ption] that the scope of the protection applicable to the Federal Government and States is pegged to…1791." *Id*. at 37; *see also id*. at 82-83 (Barrett, J., concurring) ("1791 is the benchmark" because "Reconstruction-era history" alone is "simply too late (in addition to too little)," and rejecting "freewheeling reliance on historical practice from the mid-to-late 19th century…"). The Supreme Court recently reinforced this in *Rahimi*, 602 U.S. ___ at *16 (citing *Bruen*, 597 U.S. at 29 & n.7), stating that, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit 'apply[ing] faithfully the balance struck by ***the founding generation*** to modern circumstances.'" (emphasis added); *see also id*. at 17 ("For example, if laws at ***the founding*** regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar

152,368,335

restrictions for similar reasons fall within a permissible category of regulations.")[15] (emphasis added).[16]

69.    *Bruen* examined New York's proper cause requirement for obtaining a carry permit, which "concern[ed] the same alleged societal problem addressed in *Heller:* handgun violence, primarily in urban area[s]." *Bruen,* 597 U.S. 1 at 27 (quotation omitted). In striking down New York's proper cause requirement, the Supreme Court deemed it controlling that the law lacked an analogue from "before, during, and even after the founding[.]" *Id.*

### B.    SS1 for SB 1 Facially and As-Applied, Violates the *Bruen* Standard

70.    The firearms at issue in this case, handguns, unquestionably fall within the scope of the Second Amendment, as the Supreme Court in *Heller* held that handguns are the most popular weapon chosen by Americans for self-defense. 554

---

[15] *Rahimi*, 602 U.S. ___ at *22, *25, also draws its analogues almost exclusively from the founding era, citing K. Ryan, "The Spirit of Contradiction": Wife Abuse in New England, 1780-1820, 13 Early American Studies 586, 602 (2015); 1795 Mass Acts Ch.2, in Acts and Resolves of Massachusetts, 1794-1795; 1786 Va. Acts ch. 21; 2 Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, pp. 652-653 (1807); Acts and Laws of His Majesty's Province of New-Hampshire in New England 2 (1761); Collection of All of the Public Acts of Assembly of the Province of North-Carolina: Now in Force and Use 131 (1751)(1741 statute).

[16] The Third Circuit followed suit in *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th ___, ___ (3d Cir. 2025), a case decided recently after the Supreme Court remanded for further consideration in light of *Rahimi*, but did not reverse.

U.S. at 629. In *Heller,* the District of Columbia law at issue "addressed a perceived societal problem—firearm violence in densely populated communities"—by imposing a licensing regime with the result of effectively banning handgun possession in the home. *Bruen,* 597 U.S. at 27.

71.    In evaluating the licensing regime challenged in *Heller*, the Supreme Court stated, "the Founders themselves could have adopted [a similar law] to confront that problem," but they did not. *Id.* When striking down the handgun ban in *Heller*, the Supreme Court found it dispositive that no "Founding-era historical precedent" banned handgun possession in the home. *Id.* (citations omitted).

72.    In this case, there is also no historical regulation relevantly similar to the Permit-to-Purchase requirement. At the time of the Founding, the preferred means of addressing the threat of violence was to require law-abiding individuals to be armed. States "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." *See* David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine,* 13 CHARLESTON L. REV. 205, 232 (2018) (cited with approval in *Bruen,* 597 U.S. at 30). However, "[u]ntil the early twentieth century, there were no laws that required that individuals receive government permission before purchasing or borrowing a

firearm." David Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy* ("Kopel"), 53 HARV. J. ON LEGIS. 303, 336 (2016).[17]

### C. SS 1 for SB 1's Provision for the Denial of a Permit on the Basis of the Director's Sole Determination that an Applicant Poses a Danger of Causing Physical Injury to Self or Others Violates the Second Amendment

73.    SS1 for SB 1 also permits the Director, at his or her sole discretion, to deny a permit to any person who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." § (f)(3).

74.    The Director may also revoke a permit, "at any time," on his or her discretionary finding that a person possessing a permit "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." §§ (f)(3); (*l*)(1).

75.    In *Rahimi*, the Supreme Court upheld a challenge to 18 U.S.C. 922(g)(8), a materially different law that prohibits an individual subject to a domestic violence restraining order, issued by a court, from possessing a firearm if

---

[17] The *Bruen* Court refused to recognize for this analysis laws that were "late-in-time" for establishing a Second Amendment historical analogue. 597 U.S. at 66 n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici."). *Bruen* also instructed that "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen,* 597 U.S. at 36.

152,368,335

that order includes a finding that he represents a credible threat to the physical safety of an intimate partner, or a child. *Rahimi*, 602 U.S.\_\_\_\_ at *1.

76.    But the Supreme Court made the limitations of its holding clear, emphasizing that, "we conclude only this: An individual found ***by a court*** to pose a credible threat to the physical safety of another may be ***temporarily*** disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. \_\_\_ at *30 (emphasis added).

77.    The Supreme Court, therefore, sharply distinguished laws that limit individuals ***found by a court*** to be dangerous, from those, like SS 1 for SB 2, that apply to the public generally, and do so arbitrarily. *Id.* at 26 ("Section 922(g)(8) restricts gun use to mitigate *demonstrated* threats of physical violence, just as the surety and going armed laws do. Unlike the regulation struck down in *Bruen*, Section 922(g)(8) does not broadly restrict arms use by the public generally.")(emphasis added).

78.    In addition to basing its decision on the pre-existence of a court order, *Rahimi* rejected the notion that a person "may be disarmed simply because he is not 'responsible,'" further rejecting broad disarmament of the public on the basis of vague and arbitrary determinations of bureaucrats like the Director. *Id.* at *29-*30 ("'Responsible' is a vague term," "[i]t is unclear what such a rule would entail," and

152,368,335

such a standard does not "derive from our case law," which "said nothing about the status of citizens who were not 'responsible.'")

79.    Likewise, *Bruen* rejected the idea that a person could be disarmed because of "a perceived lack of …suitability." *Bruen* at 13; *see also id*. at 14-15 (identifying impermissible "may issue" regimes by the requirement that applicants "demonstrate[] cause or suitability").

80.    SS 1 for SB 2 has no objective criteria for a determination, by a court, of "a credible threat" present in the *Rahimi* matter or a court order containing a finding that Mr. Rahimi had committed "family violence," that was "likely to occur again," and that Mr. Rahimi posed "a credible threat" to the "physical safety" of his girlfriend and young child. 602 U.S. ___ at *9.

81.    Rather, SS1 for SB 2 merely impermissibly cloaks a vague "may issue" and "suitability" styled statute in the discretion of the Director.

82.    The Permit-to-Purchase legislation challenged in this case, with its discretionary and subjective criteria vested with the Director, is consistent with the history of the repugnant racist licensing laws which *Bruen* refused to consider as relevant. *Bruen*, 597 U.S. at 62.

83.    This history of licensing laws for possession of firearms (not just carrying) aligns with the ugly racist history of gun-control laws in general, especially in the 1800s. Delaware law was no exception. *See* 8 LAWS OF THE STATE OF

152,368,335

DELAWARE 208 (1841). (Delaware charged "twenty-five cents" for "licenses to negroes to keep a gun." 9 LAWS OF THE STATE OF DELAWARE 430 (1843)).[18]

84.    It is no coincidence that other firearm licensing statutes with provisions that were either vague and/or targeted at certain minority groups arose in the period around emancipation. *See Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857) (Chief Justice Roger Taney offensively lamenting that were the slaves freed, it "would give to persons of the negro race" the right "to keep and carry arms wherever they went.")

85.    Similarly, in a shameful period of history, states began to restrict the carrying of firearms, with laws generally "passed for the purpose of disarming the negro [and were] never intended to be applied to the white population…generally conceded to be in contravention to the Constitution and non-enforceable if contested." *Watson v. Stone*, 4 So. 2d 700, 703 (Fla. 1941); *see also State ex rel. Russo v. Parker*, 57 Fla. 170 (1909).

86.    As Justice Kavanaugh explained in *Rahimi*, laws with origins in racism are contrary to the Fourteenth Amendment, which sought to "reject the Nation's history of racial discrimination, not backdoor incorporate racially discriminatory and

---

[18] A few outlier states, such as Oregon and New York, passed laws in the twentieth century requiring a license to purchase pistols or revolvers for the documented purpose of preventing what they viewed as "dangerous classes" such as "freed Blacks" or Italian immigrants from possessing firearms. Robert J. Cottrol & Brannon P. Denning, *To Trust the People with Arms: The Supreme Court and the Second Amendment*, at 57-58 (University Press of Kansas 2023).

152,368,335

oppressive historical practices and laws into the Constitution." *Rahimi* at 59 (Kavanaugh, J., concurring).

87.    Delaware's SS 1 for SB 2 facially violates the Second Amendment and is unconstitutional in its placement of the discretionary power to grant or deny a permit with an unelected bureaucrat, the Director, based upon discretionary and vague criteria.

88.    The conduct SS 1 for SB 2 regulates is protected by the Second Amendment and Defendants cannot establish that the law is consistent with either the Nation's or Delaware's history and tradition of firearms regulation. There is no historical support for a permit-to-purchase.[19]

---

[19] Many other parts of SS 1 for SB 2 have no justification based on the Nation's historical tradition. For instance, there is no historical tradition of requiring a training course merely to possess a handgun in any of the States. *See* George H. Ryden, DELAWARE–THE FIRST STATE IN THE UNION  117 (1938) (1741 Delaware law requiring that "every Freeholder and taxable Person" possess "[o]ne well-fixed Musket or Firelock."); 3 PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636–1667, at 345 (1965 Reprint) (A law requiring all people able to carry firearms to carry a firearm); 5 LAWS OF NEW HAMPSHIRE: FIRST CONSTITUTIONAL PERIOD, 1784–1792, at 178– 179 (1916) (An act requiring all able bodied men from 16-40 to be prepared with a firearm for military service); 1 Hening, THE STATUTES AT LARGE, at 127 (A 1623 law requiring arms to travel); 6 1 AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 210–11 (Jon Wakelyn ed., 2006) (Concessions and Agreements, Jan. 11, 1664).

152,368,335

### D.    Untangling the "May Issue" and "Shall Issue" Distinction in the Context of SS 1 for SB 2

89.    Some outlier states defending permitting schemes across the nation have clung to dicta in *Bruen* on the issue of so-called "shall issue" vs. "may issue" permitting schemes.

90.    Painting with an overly broad brush, those rogue states wrongly suggest that *Bruen* supports the notion that simply prefacing any permitting scheme with the phrase "shall issue" immunizes that scheme (and its requirements, whatever they may be) from a Second Amendment challenge. This suggestion draws too much from too little.

91.    First, the context of this dicta in *Bruen* must be considered. In *Bruen*, the Supreme Court examined New York's proper cause requirement for obtaining a carry permit. Under the  challenged statute, a New Yorker who sought to carry a firearm outside their home or place of business for self-defense, was required obtain an unrestricted license to "have and carry" a concealed "pistol or revolver." To secure that license, the applicant was required to prove that "proper cause exists" to issue it. *Id*. at 15.

92.    For purposes of drawing a distinction between New York's particularly oppressive public carry statute and that of many other states, the Supreme Court broadly characterized the New York law as one of a few outlier states with permit

statutes, while broadly characterizing 43 other states as having "shall issue" permit statutes. *Id*. at 17.

93.    The premise of this distinction was that the text of the "may issue" statutes granted authorities "discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id*. at 14-15.

94.    The Supreme Court made this distinction for purposes of demonstrating that either facially, and/or in practice, the New York statute in question represented a relative outlier statute, among the states, as to public carry. *Id*. at 101 (Kavanaugh, J., concurring) ("Applying that test, the Court correctly holds that New York's outlier "may-issue" licensing regime for carrying handguns for self-defense violates the Second Amendment."); *id*. at 102 ("New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials . . ..")

95.    Those 43 statutes broadly categorized as "shall issue" in *Bruen* were not subject to the *Bruen* test because those statutes were not before the Supreme Court in that matter.

96.    The Supreme Court, in fact, cursorily acknowledged that the 43 statutes were not, themselves, identical to each other. Many were categorized as "shall issue" on the basis that the Supreme Court believed that the language of their statute

demonstrated "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id*. at 17.

97.    However, a smaller sub-set, including Delaware's, were categorized as "shall issue," not by the language of the statute itself but by how the Supreme Court perceived they operated in practice in those states. *Id*. at 17, n.1 ("Three States—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like "shall issue" jurisdictions. *See* Conn. Gen. Stat. §29-28(b) (2021); Del. Code, Tit. 11, §1441 (2022); R. I. Gen. Laws §11-47-11 (2002).")

98.    *Bruen*, therefore, did not rule on the constitutionality of the 43 statutes broadly categorized as "shall issue." Rather, it required that licensing processes, in the context of public carry, use "narrow, ***objective***, and definite" standards, while flatly prohibiting the "appraisal of facts, the exercise of judgment and the formation of an opinion." *Id*. at 38 n.9 (emphasis added).

99.    *Bruen* simply contrasted the features of New York's licensing scheme—which did prevent most people from "exercising their Second Amendment right to public carry"—with other regimes, not at issue, which did "not necessarily prevent" the same because they "appear[ed] to contain" certain features. *Id*.

100.    Any suggestion that the Supreme Court endorsed the constitutionality of those 43 public carry statutes broadly characterized as "shall issue" is false.[20] Further, SS 1 for SB 2 requires a permit for purchase and ownership of a handgun rather than for purposes of public carry, the use addressed by those 43 statutes.

101.    The Supreme Court then more directly addressed the necessity of objective, non-discretionary criteria for denying fundamental Second Amendment rights in *Rahimi*.[21]

102.    The restraining order in *Rahimi*, included a finding by a court that Mr. Rahimi had committed "family violence," that was "likely to occur again," and that Mr. Rahimi posed "a credible threat" to the "physical safety" of his girlfriend and young child. *Id*. at *9.

103.    Mr. Rahimi was given an opportunity to contest the testimony his girlfriend provided in support of the order and did not do so. *Id*.

---

[20] *Bruen*, 597 U.S. 1 at 13-*14 (making clear that New York's "proper cause," "may issue" outlier regime was what was before the Court for determination in the matter).
[21] Notably, in *Bruen*, the vast majority of the "43…'shall-issue' licensing regimes" the Court identified do not condition public carry on issuance of a license, with many either being "constitutional carry" jurisdictions, or allowing unlicensed open carry. *Id*. They were not permit-to-purchase schemes. Thus, the constitutionality of these entirely voluntary licensing regimes say nothing about the constitutionality of a licensing scheme encompassing (1) ownership of common arms; (2) which citizens must comply with in order to purchase or possess common arms. *See, e.g*., www.usconcealedcarry.com/blog/constitutional-carry-in-states (29 states now have a state constitutional provision that allows for carrying a firearm without a license.).
152,368,335

104.    In upholding 18 U.S.C. 922(g)(8) in the face of Mr. Rahimi's challenge, the Supreme Court made a discreet ruling: "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at *30.

105.    Contrast the context and substance of the *Rahimi* holding[22] with how the State of Delaware seeks to disarm its citizens through permit denial. SS 1 for SB

---

[22] *Bruen*'s "shall-issue" vs. "may-issue" dicta in the public carry context (which did not refer to a permit-to-purchase scheme), is notable to the extent that the statutes referenced in that dicta contained language defining what objectively constituted a "danger" that is entirely absent from SS 1 for SB 2: Mo. Rev. Stat. § 571.101 (2016) ("[a] concealed carry permit . . . shall be issued . . . if the applicant . . . [h]as not engaged in a pattern of behavior, documented in public or closed records, that causes the sheriff to have a reasonable belie*f* that the applicant presents a danger to himself or others.")  Mont. Code Ann. § 45-8-321 (2021)(a sheriff "may deny an applicant a permit to carry a concealed weapon if the sheriff has reasonable cause to believe that the applicant is mentally ill, mentally disordered, or mentally disabled or otherwise may be a threat to the peace and good order of the community to the extent that the applicant should not be allowed to carry a concealed weapon."); N. D. Cent. Code Ann. § 62.1-04-03 (Supp. 2021) (The bureau of criminal investigation, which grants concealed carry permits, "may deny approval for a license if the bureau has reasonable cause to believe that the applicant . . . has been or is a danger to self or others as demonstrated by evidence, including past pattern of behavior involving unlawful violence or threats of unlawful violence; past participation in incidents involving unlawful violence or threats of unlawful violence; or conviction of a weapons offense.") Wyo. Stat. Ann. § 6-8-104 (2021)(the state shall deny a permit "upon reasonable grounds for denial" which include "facts known to the sheriff which establish reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state, as demonstrated by a past pattern or practice of behavior, or participation in incidents involving a controlled substance, alcohol abuse, violence or threats of violence as these incidents relate to criteria listed in this section.")

152,368,335

2 requires only that the Director at his or her sole discretion, determine that a person who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," to deny a permit and disarm that person. § (f)(3).

106.    The vague, discretionary standard in SS 1 for SB 2 bears no resemblance to the court-ordered restriction involved in *Rahimi's* discreet holding. Rather, it bears similarity to what *Rahimi* rejected—the Government's argument that Mr. Rahimi could be disarmed "simply because he is not 'responsible.'" *Rahimi*, 602 U.S. ___ at *30. The Supreme Court found "responsible" to be an impermissibly vague term that represented a line that did not "derive from our case law." *Id*.

107.    Regardless of inapposite dicta, the fact remains that the Second Amendment's 'plain text' covers the regulated conduct in SS 1 for SB 2, and the government has only one way to defend the regulation—by proving that it is consistent with this Nation's historical tradition of firearm regulation. This they cannot do.

108.    The State will not be able to "affirmatively prove," based on "historical precedent," that an "enduring" and "comparable tradition of regulation" justifies SS 1 for SB 2. *Bruen*, 597 U.S. at 19, 27, 67.

109.    Therefore, SS 1 for SB 2 violates the Second Amendment and must be stricken.

152,368,335

40

110.   By its terms, SS1 for SB2 will be implemented no later than a date-certain this year.

## COUNT I

### Claim under 42 U.S.C. § 1983 for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution

111.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

112.   There is an actual and present controversy between the parties.

113.   The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens their fundamental right to keep and bear arms, both in the home and in public.

114.   The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

115.   The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, own, receive or possess common firearms for all lawful purposes, including self-defense.

116.   SS 1 for SB 2 impermissibly restricts the right to purchase a handgun for any lawful purpose, including self-defense, without first following a lengthy, arduous process that vests unconstitutional discretion in the hands of the Director as to whether a permit will be granted. This includes a ban on those 18-to-20-year-olds

152,368,335

41

from purchasing and owning "deadly weapons" that are common firearms. 11 *Del. C.* § 1448(a)(5).

117.  SS 1 for SB 2's permitting scheme further violates the Second Amendment of the United States Constitution because:

> (a)  it denies a constitutional right until a permit to exercise that right is issued;
>
> (b)  the permitting process, both on the face of the statute and as applied, is unconstitutionally burdensome, vague and arbitrary;
>
> (c)  the permitting process, both on the face of the statute and as applied, was designed to deny constitutional rights and make it more burdensome to exercise them, especially those of limited economic means.

118.  42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

119.  Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of their fundamental Second and Fourteenth Amendment rights in the State of Delaware, including Plaintiffs, Thomas Neuberger, Jerry Martin; William R. Hague, Jr.; DSSA and its members, and BRPC and its members, through Defendants' enforcement and implementation of SS 1 for SB 2.

152,368,335

120.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Second Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## COUNT II

### Claim under 42 U.S.C. § 1983 for Deprivation of Plaintiffs' Rights Under the Fourth Amendment

121.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

122.   There is an actual and present controversy between the parties.

123.   The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

124.   The very core of the Fourth Amendment's guarantee is the right of a person to retreat into his or her home and "there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (quoting *Florida v. Jardines*, 569 U. S. 1, 6 (2013)).

125.   Facial challenges under the Fourth Amendment are not categorically barred or especially disfavored. *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015).

152,368,335

126.   The Supreme Court has, on numerous occasions, declared statutes facially invalid under the Fourth Amendment. *See, e.g. Chandler v. Miller*, 520 U.S. 305, 308-309 (1997)(striking down a Georgia statute requiring candidates for certain state offices to take and pass a drug test, concluding that this "requirement . . . [did] not fit within the closely guarded category of constitutionally permissible suspicionless searches"); *Ferguson v. Charleston*, 532 U.S. 67, 86 (2001) (holding that a hospital policy authorizing "nonconsensual, warrantless, and suspicionless searches" contravened the Fourth Amendment); *Payton v. New York*, 445 U.S. 573, 574, 576 (1980) (holding that a New York statute "authoriz[ing] police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest" was "not consistent with the Fourth Amendment"); *Torres v. Puerto Rico*, 442 U.S. 465, 466, 471 (1979) (holding that a Puerto Rico statute authorizing "police to search the luggage of any person arriving in Puerto Rico from the United States" was unconstitutional because it failed to require either probable cause or a warrant).

127.   While in a facial challenge a plaintiff must establish that a "law is unconstitutional in all of its applications," when the Court assesses whether a statute meets this standard, it considers "only applications of the statute in which it actually authorizes or prohibits conduct." *City of L.A. v. Patel*, 576 U.S. at 418. Such "[l]egislation is measured for consistency with the Constitution by its impact on

152,368,335

those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 894 (1992).

128.   Therefore, when addressing a facial challenge to a statute authorizing warrantless searches, "the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *City of L.A. v. Patel*, 576 U.S. at 418.

129.   The Supreme Court has repeatedly held that "'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 228 (2009) (quoting *Katz v. United States*, 389 U. S. 347, 357 (1967)). This rule "applies to commercial premises as well as to homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978).

130.   Search regimes where no warrant is ever required may be reasonable only where "'special needs . . . make the warrant and probable-cause requirement impracticable,'" *Skinner v. Railway Labor Executives Assn'n,* 489 U.S. 602, 619 (1989) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (some internal quotation marks omitted), and where the "primary purpose" of the searches is

152,368,335

"[d]istinguishable from the general interest in crime control," *Indianapolis v. Edmond,* 531 U.S. 32, 44 (2000).

131.    Further, in a case litigated and won by undersigned counsel against the State, the Delaware Superior Court struck down a law on Fourth Amendment grounds that allowed excessive and untethered search and seizure of firearms. *See Del. State Sportsmen's Ass'n v. Garvin,* 196 A.3d 1254, 1277 (Del. Super. 2018) ("A law enforcement officer with complete discretion to conduct searches 'impinges on ... [the] rights to be free from unreasonable searches under the Fourth Amendment.'"*)*(internal quotations omitted).SS 1 for SB 2's Permit-to-Purchase scheme has no analogue in the relevant historical tradition of firearms regulation in this Nation and, therefore, violates the Second Amendment. Moreover, SS 1 for SB 2's provisions for effecting the "surrender" and "removal" of firearms from Delawareans whose permits are revoked also violates the Fourth Amendment.

132.    SS 1 for SB 2 grants the Director of the State Bureau of Identification, an unelected bureaucrat, the power to revoke the permit of any Delawarean who, according to the sole discretion of the Director, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," and thus the Director would have the discretion to effect the "surrender" or "removal" of firearms from that Delawareans home without a warrant.

152,368,335

133.   Further, the comments on the House floor by Secretary McQueen indicate that such "surrender" and "removal" would apply to all guns in the home, not just those the State purports to remove pursuant to revocation of a permit.

134.   SS 1 for SB 2, therefore, authorizes, in all its relevant applications, the search and seizure of lawfully owned common arms outside the judicial process, without prior approval by a judge or a magistrate judge.

135.   SS 1 for SB 2 further authorizes this search and seizure of lawfully owned common arms without any pre-compliance review before a neutral judicial decisionmaker.

136.   SS 1 for SB 2's provision for the warrantless removal from the home of firearms based upon the subjective and nebulous "danger of causing physical injury" standard is a per se violation of the Fourth Amendment's protection against unreasonable search and seizure.

137.   A recent unanimous Supreme Court opinion in *Caniglia v. Strom*, 141 S. Ct. at 1600 (2021), is on all fours with this matter. There, the Supreme Court held that the warrantless removal of firearms from the home of a man who police determined to be "a risk to himself or others" was a violation of the Fourth Amendment.[23]

---

[23]   In *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1275 (Del. Super. 2018), a case that the State did not appeal to the Delaware Supreme Court, the Superior Court found a regulation unconstitutional under the Fourth Amendment,

138.    In *Caniglia*, the Supreme Court reinforced the principle that the "'very core'" of the Fourth Amendment's guarantee is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Caniglia*, 593 U.S. at 198 (quoting *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013)).

139.    SS 1 for SB 2 seeks to codify exactly what the United Supreme Court determined was a Fourth Amendment violation.

140.    All of the plaintiffs, Neuberger, Martin, Hague, and members of DSSA and BRPC have concrete plans to purchase a handgun covered by SS 1 for SB 2's permit requirement, and SS 1 for SB 2 vests unbridled discretion in the Director to deny their permit application and/or to revoke their permit and effectuate a warrantless search of their homes to confiscate their lawfully owned common arms.

141.    Plaintiffs will be subjected to enforcement of SS 1 for SB 2 because they have concrete plans to purchase a handgun covered by SS 1 for SB 2. Thus, SS 1 for SB 2 leaves Plaintiffs with a choice—(1) subject themselves to a lengthy and arduous 11-point process and the unbridled discretion of the Director to deny or revoke their permit and effectuate a warrantless search of their homes to confiscate their lawfully owned common arms; (2) decline to purchase a permit-less handgun

---

where in the course of investigation of gun possession in Delaware State Parks, State officials were given "unfettered discretion to stop State Park and Forest visitors…without requiring a scintilla of evidence of criminal activity."

out of fear of prosecution and warrantless search of their homes to confiscate their lawfully owned common arms, *see MedImmune, Inc. v. Genentech, Inc*., 549 U.S.118, 128-29, (2007); or (3) purchase a handgun without applying for a permit and subject themselves to prosecution and the warrantless search of their homes to confiscated their lawfully owned common arms. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (a plaintiff can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder); *Lozano v. City of Hazleton*, 620 F.3d 170, 185 (3d Cir. 2010) (standing existed where plaintiffs were "direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to do"), *vacated on other grounds*, 563 U.S. 1030 (2011); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (rejecting the government's argument that "no harm is imminent because no prosecution is pending").

142.    Further, Director McQueen's comments on the House floor stating that his purported authority to enforce the "surrender" and "removal" of lawfully owned common arms would apply to all guns in the home, not just those the State purports to remove pursuant to revocation of a permit. Thus, by virtue of owning a handgun, whether with or without a permit, Plaintiffs are targets of the State's warrantless and unlawful search and seizure.

152,368,335

143.    Defendant's enforcement of SS 1 for SB 2, including their intended actions to effectuate the "surrender" and "removal" of lawfully owned common arms, including those arms not subject to the permit requirement, has created a reasonable fear in Plaintiffs that any purchase of a firearm, whether with or without a permit, will result in its warrantless removal by the State, through the Director. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 184 (2000)(continuous and pervasive conduct creating a reasonable fear in Plaintiffs created standing to bring challenge).

144.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

145.    Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of their fundamental Fourth Amendment rights in the State of Delaware, including Plaintiffs, Thomas Neuberger, Jerry L. Martin; William R. Hague, Jr.; DSSA and its members, and BRPC and its members, through Defendants' enforcement and implementation of SS 1 for SB 2.

For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Fourth Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

152,368,335

## COUNT III

### Void for Vagueness

146.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

147.    There is an actual and present controversy between the parties.

148.    Statutes that are vague and arbitrary violate the Due Process Clause of the Fourteenth Amendment. *See, e.g. Springfield Armory, v. City of Columbus,* 29 F.3d. 250, 251 (6th Circ. 1994).

149.    The Supreme Court's void for vagueness doctrine's primary objective is to guard against "arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (underscoring the threat that vague laws pose to legislative policymaking primacy).

150.    A more "stringent" vagueness test applies for statutes that "threaten to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

151.    Further, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for

152,368,335

resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Id*. at 498.

152.   SS 1 for SB 2 infringes upon the fundamental constitutional rights of Plaintiffs, namely their Second Amendment right to bear arms. *See Bruen*, 597 U.S. 1, at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 789 (2010)) ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.')

153.   SS 1 for SB 2 is impermissibly vague, in that it grants the Director of the State Bureau of Identification, an unelected bureaucrat, the power to deny or revoke the permit of any Delawarean who, according to the sole discretion of the Director, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms."

154.   SS 1 for SB 2, therefore, fails to provide a reasonable opportunity to know, by what standards a permit applicant, including Plaintiffs, will be judged.

155.   Persons of common intelligence must necessarily guess at the meaning, scope and application of SS 1 for SB 2's "danger" standard for denying and/or revoking a permit.

152,368,335

156.   The unbridled discretion that SS 1 for SB 2's impermissibly vague standards vest in the Director impermissibly delegates policy matters to the Director, and undoubtedly invites arbitrary and discriminatory application.

157.   This vagueness also has a chilling effect on Plaintiffs' constitutionally protected conduct.

128.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Second Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for the following relief:

(a)     A judgment that SS 1 for SB 2 and all related regulations, policies, and/or customs designed to enforce or implement the same, are a violation of Plaintiffs' fundamental right to keep and bear arms, including purchasing handguns for any lawful purpose without a state issued permit or license, as guaranteed under the Second and Fourteenth Amendments, as well as a violation of their rights under the Fourth Amendment to the United States Constitution. Declaratory judgment is proper in this matter, as there is a real controversy between the parties, an interest is adversely affected, and the issue is ripe for resolution;

(b)     Relief pursuant to 42 U.S.C. § 1983 for deprivation by Defendants of Plaintiff's federal constitutional rights under color of state law;

152,368,335

(c)    Attorney's fees pursuant to 42 U.S.C. § 1988(b);

(d)    Permanent injunction to enjoin Defendants from implementing and enforcing SS 1 for SS 2.

(e)    Any and all other and further relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper, including attorney's fees and costs.

Respectfully submitted,

LEWIS BRISBOIS
    BISGAARD & SMITH LLP

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi (No. 2624)
Scott D. Cousins (No.3079)
Alexander D. MacMullan
(Admitted *pro hac vice*)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Scott.Cousins@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com

OF COUNSEL:
Joseph G.S. Greenlee
Erin M. Erhardt
National Rifle Association of
    America – Institute for Legislative
    Action
11250 Waples Mill Road
Fairfax, VA  22030

*Counsel for Plaintiffs*

Dated:  February 14, 2025

152,368,335

## <u>Index of Exhibits to Neuberger Second Amended Complaint</u>

SS 1 for SB 2 ................................................................................................. A

HB 100 and 101 Authorizing Funding for SS 1 for SB 2 in FY 2025 .................... B

152,368,335