IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS S. NEUBERGER; JERRY L. MARTIN; WILLIAM R. HAGUE, JR.; DELAWARE STATE SPORTSMAN'S ASSOCIATION, INC; and BRIDGEVILLE RIFLE & PISTOL CLUB, LTD., | | |
| Plaintiffs. | | |
| v. | | Civil Action No. 1:24-cv-00590-MN |
| DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; NATHANIAL MCQUEEN, JR., in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security; and COL. MELISSA ZEBLEY, in her official capacity as Superintendent of the Delaware State Police, | | |
| Defendants. | | |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION OF
DEFENDANTS' MOTION TO DISMISS**

LEWIS BRISBOIS BISGAARD
& SMITH LLP

Francis G.X. Pileggi (No. 2624)
Scott D. Cousins (No. 3079)
Alexander D. MacMullan (admitted *pro hac vice*)
Andrew A. Ralli (No. 6733)

OF COUNSEL:
Joseph G.S. Greenlee
Erin M. Erhardt
National Rifle Association of America –
   Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA 22030

500 Delaware Avenue, Suite 700
Wilmington, Delaware 19801
Francis.Pileggi@lewisbrisbois.com
Scott.Cousins@lewisbrisbois.com
Alexander.MacMullan@lewisbrisbois.com
Andrew.Ralli@lewisbrisbois.com

Dated: March 28, 2025

*Counsel for Plaintiffs*

154949653.1

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

SUMMARY OF THE ARGUMENT ......................................................................1

COUNTERSTATEMENT OF FACTS ...................................................................2

STANDARD OF REVIEW ...................................................................................2

ARGUMENT ........................................................................................................3

      I.      PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS FOR RELIEF AND THE MATTER IS RIPE..................................................................3

      II.     THE ALLEGATIONS IN PLAINTIFFS' AMENDED COMPLAINT STATE A PLAUSIBLE CLAIM FOR RELIEF ON SECOND AMENDMENT GROUNDS ...............................................................6

           A.    The State does not argue that the Amended Complaint fails to meet *Twombly* and *Iqbal* pleading standards.....................................6

           B.    The Statute Fails the *Bruen* Test ..............................................6

                1.    The *Bruen* test ..........................................................6

                2.    The Statute restricts conduct covered by the Second Amendment's plain text..............................................7

                3.    The State moves to dismiss Plaintiffs' Second Amendment claim relying upon inapposite *dicta* from Bruen instead of by following *Bruen's* foundational holding....................................8

                4.    The Statute is not consistent with the Nation's historical tradition of firearms restrictions.....................................15

                5.    The Statute is unconstitutional in all its applications because broad, discretionary permits for possession of common handguns are always unconstitutional ...........................19

      III.   THE ALLEGATIONS IN PLAINTIFFS' AMENDED COMPLAINT STATE A PLAUSIBLE CLAIM FOR RELIEF ON FOURTH AMENDMENT GROUNDS .............................................................20

      IV.   THE ALLEGATIONS IN PLAINTIFFS' SECOND AMENDED COMPLAINT STATE A PLAUSIBLE CLAIM FOR RELIEF ON THE GROUND THAT THE STATUTE IS VOID FOR VAGUENESS ....................22

CONCLUSION.....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Aldridge v. Commonwealth,*
    4 Va. 447 (1824) ...................................................................................................................18

*Arizona v. Gant,*
    556 U.S. 332 (2009) ..............................................................................................................21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................................3, 6, 25

*Babbitt v. Farm Workers,*
    443 U.S. 289 (1979) ...........................................................................................................4, 5

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) (Alito, J., concurring) ..........................................................................7

*City of Los Angeles, Calif. v. Patel,*
    576 U.S. 409 (2015) .........................................................................................................21, 22

*Constitution Party of Pennsylvania v. Aichele,*
    757 F.3d 347 (3d Cir. 2014) ..................................................................................................3

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...................................................................................................... *passim*

*Ezell v. City of Chicago,*
    651. F.3d 684, 704 (7th Cir. 2011) ......................................................................................8

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009) ..................................................................................................2

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972). (State's Brief ) ...............................................................................24, 25

*Hays v. City of Urbana, Ill.,*
    104 F.3d 102 (7th Cir. 1997) .............................................................................................3, 4

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ................................................7

*Johnson v. United States,*
    135 S. Ct. 2551 (2015) .....................................................................................................22, 23

*Katz v. United States*,
    389 U. S. 347 (1967).............................................................................21

*Koons v. Platkin*,
    673 F. Supp. 3d 515 (D.N.J. 2023) .............................................23, 24

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993).........................................................3, 6, 25

*Lara v. Comm'r Pa. State Police*,
    125 F.4th 428 (3d Cir. 2025) ...................................................15, 20

*Lozano v. City of Hazleton*,
    620 F.3d 170 (3d Cir. 2010), vacated on other grounds, 563 U.S. 1030 (2011) .....................3

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).....................................................................3, 6

*Md. Shall Issue, Inc. v. Moore*,
    116 F.4th 211 (4th Cir. 2024) .........................................................14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022)................................................................... *passim*

*Pena-Rodriguez v. Colorado*,
    580 U.S. 206 (2017).........................................................................16

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925)...........................................................................4

*Ramos v. Louisiana*,
    590 U.S. 83 (2020) (Kavanaugh, J., concurring) ..........................16

*Range v. AG United States*,
    124 F.4th 218 (3d Cir. 2024) ...........................................8, 10, 11, 15

*Rigby v. Jennings*,
    630 F. Supp. 3d 602 (D. Del. 2022)..................................................7

*Rocky Mountain Gun Owners v. Polis*,
    121 F.4th 96 (10th Cir. 2024) ...........................................................4

*State v. Smith*,
    2020 Del. Super. LEXIS 2953 (August 18, 2020)...........................25

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)...........................................................................4

*United States v. ,*
602 U.S. 680 (2024)................................................................................................13, 15, 16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982)................................................................................................23

*Virginia v. American Booksellers Ass'n, Inc.,*
484 U.S. 383 (1988)................................................................................................5

*Yukutake v. City of Honolulu,*
No. 21-16756 (9th Cir. March 4, 2025) ................................................................14

## Constitution and Statutes

U.S. CONST. amend II........................................................................................... passim

U.S. CONST. amend IV ......................................................................................... passim

18 U.S.C.§ 922(g)(1) ................................................................................................10, 11

Conn. Gen. Stat. § 29-28(b) (2021) ........................................................................12

11 *Del. C*. § 1441 (2022) ..........................................................................................12

8 LAWS OF THE STATE OF DELAWARE (1841)
https://www.google.com/books/edition/Laws_of_the_State_of_Delaware/gkF
KAAAAYAAJ?hl=en&gbpv=1&bsq=%22license%22 ......................................17

R. I. Gen. Laws § 11-47-11 (2002).........................................................................12

19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA, pt. I, 76–77 (Allen D.
Candler ed., 1911)...............................................................................................18

ACTS PASSED BY THE GENERAL ASSEMBLY OF SOUTH CAROLINA, AT A SESSIONS
BEGUN AND HOLDEN AT CHARLES-TOWN THE FIFTEENTH DAY OF NOVEMBER,
IN THE SEVENTH YEAR OF THE REIGN OF OUR SOVEREIGN LORD GEORGE THE
SECOND, BY THE GRACE OF GOD, OF GREAT BRITAIN, FRANCE AND IRELAND,
KING, DEFENDER OF THE FAITH &C. (1736) .......................................................17

House Bill 100 (January 10, 2025) ..........................................................................5

House Bill 101 (January 7, 2025) ............................................................................5

## Other Authorities

SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE....................................8

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the
Separation of Powers*, 17 Suffolk U. L. Rev. 881, 894 (1983) ..................................3

Constitutional Carry/Unrestricted/Permitless Carry,
USCCA,https://www.usconcealedcarry.com/resources/terminology/types-of-
concealed-carry-licensurepermitting-policies/unrestricted/ (last visited Mar.
23, 2025) ....................................................................................................................................13

DELAWARE ONLINE (May 16, 2024, 3:38 PM),
https://www.delawareonline.com/story/news/2024/05/16/permit-to-purchase-
gun-law-delaware-john-carney-legal-challenge/73713390007/ ................................................5

Fed. R. Civ. P. 12(b)(6)………………………………………………………………………2

## INTRODUCTION

SS 1 for SB 2 ("the Statute") mandates that law-abiding citizens obtain a permit in order to purchase common firearms. It is consistent only with this country's history of repugnantly racist restrictions on the civil rights of black Americans[1] and cannot pass muster under Supreme Court precedent.[2]

## SUMMARY OF THE ARGUMENT

The Statute fails the two-part test for evaluating a Second Amendment challenge mandated by the United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). It restricts rights covered by the plain text of the Second Amendment. The State's Motion to Dismiss glosses over this first step of the test. The State also fails to undertake any of the historical analysis to justify the law that the second step of the test articulated in *Bruen* requires. Instead, the State argues that inapposite, inapplicable *dicta* in footnote 9 of *Bruen* should trump its foundational holding and foreclose this Court's analysis.

The Statute also violates the Fourth Amendment. It authorizes searches of Delawareans' homes, at the sole discretion of the Director, and outside the judicial process.[3] It is also unconstitutionally vague. The Statue relies upon an ill-defined and amorphous standard of "dangerousness" to justify denial and/or revocation of a permit.

In part and in whole, the Statute is an unconstitutional violation of Delawareans' constitutionally protected rights. It must be stricken, and the State's Motion to Dismiss denied.

---

[1] Similarly, Rev. Dr. Martin Luther King was denied a permit to purchase a gun despite death threats.

[2] The Statute was signed into law on May 16, 2024.

[3] Defendant, Secretary Nathaniel McQueen, stated publicly that: upon revocation of a permit, "all weapons in the home are to be removed." That is, he intends to confiscate even those firearms not purchased with the permit.

## COUNTERSTATEMENT OF FACTS

The Statute mandates that all Delawareans, excluding those who hold a valid license to carry weapons, submit an application for a handgun license before purchasing and possessing a handgun. *See* §§1448D (b)(2) and (c)(2). All applications require the approval of one person, the Director of the State Bureau of Identification ("the Director"), giving an unelected agent of the state government discretion over approval, denial and revocation of permits. § 1448D(h)(i). Delaware and the Nation's history of racist restrictions on Second Amendment rights suffered from the same infirmity.

Specifically, the Director at his or her sole discretion, is empowered to deny a permit to any person who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," and may revoke a permit "at any time" pursuant to the same subjective criteria. §§ 1448D (f)(3); (*l*)(1). If the Director does revoke a license, the State Police have purported "probable cause" to remove the firearms from the individual's "custody, possession, or control." *See* § 1448D (k)(3).

## STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotations and citations omitted). The complaint must only contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS FOR RELIEF AND THE MATTER IS RIPE

To establish standing, "a plaintiff must show three elements: injury-in-fact, causation, and redressability." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014).

"When the plaintiff is himself an object of the action … there is ordinarily little question that the action or inaction has caused him injury." *Aichele*, 757 F.3d at 362 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). And Plaintiffs are undoubtedly the object of the action in the instant case: they are the ones required to obtain a Handgun Qualified Purchaser Permit. *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 894 (1983) ("Thus, when an individual who is the very object of a law's requirement or prohibition seeks to challenge it, he always has standing").

Plaintiffs are the "direct targets of an ordinance they allege to be unconstitutional"—the Statute—"complaining of what the ordinance would compel them to do"—obtain a Handgun Qualified Purchaser Permit. *See Lozano v. City of Hazleton*, 620 F.3d 170, 185 (3d Cir. 2010), vacated on other grounds, 563 U.S. 1030 (2011). Thus they are "affected in a 'personal and individual way' by what [the Statute] requires of them." *Id*. at 186 (quoting *Lujan*, 504 U.S. at 561 n.1).

Moreover, upon implementation, Plaintiffs will be responsible for the costs of complying with the Statute—the time and expense involved in obtaining a Permit. Even if "relatively small, that cost is sufficient for standing purposes." *Id.*; *see also Hays v. City of Urbana, Ill.*, 104 F.3d

102, 103 (7th Cir. 1997) ("What is necessary for standing is a concrete injury, redressable by success in the litigation. Costs of compliance … can constitute that injury…. These costs would be avoided if they prevail.").

It is immaterial that the Statute has not yet been implemented: "Long ago, the Supreme Court held that a person who must comply with a law or face sanctions has standing to challenge its application to him, even if the threat of prosecution is not immediate—indeed, even if the law is not yet in effect." *Hays*, 104 F.3d at 103 (citing *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)). The Supreme Court "permit[s] pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The Supreme Court has held that the injury-in-fact is sufficiently imminent where a plaintiff "alleges 'an intention to engage in a course of conduct arguably affected . . . with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder'"—exactly the circumstances in the instant case. *Id.* (quoting *Babbitt v. Farm Workers*, 443 U.S. 289, 298 (1979)).

Plaintiffs have alleged an intent to exercise their Second Amendment rights by purchasing handguns for self-defense. Historically, a permit has never been required for the mere purchase of a handgun (except for disfavored groups not considered part of "the people," as discussed *infra*)— yet that is precisely what the Statute requires. Other circuits have recognized that "a concrete and particularized future injury" sufficient to establish standing exists when a plaintiff's "desire to exercise a fundamental right, specifically his Second Amendment right to 'possess a [firearm] in the home for self-defense,' will be affected if it becomes more difficult for him to acquire a firearm legally." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 109 (10th Cir. 2024) (quoting *Bruen*, 597 U.S. at 9).

Further, "[t]the threat of prosecution is generally credible where the defendant 'has not disavowed any intention of invoking' the statute against plaintiff." *Id*. at 110 (quoting *Babbitt*, 442 U.S. at 302). And the Defendants here clearly intend to invoke the statute against Plaintiffs by requiring them to obtain Handgun Qualified Purchaser Permits in order to purchase handguns after the Statute is implemented. "The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise." *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). Indeed, the State has indicated that it has every intention to implement and enforce the Statute as advertised. The Statute is already in effect and is set to be implemented no later than November 16, 2025. § 1448B (b)(5)(1)-(2) (The "Act is effective immediately and is to be implemented the earlier of … Eighteen months from the date of the Act's enactment [May 16, 2024]" or "The date of publication in the Register of Regulation of a notice by the Director of the State Bureau of Identification that the necessary processes have been established for implementation."). Funding for the permitting scheme has already begun, signaling that the State is actively working on implementing the necessary processes. *See* House Bill 100 (January 10, 2025) and House Bill 101 (January 7, 2025) (allocating nearly $5,000,000 for FY 2025 to implement SS1 for SB 2). And Governor Carney has made clear that the intent of the law is to "prevent [people] from picking up a gun in the first place." Esteban Parra, *Delaware governor signs 'permit to purchase' gun bill into law*, DELAWARE ONLINE (May 16, 2024, 3:38 PM), https://www.delawareonline.com/story/news/2024/05/16/permit-to-purchase-gun-law-delaware-john-carney-legal-challenge/73713390007/.

Plaintiffs are the targets of the Statute—they are the ones who are required to obtain the Handgun Qualified Purchase Permit—and they are the ones who must bear the costs associated with obtaining that Permit. Therefore, their injuries are "fairly traceable" to Defendants'

implementation and enforcement of the Statute. *Lujan*, 504 U.S. at 560 (cleaned up). And their injuries are "redress[able] by a favorable decision." *Id.* at 561–62 (quotation omitted); *see also id.* ("When the suit is one challenging the legality of government action or inaction … a judgement preventing or requiring the action will redress [the plaintiff's injury].). Plaintiffs thus have standing to challenge the Statute.

## II.    THE ALLEGATIONS IN PLAINTIFFS' AMENDED COMPLAINT STATE A PLAUSIBLE CLAIM FOR RELIEF ON SECOND AMENDMENT GROUNDS

### A.  The State does not argue that the Amended Complaint fails to meet *Twombly* and *Iqbal* pleading standards

The State's Motion to Dismiss Plaintiffs' claim that the Statute violates the Second Amendment does not argue that Plaintiffs' Complaint falls short of the standard announced in *Twombly* and *Iqbal*. Rather, the State argues the merits of Plaintiffs' claims as if this is a post-trial brief. These arguments do not belong in a motion to dismiss. *Kost*, 1 F.3d at 183. Thus, the State's Motion must be denied with respect to Plaintiffs' Second Amendment claim because, as the State concedes by engaging in at least a cursory evaluation of the *Bruen* test, Plaintiffs' challenge satisfies the first-step of Bruen—demonstrating that the Statute burdens the Second Amendment rights of Plaintiffs. The second-step of the test *Bruen* requires is a review of historical tradition— which the State has not engaged in. 597 U.S. at 24.

### B.  The Statute Fails the *Bruen* Test

#### 1.  The *Bruen* test

Should the Court engage in a merits-based analysis of the State's Motion to Dismiss utilizing the *Bruen* test, it will find that the Statute is plainly violative of the Second Amendment. In rejecting "means-end scrutiny" as the applicable test for Second Amendment claims, the *Bruen* court held:

> [T]he standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24 (citation omitted).

### 2.  The Statute restricts conduct covered by the Second Amendment's plain text

At step one, the Statute restricts conduct self-evidently covered by the Second Amendment's plain text—the purchase and possession of commonly used handguns. *Bruen*, 597 U.S. at 21 (holding it is "'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'") It is well-established by the Supreme Court that the handguns at issue in this case are in common use. *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)("….handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."); *Caetano v. Massachusetts*, 577 U.S. 411, 416-17 (2016) (Alito, J., concurring) ("semiautomatic pistols" are among "the weapons most commonly used today for self-defense."); *Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("[H]andguns—the vast majority of which today are semi-automatic—… have not traditionally been banned and are in common use by law-abiding citizens.")

Moreover, just as a law requiring a permit to keep a firearm self-evidently burdens the right to keep arms, a law requiring a permit to acquire a firearm is no different. One cannot exercise his right to keep something if he is prohibited from acquiring it.[4] *See Rigby v. Jennings*, 630 F. Supp.

---

[4] To "have" something—both historically and today—has always included its acquisition. Samuel Johnson's 1773 dictionary—which *Heller* relied on to define "arms," "keep," "bear," and "well-

3d 602, 615 (D. Del. 2022)(*citing Ezell v. City of Chicago*, 651. F.3d 684, 704 (7ᵗʰ Cir. 2011)) (holding that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use…"); *see also Heller*, 554 U.S. at 582.

What remains is a straightforward inquiry and result—a determination of whether Plaintiffs' are a part of "the people" afforded Second Amendment protections. They are. *Range v. AG United States*, 124 F.4th 218, 226 (3d Cir. 2024) (citing *Heller*, 554 U.S. at 580) ("[*Heller*] explained that "the people" as used throughout the Constitution 'unambiguously refers to all members of the political community, not an unspecified subset.'") And whether the Statute "regulates Second Amendment conduct"—it does. *Id.* at 228 (quoting *Heller* 554 U.S. at 582) ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

With this established, the burden shifts to the State to defend the Statute as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24 (citation omitted). The State abdicates this responsibility in their Motion to Dismiss, instead invoking inapposite *dicta* from *Bruen*.

    **3. The State moves to dismiss Plaintiffs' Second Amendment claim relying upon inapposite *dicta* from Bruen instead of by following *Bruen's* foundational holding.**

In *Bruen,* the Supreme Court "h[e]ld that when the Second Amendment's plain text covers an individual's conduct," the law can be upheld "[*o*]*nly if*" it is "consistent with this Nation's

_____

regulated" —defined "have" as "5. To obtain" and "6. To take; to receive." 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773). Noah Webster's 1828 dictionary—which Heller relied on to define "arms," "keep," "bear," and "militia"—defined "have" as "9. To gain; to procure; to receive; to obtain; to purchase." 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). Today, Merriam-Webster's defines "have" as "4 a: to acquire or get possession of: OBTAIN" and to "b: RECEIVE." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 533 (10th ed. 1996)

historical tradition." *Bruen*, 597 U.S. at 17 (emphasis added). The State's Motion to Dismiss fails to undertake the historical inquiry mandated by the Supreme Court when a law restricts conduct covered by the Second Amendment's plain text. Instead, the State relies almost entirely upon irrelevant *dicta* in footnote 9 of *Bruen* to argue that this *dicta* should overrule *Bruen*'s foundational holding. The State's near-exclusive reliance on *Bruen*'s *dicta* does not support dismissal. Properly read, footnote 9 has little impact on this matter. In full, it reads:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they *do not necessarily* prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion"—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 597 U.S. at 38 n.9.

Initially, this *dicta* refers to a permit to carry a firearm already possessed—not a permit to purchase. *Bruen* examined New York's proper cause requirement for obtaining a ***carry permit*** rather than for the purchase or possession of a firearm. Under the challenged statute[5], a New Yorker who sought to carry a firearm outside their home or place of business for self-defense was required

---

[5] Similar to the racist history of all firearm restrictions in this country, the New York statute in *Bruen* had its origins in a law designed to prevent Italians from exercising their Second Amendment rights. *Judge Foster gives Marino Rossi One Year for Arming himself….*" N.Y. Times (Sept. 28, 1911) at 5 (describing Sullivan Law targeting Italian immigrants to restrict their Second Amendment rights).

to obtain an unrestricted license to "have and carry" a concealed "pistol or revolver." To secure that license, the applicant was required to prove that so-called "proper cause exists" to issue it. *Id.* at 15. Drawing a distinction between New York's particularly oppressive public carry statute and that of many other states, *Bruen* broadly characterized the New York law as one of a few outlier states with "may issue" carry permit statutes, while broadly characterizing 43 other states as having "shall issue" carry permit statutes. *Id.* at 17.

*Bruen* made this distinction to demonstrate that the New York statute in question was an outlier statute among the states regarding public carry. *Id.* at 101 (Kavanaugh, J., concurring) ("Applying that test, the Court correctly holds that New York's outlier "may-issue" licensing regime for carrying handguns for self-defense violates the Second Amendment."). *Bruen* did not rule on the constitutionality of any of the 43 statutes broadly categorized as "shall issue," because those 43 statutes were not before the Court. Yet from this limited *dicta* the State suggests an entirely separate shortcut method for evaluating the Statute from the *Bruen* test.

Other incomplete, *dicta*-based methods of applying *Bruen* have been rejected by the United States Court of Appeals for the Third Circuit. In *Range v. AG United States,* 124 F.4th 218 (3d Cir. 2024), the government similarly urged the Third Circuit to shortcut its *Bruen* analysis on the basis of two instances of Supreme Court *dicta*. *Range* involved a non-violent felon's challenge to 18 U.S.C. 922(g)(1) and its ban on his ability to possess a common firearm. The government first urged the Third Circuit to exclude Range from "the people" afforded Second Amendment protection based only on the Supreme Court's reference to "law-abiding citizens" in *Heller.* The Third Circuit rejected this, noting that "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were *dicta*. And while we heed that phrase, we are careful not to overread it as we and other circuit

courts did with *Heller*'s statement that the District of Columbia firearm law would fail under any form of heightened scrutiny." 124 F.4th at 226.

At step two of *Bruen*, the government again attempted a *dicta*-centered argument to support 922(g)(1), arguing that the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," should be the beginning and end of the Third Circuit's analysis. *Id.* (quoting *Heller* 554 U.S. at 626). The Third Circuit again rejected the government's *dicta*-based argument and conducted a thorough review of the history and tradition of firearms regulations from the time of the founding that revealed there was no support for banning Range from owning common firearms. 124 F.4th at 232.

As in *Range*, there are several flaws that are fatal to the State's argument that this *dicta* should control and foreclose Plaintiffs' challenge.[6] First, the State fails to acknowledge that *Bruen* addressed permitting for public carry of a firearm, not purchase or possession, including in the home. In contrast, the Statute's permitting requirement extends to any possession of a common firearm, including " …to the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. The Supreme Court, in *Heller*, undertook a historical analysis of the traditions of the American people, and held that the Second Amendment "elevates above all [governmental] interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635.

The Statute's restrictions extend to all possession of common arms, including in the home. *Heller's* emphasis on the tradition of possession in the home for self-defense demonstrates that the

---

[6] Justice Alito in *Bruen* explained: "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." 597 U.S. at 72 (Alito, J., concurring).

tradition of regulations on the *carry* of firearms is distinct from the tradition of regulations on the *possession* of firearms. The State has failed to acknowledge or address this fact.

Second, the State fails to acknowledge that *Bruen* did not subject the 43 statutes mentioned in *dicta* to the two-part test it established nor does the State investigate the features of those statutes. In observing only that their decision should not "suggest" that the 43 "shall-issue" statutes were unconstitutional, *Bruen* did not subject any of those statutes to a historical analysis of the traditions of the American people to determine their constitutionality. A cursory review of these statutes demonstrates as much. Many were categorized as "shall issue" on the basis that the Supreme Court believed that the language of their statute demonstrated "authorities *must* issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, *without granting licensing officials discretion* to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 17 (emphasis added). *Bruen* referenced only the minimal "threshold requirements" to identify law-abiding citizens and did not address subjective criteria such as "dangerousness" found in the Statute. *Id.*

A smaller subset of the 43 public carry statutes, including Delaware's, were categorized as "shall issue," not by the language of the statute itself but by how the Supreme Court perceived they operated in practice in those states. *Id.* at 17 n.1 ("Three States—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like "shall issue" jurisdictions. *See* Conn. Gen. Stat. §29-28(b) (2021); Del. Code, Tit. 11, §1441 (2022); R. I. Gen. Laws §11-47-11 (2002)."). The 43 statutes were not referenced in passing by *Bruen* to invite the government to ignore *Bruen*'s core holding and mandate for evaluation of a Second Amendment challenge. They were referenced only to highlight how singularly onerous New York's proper cause requirement was in the context of public carry.

Even more, the "shall-issue" permitting schemes briefly discussed in *Bruen* are entirely optional in a majority of states. 26[7] of the 43 states broadly categorized as "shall-issue" in footnote 9 are "constitutional carry" jurisdictions where no permit is required to carry a firearm. *Bruen* acknowledged this. 597 U.S. at 13 n.1. Moreover, of the 17 states *Bruen* discussed that do not permit unpermitted constitutional carry, 12[8] allow open carry without a permit. *Bruen* also acknowledged this. *Id*. In other words, when drafting footnote 9, the *Bruen* Court was aware that in practice only a few states require a person to go through a permitting process before being able to carry a handgun in public for self-defense.

Third, the State fails to acknowledge that the Statute does not share the limited guidelines that *Bruen's* footnote 9 *dicta* identifies for a potentially constitutional "shall issue" public carry statute. Footnote 9 only cursorily suggested that a "shall issue" statute *may* not be unconstitutional provided that it contain "narrow, objective, and definite standards guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion"—features that typify proper-cause standards…" *Id*. at 38 fn.9.

The Statute empowers the Director, at his sole discretion, to deny a permit to any person who, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." § (f)(3). This power is not reliant on a court order stating the same nor limited in time, as was the case in *United States v. Rahimi*, 602 U.S. 680, 702 (2024) ("….we conclude

---

[7]    *See generally* Constitutional Carry/Unrestricted/Permitless Carry, USCCA, https://www.usconcealedcarry.com/resources/terminology/types-of-concealed-carry-licensurepermitting-policies/unrestricted/ (last visited Mar. 23, 2025).

[8] *See* Open Carry, OpenCarry.org, Open Carry | OpenCarry.org (last visited Mar. 23, 2025)

only this: An individual *found by a court to pose a credible threat* to the physical safety of another may be temporarily disarmed consistent with the Second Amendment.") (emphasis added).

It does not provide any objective criteria for what constitutes such a "danger." Based upon the text of the Statute, there is no way for the Director to deem an applicant a "danger" without subjectively appraising facts, exercising judgment and forming an opinion regarding an applicant's suitability to purchase a common handgun. *Bruen*, even in footnote 9 *dicta*, made clear that public carry statutes that placed such discretion in bureaucrats' hands were unconstitutional. Statutes requiring permits to purchase were not addressed.

The State also fails to acknowledge that its second favorite non-controlling case, *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024)[9], cited by the State in conjunction with footnote 9 throughout the Motion to Dismiss, assessed a permitting statute that did not have discretionary "dangerousness" criteria. The Maryland statute at issue in that matter required applicants only to meet the objective criteria of being "at least 21 years old, be[ing] a Maryland resident, complet[ing] a firearms safety training course, and not be[ing] barred by federal or state law from purchasing or possessing a handgun" in order to obtain their permit *Id*. at 217. As discussed below, *Md. Shall Issue* was decided incorrectly because permits to purchase or possess violate the Second Amendment.[10] Nevertheless, the State's frequent citation to that non-controlling case ignores that the permit statute at issue in *Md. Shall Issue* lacked the discretionary "dangerousness" clause that is most objectionable and unconstitutional in the Statute.

---

[9] This case is currently on appeal.
[10] A recent 9th Circuit case, *Yukutake v. City of Honolulu*, No. 21-16756 (9th Cir. March 4, 2025), held that a short waiting period imposed in connection with a requirement for a permit to possess a handgun violated the Second Amendment.

The State's Motion to Dismiss relies on inapposite *dicta* and non-binding Fourth Circuit authority addressing a dissimilar permitting statute to evade the test for evaluating a Second Amendment challenge that *Bruen* requires. The gap-filled, *dicta*-based method the State suggests has been rejected by the Third Circuit in *Range* and is contrary to *Bruen's* core holding. On this basis alone the State's Motion to Dismiss Plaintiffs' Second Amendment challenge must be denied.

### 4.    The Statute is not consistent with the Nation's historical tradition of firearms restrictions

Failing to address "this Nation's historical tradition," or to provide any historical analogue or analysis of "whether a historical regulation is a proper analogue" for the Statute, the State leaves it to Plaintiffs to analyze the history of permitting for possession of common arms. *Bruen,* 597 U.S. at 28. Of course, *Bruen* mandates—but the State ignores—that they bear this burden, not Plaintiffs. *Id*. at 19 ("The government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

First, there is the matter of the proper era in the Nation's history to analyze. *Bruen* instructed that "when it comes to interpreting the Constitution, not all history is created equal." *Id*. at 34. "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them,'" so a Second Amendment analysis must center on the founding era. *Id*. (quoting *Heller*, 554 U.S. at 634–35); *see also Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 434 (3d Cir. 2025) ("To aid the court in that second-step analysis, the government bears the burden of identifying a 'founding-era' historical analogue to the modern firearm regulation.")

A review of firearms licensing laws in the pre-founding, colonial period and at the time of the founding reveals only anti-gun laws motivated by racism. *Heller*, *Bruen*, and *Rahimi* teach that discriminatory historical laws cannot establish a tradition that the court will follow. *Heller* did not

include in its analysis any of the discriminatory historical laws that prohibited slaves and free African Americans from possessing firearms when analyzing the District of Columbia's handgun prohibition. *Bruen* did not consider any of the racist historical laws requiring slaves and free African Americans to obtain discretionary licenses to carry arms when analyzing New York's discretionary licensing law for arms carrying, even though *amici* in the case presented many examples to the Court. *See, e.g.*, Brief for *Amicus Curiae* National African American Gun Association, Inc. in Support of Petitioners at 4–11, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (No. 20-843), 2021 WL 3071861 And *Rahimi* did not consider any contemptible historical laws disarming people based on religion or race, even though numerous examples were presented to the Court and several *amici* expressly encouraged the Court to rely on such laws. *See, e.g.*, Brief of Second Amendment Law Scholars as *Amici Curiae* in Support of Petitioner at 15 n.4, *United States v. Rahimi*, 602 U.S. 680 (2024) (No. 22-915), 2023 WL 5489050.

Rather, the Supreme Court "has emphasized time and again the 'imperative to purge racial prejudice from the administration of justice.'" *Ramos v. Louisiana*, 590 U.S. 83, 128–29 (2020) (Kavanaugh, J., concurring) (quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 221 (2017)). As Justice Kavanaugh asked rhetorically, "[w]hy stick by ... a practice that is thoroughly racist in its origins[?]" *Id*. at 129.

The history of laws requiring permits to purchase or possess firearms parallels the ugly history of racism in this country. The only laws upon which the State could rely to support the Statute are racist anti-gun restrictions that the Supreme Court has consistently rejected. This includes in Delaware.

In fact, after the founding era, Delaware established the most elaborate, racist permit for possession law in America at the time in 1832. A "free negro or free mulatto" could "have use and keep in his possession a gun or fowling piece" if "one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun." 8 LAWS OF THE STATE OF DELAWARE, FROM THE SIXTEENTH DAY OF JANUARY, ONE THOUSAND EIGHT HUNDRED AND THIRTY, TO THE THIRTEENTH DAY OF FEBRUARY, ONE THOUSAND EIGHT HUNDRED AND THIRTY-FIVE 208 (1841).[11]

The founding era's permit for possession laws were also all motivated by racism.[12] Virginia enacted a 1792 law providing that, "[n]o negro or mulatto whatsoever shall keep or carry any gun,

---

[11] https://www.google.com/books/edition/Laws_of_the_State_of_Delaware/gkFKAAAAYAAJ?hl=en&gbpv=1&bsq=%22license%22

[12] The precolonial era was no better than the founding. The first law requiring a license to own a firearm appears to be Virginia's 1723 statute forbidding any "negro, mulatto, or Indian ... to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." 4 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 131 (William Waller Hening ed., 1820). South Carolina and Georgia passed similar permitting laws targeting Blacks soon thereafter.

In 1736, South Carolina empowered its slave patrol to "examine all Negro Houses for offensive Weapons, or Ammunition" and confiscate "all Swords, Guns, Pistols, Cutlasses or other offensive Weapons, and all Ammunition," unless the slave had "a Licence in writing from their Owner or Overseer." ACTS PASSED BY THE GENERAL ASSEMBLY OF SOUTH CAROLINA, AT A SESSIONS BEGUN AND HOLDEN AT CHARLES-TOWN THE FIFTEENTH DAY OF NOVEMBER, IN THE SEVENTH YEAR OF THE REIGN OF OUR SOVEREIGN LORD GEORGE THE SECOND, BY THE GRACE OF GOD, OF GREAT BRITAIN, FRANCE AND IRELAND, KING, DEFENDER OF THE FAITH          &C.          at          72–73          (1736), https://www.google.com/books/edition/Acts_Passed_by_the_General_Assembly_of_S/ZIE2AQAAMAAJ?hl=en&gbpv=1&dq=all+Swords,+Guns,+Pistols,+Cutlasses+or+other+offensive+Weapons+%2B+south+carolina&pg=RA1-PA72&printsec=frontcover

Georgia's 1768 law forbade "any Slave, unless in the Presence of some white person to Carry or make use of Fire Arms or any Offensive Weapon whatsoever, unless such Slave shall have a Ticket or License in Writing from his Master Mistress or Overseer to Hunt and Kill Game Cattle or

powder, shot, club, or other weapon whatsoever, offensive or defensive," with the exception that "every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves." 1 A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC & PERMANENT NATURE, AS ARE NOW IN FORCE 263 (2d ed. 1814).[13] Kentucky enacted a similar law in 1798, providing that "[n]o negro, mulatto, or Indian, whatsoever, shall keep or carry any gun," except that "every free negro, mulatto or Indian, being a house-keeper, may be permitted to keep one gun," and "all negroes, mulattoes and Indians, bond or free, living at any frontier plantation, may be permitted to keep and use guns . . . by license from a justice of the peace." 2 A DIGEST OF THE STATUTE LAW OF KENTUCKY 1150 (William Littell & Jacob Swigert eds., 1822).[14]

Founding-era permit for purchase or possession laws were discriminatory and never applied to free citizens. They applied only to slaves, freedmen, and American Indians, who at that time were considered not to be among "the people" protected by the Second Amendment. *See* U.S. CONST. amend. II; *see, e.g., Aldridge v. Commonwealth*, 4 Va. 447, 449 (1824) (specifying how

---

Mischievous Birds or Birds of Prey." 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA, Part I, 76–77 (Allen D. Candler ed., 1911), https://www.google.com/books/edition/The_Colonial_Records_of_the_State_of_Geo/wkUOAAAAIAAJ?hl=en&gbpv=1&dq=%22ticket+or+license%22+%2B+%22COLONIAL+RECORDS+OF+THE+STATE+OF+GEORGIA%22&pg=PA76&printsec=frontcover

[13] https://www.google.com/books/edition/A_Collection_of_All_Such_Acts_of_the_Gen/Mz4wAQAAMAAJ?hl=en&gbpv=1&bsq=%22powder%22

[14] https://www.google.com/books/edition/A_Digest_of_the_Statute_Law_of_Kentucky/0zhFAAAAYAAJ?hl=en&gbpv=1&bsq=%22one%20gun%22.

the Bill of Rights ... was not intended to apply to our slave population," and "free blacks and mulattoes were also not comprehended in it"). The State has not and cannot provide historical analogues from the appropriate era, relevantly similar to the Statute without resorting to repugnant, racist laws that the Supreme Court has consistently declined to consider. Therefore, the State's Motion to Dismiss Plaintiffs' Second Amendment claim must be denied.

### 5. The Statute is unconstitutional in all its applications because broad, discretionary permits for possession of common handguns are always unconstitutional

Finally, the State claims that Plaintiffs' Second Amendment claim must be dismissed because it is a facial challenge that is "constitutional in at least some of its applications." (State Brief at 15) The State then claims that the Statute could be utilized to deny a handgun to an individual "subject to domestic violence protective orders" and individuals "involuntarily committed for a mental condition." (*Id.*) But existing laws already impose these restrictions. The State, therefore, again glosses over a central holding from *Bruen*. *Bruen* pointed to two critical metrics in determining whether a challenged regulation withstood inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. The State's argument that certain conceivable applications of the Statute could render a constitutionally supportable outcome, and thus foreclose a facial challenge, focuses only on the "why" while ignoring the "how." It mistakes potential bases, independent of permitting, for which an individual may be denied a handgun under other existing laws, for constitutional applications of the Statute.

Subjecting all Delawareans to the Statute is plainly unconstitutional under *Bruen* because the Statute restricts Delawareans' fundamental Second Amendment rights and there is no historical tradition in the relevant portions of our Nation's history that justifies requiring a permit for purchase or possession of common handguns.

The State's theory is that the "proper cause" carry permit struck down in *Bruen* should survive a facial challenge because, conceivably, its suitability requirement could be utilized to deny a New Yorker who was "subject to domestic violence protective orders" or "involuntarily committed for a mental condition" the right to carry a firearm. The Third Circuit's decision to strike a ban of 18-20 year olds' ability to carry common arms in *Lara* also could not survive the State's conception of the viability of a facial challenge because, conceivably, some 18-20 year olds may be independently unsuitable to carry common arms due to felony convictions or something similar. In each of these instances the "why" of the ban is arguably constitutionally supportable, but the "how" is not.

Casting aside the State's uninformed effort to shift the burden of proof in this case, what remains is a permit statute that restricts all Delawareans' Second Amendment rights in all applications.

### III.    THE ALLEGATIONS IN PLAINTIFFS' AMENDED COMPLAINT STATE A PLAUSIBLE CLAIM FOR RELIEF ON FOURTH AMENDMENT GROUNDS

The Statute grants the Director the power to revoke the permit of any Delawarean who, according to the sole discretion of the Director, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," and thus the Director would have the discretion to effect the "surrender" or "removal" of firearms from that Delawareans home without a warrant. § 1448D (k)(3). During the floor debate in the Delaware House of Representatives for the Statute, on March 7, 2024, Defendant, Secretary Nathaniel McQueen, stated that upon revocation of a permit, "all weapons in the home are to be removed." That is, he intends to confiscate even those firearms not purchased with the permit.

In its Motion to Dismiss, the State suggests that the facial challenge brought by Plaintiffs is an impossibility. However, facial challenges under the Fourth Amendment are not categorically

barred or especially disfavored, *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015), and

the Supreme Court has repeatedly held that "'searches conducted outside the judicial process,

without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable ... subject

only to a few specifically established and well-delineated exceptions,'" *Arizona v. Gant*, 556 U.S.

332, 228 (2009) (quoting *Katz v. United States*, 389 U. S. 347, 357 (1967)).

The State suggests that, despite the above, the challenge cannot succeed because Plaintiffs

must establish that a "law is unconstitutional in all of its applications." *Patel*, 576 U.S. at 416. It

offers three examples of allegedly constitutional applications in its argument for dismissal. One is

that there are conceivable exigent circumstances under which a warrantless search and seizure

conducted pursuant to the Statute could be constitutional. Another is that there are procedures by

which the search and seizure of firearms could be conducted that are constitutional—namely by

request and voluntary submission by the permit holder, or by obtaining a warrant through a neutral

magistrate. (Opp. at 19)

The State's offerings do not demonstrate there are constitutional applications of the Statute

that are relevant to Plaintiffs' facial challenge. That is because "when assessing whether a statute

meets this standard, the Court has considered only applications of the statute in which it actually

authorizes or prohibits conduct." *Patel*, 576 U.S. at 418. The *Patel* court noted that all three of the

very examples that the State offers—warranted search, consent, and exigency—are not

applications that the court should consider in a facial challenge to a statute, because they may

proceed independent from the Statute. *Id*. ("If exigency or a warrant justifies an officer's search,

the subject of the search must permit it to proceed irrespective of whether it is authorized by statute.

Statutes authorizing warrantless searches also do no work where the subject of a search has

consented. Accordingly, the constitutional "applications" that petitioner claims prevent facial

relief here are irrelevant to our analysis because they do not involve actual applications of the statute.").

The State's "all applications" argument fails in the context of Plaintiffs' Fourth Amendment challenge for the same reasons it fails in the context of Plaintiffs' Second Amendment challenge— the constitutional applications that the State cite to purportedly defeat the facial challenge are authorized independent of the Statute and are therefore not considerations when assessing what the Statute does or does not authorize. Without any constitutional applications that are independent of the Statute the State's Motion to Dismiss Plaintiff's Fourth Amendment claim should be denied.

## IV.   THE ALLEGATIONS IN PLAINTIFFS' SECOND AMENDED COMPLAINT STATE A PLAUSIBLE CLAIM FOR RELIEF ON THE GROUND THAT THE STATUTE IS VOID FOR VAGUENESS

Plaintiffs allege that the Statute is impermissibly vague, in that it grants the Director the power to deny or revoke the permit of any Delawarean who, according to the sole discretion of the Director, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms."[15] §1448D (f)(3) In so doing the Statute fails to provide a reasonable opportunity to know by what standards a permit applicant, including Plaintiffs, will be judged.

The Supreme Court in *Johnson v. United States,* 135 S. Ct. 2551, 2556 (2015), held that "[o]ur cases establish that the Government violates [the due process] guarantee by taking away someone's life, liberty or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary

---

[15] Defendant, Secretary Nathaniel McQueen's provocative comments during the floor debate in the Delaware House of Representatives for the Statute, on March 7, 2024, that upon revocation of a permit, "all weapons in the home are to be removed," including those not covered by the Statute's permitting requirement suggest the State intends an unfounded and overly-expansive interpretation of its powers under the Statute—powers that would extend to the denial and/or revocation of permits under the "dangerousness" standard.

enforcement." In *Johnson*, the Court also made clear that its "holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 2561. A law that burdens constitutional rights or that imposes criminal penalties must meet a higher standard of specificity than a law that merely regulates economic concerns. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) This matter requires a higher standard of specificity for both its imposition of criminal penalties and its burden upon core Second Amendment rights.

The State supports its Motion to Dismiss Plaintiffs' void for vagueness claim primarily with a 2023 decision from the District of New Jersey, *Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023). The State argues, in conclusory fashion, that this persuasive authority controls by virtue of the Statue "incorporating near-identical language" to the New Jersey statute. But the New Jersey statute did not use "near-identical" language, and the holding in *Koons* turned on language that the Statute does not contain. Specifically, *Koons* held that the New Jersey statute "provide[d] enough standards to guide licensing officials eliminating the risk of arbitrary enforcement" because it required licensing officials to determine if a prospective applicant was known in the community to have "*engaged in acts* or *made statements* suggesting the person is likely to engage in conduct, *other than justified self-defense*, that would pose a danger to self or others." *Id.* at 572 (emphasis added). The *Koons* court determined that the New Jersey statement "requires licensing officials to examine objective evidence—*the applicant's acts and statements*—to determine whether he or she may engage in conduct that would endanger him- or herself or the public." *Id.* (emphasis added).

*Koons* was decided incorrectly and is not controlling. However, the Statute's "dangerousness" standard is devoid of the "objective evidence" that was controlling in *Koons*. The

Statute states only that the Director may not issue a permit to any applicant "…who poses a danger of causing physical injury to self or others by owning, purchasing, or possessing firearms." §1448D (f)(3) The Director is not instructed by the legislature to utilize "objective" "acts and statements" in reaching his determination of dangerousness, like in *Koons*. It provides no guidance to the Director on what criteria dangerousness should be judged, and therefore invites arbitrary enforcement due to its standardless and unconstitutionally vague nature.

The State also suggests that the Court "extrapolate" upon the meaning of the Statute's "dangerousness" standard on the basis that "the standard is regularly used in other statutes" in Delaware, citing *Grayned v. City of Rockford*, 408 U.S. 104, 110–14 (1972). (State's Brief at 21) However, *Grayned* cautioned that "'[e]xtrapolation,' of course, is a delicate task, for it is not within our power to construe and narrow state laws." *Grayned*, 408 U.S. 104 at 110. To the extent that *Grayned* was willing to extrapolate on the meaning of terms of the statute at issue in context of a void for vagueness challenge, it did so by looking to conclusions on identical terms made by the highest court in the state where the statute originated, in the context of similar void for vagueness challenges:

> Were we left with just the words of the ordinance, we might be troubled by the imprecision of the phrase "tends to disturb." However, in *Chicago v. Meyer*, and *Chicago v. Gregory*, the Supreme Court of Illinois construed a Chicago ordinance prohibiting, inter alia, a "diversion tending to disturb the peace," and held that it permitted conviction only where there was "imminent threat of violence." (internal citations omitted.)

*Id*. at 111 (internal citations omitted).

The State fails to offer this Court a similar relevant interpretation. Instead it cites to *State v. Smith*, 2020 Del. Super. LEXIS 2953 (August 18, 2020), without explication and claims that "Delaware's courts evidently have no issue interpreting the danger standard…." (State's Brief. at 23) But *State v. Smith* does not interpret or articulate "dangerousness" at all, as *Chicago v. Meyer*

and *Chicago v. Gregory* did for *Grayned*. There was no void for vagueness challenge in *State v. Smith* that required interpretation of "dangerousness." There was only a pre-*Bruen* Second Amendment and Article I, Section 20 challenge to the plaintiff's prohibition on possessing a firearm as a result of his commitment for a mental health evaluation. *Smith*, 2020 Del. Super LEXIS 2953 at *13. The *Smith* court upheld the ban based on a now-defunct interest-balancing standard and said nothing on the record to illuminate the meaning of "dangerousness" or to aid in evaluation of the same. *Smith* provides no relevant guidance on the meaning or application of "dangerousness."

Just as with Plaintiffs' Second Amendment and Fourth Amendment claims, the State does not argue that Plaintiffs' void for vagueness challenge falls short of the standard announced in *Twombly* and *Iqbal*, but instead argues the merits of Plaintiffs' claims. These arguments remain inappropriate on a motion to dismiss. *Kost,* 1 F.3d at 183 (holding that the purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.) The State's merits-based arguments on the void for vagueness claim, should they be considered, also remain inadequate and underdeveloped and do not warrant dismissal of the claim.

## <u>CONCLUSION</u>

Defendants' Motion to Dismiss should be denied, because:

1. The Statute violates the Second Amendment, standing as the latest iteration in the history of racist firearm restrictions that violate Supreme Court precedent;

2. The Statute violates the Fourth Amendment by authorizing unconstitutional warrantless searches and seizures;

3. The Statute is unconstitutionally vague.

LEWIS BRISBOIS BISGAARD
& SMITH LLP

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi (No. 2624)
Scott D. Cousins (No. 3079)
Alexander D. MacMullan (admitted *pro hac vice*)
Andrew A. Ralli (No. 6733)

OF COUNSEL:                                       500 Delaware Avenue, Suite 700
Joseph G.S. Greenlee                              Wilmington, Delaware 19801
Erin M. Erhardt                                   Francis.Pileggi@lewisbrisbois.com
National Rifle Association of America –           Scott.Cousins@lewisbrisbois.com
    Institute for Legislative Action              Alexander.MacMullan@lewisbrisbois.com
11250 Waples Mill Road                            Andrew.Ralli@lewisbrisbois.com
Fairfax, VA  22030

                                                  *Counsel for Plaintiffs*

Dated: March 28, 2025