# EXHIBIT A

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-1900 & 23-2043
_____

RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M.
MULLER; GIL TAL; SECOND AMENDMENT
FOUNDATION INC; FIREARMS POLICY COALITION
INC; COALITION OF NEW JERSEY FIREARM
OWNERS; NEW JERSEY SECOND AMENDMENT
SOCIETY

v.

ATTORNEY GENERAL NEW JERSEY AND
SUPERINTENDENT NEW JERSEY STATE POLICE,

PRESIDENT OF NEW JERSEY STATE SENATE,
SPEAKER OF THE NEW JERSEY GENERAL
ASSEMBLY
                              Intervenors in District Court
                              (D.N.J. No. 1:22-cv-07464)

AARON SIEGEL; JASON COOK; JOSEPH DELUCA;
NICOLE CUOZZO; TIMOTHY VARGA; CHRISTOPHER
STAMOS; KIM HENRY; ASSOCIATION OF NEW
JERSEY RIFLE AND PISTOL CLUBS INC.

v.

ATTORNEY GENERAL NEW JERSEY;
SUPERINTENDENT NEW JERSEY STATE POLICE

PRESIDENT OF THE NEW JERSEY STATE SENATE,
SPEAKER OF THE NEW JERSEY GENERAL
ASSEMBLY
Intervenors in District Court
(D.N.J. No. 1:22-cv-07463)

Attorney General New Jersey and Superintendent New
Jersey State Police,
Appellants in 23-1900

Aaron Siegel; Jason Cook; Joseph Deluca; Nicole Cuozzo;
Timothy Varga; Christopher Stamos; Kim Henry and
Association of New Jersey Rifle & Pistol Club, Inc.,
Appellants in 23-2043

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 1-22-cv-07464 & 1-22-cv-07643)
District Judge: Honorable Renée M. Bumb

_____

Argued October 25, 2023

Before: KRAUSE, PORTER, and CHUNG, *Circuit Judges.*

(Filed September 10, 2025)

2

Angela Cai **[ARGUED]**
Jeremy Feigenbaum
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

    *Counsel for Appellants in 23-1900*

Leon J. Sokol **[ARGUED]**
Cullen & Dykman
433 Hackensack Avenue
Hackensack, NJ 07601

Edward J. Kologi
Kologi & Simitz
500 N Wood Avenue
Suite 4B
Linden, NJ 07036

    *Counsel for Intervenor-Appellants*

David A. Luttinger, Jr.
Covington & Burling
The New York Times Building
620 Eighth Avenue
New York, NY 10012

    *Counsel for Amicus Curiae Brady Center to Prevent*
    *Gun Violence in Support of Appellants*

Gretchen A. Pickering
Jeffrey H. Sutherland

Cape May County Office of Prosecutor
4 Moore Road
DN-110
Cape May Court House, NJ 08210

> *Counsel for Amicus Curiae County Prosecutor's*
> *Association of New Jersey in Support of Appellants*

Jeremy Girton
Office of Attorney General for the District of Columbia
Office of the Solicitor General
400 6th Street NW
Suite 8100
Washington, DC 20001

> *Counsel for Amicus Curiae District of Columbia in*
> *Support of Appellants*

Janet Carter
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163

> *Counsel for Amicus Curiae Everytown for Gun Safety*
> *in Support of Appellants*

Simon B. Kress
Alan E. Schoenfeld
Wilmer Cutler Pickering Hale & Dorr
7 World Trade Center
250 Greenwich Street
New York, NY 10007

> *Counsel for Amici Curiae Frederick Vars and Ian*
> *Ayres in Support of Appellants*

4

Amit Jain
Roderick & Solange MacArthur Justice Center
501 H Street NE
Suite 275
Washington, DC 20002

Joshua A. Matz
Hecker Fink
1050 K Street NW
Suite 1040
Washington, DC 20001

Disha Verma
Hecker Fink
350 Fifth Avenue
63rd Floor
New York, NY 10118

> *Counsel for Amicus Curiae Giffords Law Center to
> Prevent Gun Violence in Support of Appellants*

Jasmeet K. Ahuja
Hogan Lovells US
1735 Market Street
23rd Floor
Philadelphia, PA 19103

> *Counsel for Amicus Curiae March for Our Lives
> Foundation in Support of Appellants*

Peter A. Patterson **[ARGUED]**
David H. Thompson
Cooper & Kirk

1523 New Hampshire Avenue NW
Washington, DC 20036

David D. Jensen
David Jensen PLLC
33 Henry Street
Beacon, NY 12508

*Counsel for Appellees Koons Plaintiffs*

Paul D. Clement
Andrew C. Lawrence
Erin E. Murphy **[ARGUED]**
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, NJ 07450

Mariel A. Brookins
United States Chamber Litigation Center
1615 H Street NW
Washington, DC 20062

*Counsel for Appellants in 23-2043*

Bradley A. Benbrook
701 University Avenue
Suite 106
Sacramento, CA 95825

> *Counsel for Amici Curiae Citizens Committee for the
> Right to Keep and Bear Arms and FPC Action
> Foundation in Support of Appellees*

Robert J. Olson
370 Maple Avenue W
Suite 4
Vienna, VA 22180

> *Counsel for Amici Gun Owners of America, Inc., Gun
> Owners Foundation, Gun Owners of California, Inc.,
> DC Project, Tennessee Firearms Association, Heller
> Foundation, Second Amendment Law Center, and
> California Rifle & Pistol Association, Inc. in Support
> of Appellees*

Steven W. Dulan
5311 Park Lake Road
East Lansing, MI 48823

> *Counsel for Amici Curiae Michigan Coalition for
> Responsible Gun Owners and New Jersey Firearm
> Owners Syndicate in Support of Appellees*

_____

## OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge.*

Today, we must decide a question of immense public importance: whether it is likely that provisions of New Jersey Public Law 2022, Chapter 131, which impose certain firearms-permitting requirements and prohibit the carrying of firearms in certain "sensitive places," passes constitutional muster. Challengers assert that these restrictions impermissibly infringe upon the Second Amendment right, recognized by the Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), to carry a handgun for self-defense outside of the home. New Jersey defends its law as "consistent with this Nation's historical tradition of firearm regulation," as *Bruen* requires. *Id.* at 34.

For the most part, we agree with New Jersey and join our sister circuits that have upheld similar sensitive-places laws. *See LaFave v. Cnty. of Fairfax*, —F.4th—, 2025 WL 2458491 (4th Cir. Aug. 27, 2025); *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025); *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024). The Supreme Court in *Bruen* recognized the authority of legislatures to prohibit the carry and use of firearms in certain categories of places in the eighteenth and nineteenth centuries, including "legislative assemblies, polling places, and courthouses," and instructed courts to "use analogies to those historical regulations . . . to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30. So what principles undergird the historic regulation of firearms in "sensitive places" to guide our analogical reasoning? As we look through our history, a pattern emerges: our Nation has permitted restriction of firearms in discrete

8

locations set aside for particular civic functions and where the presence of firearms was historically regulated as jeopardizing the peace or posing a physical danger to others. We undertake our analysis of the particular places New Jersey has designated as sensitive in light of that history and the principles it embodies.[1]

## I.    Background

### A. The Challenged Law

For many decades, New Jersey required anyone who wanted to carry a handgun in public to show a "justifiable need" for self-protection. In 2022, the Supreme Court held in *Bruen* that a similar New York law violated the Second Amendment of the U.S. Constitution. In response, the New Jersey legislature enacted a measure known as Chapter 131, which excised the "justifiable need" requirement and added new licensing provisions and locational restrictions. The legislature increased the cost of a Handgun Carry Permit from $50 to $200 and prescribed that at least some portion of that

---

[1] Our dissenting colleague catalogues various of the locations we discuss where restrictions were historically permitted and then labels those locations as "principles" we espouse today. *See, e.g.*, Dissent at 2–4. But rhetoric cannot substitute for reality. The principles we derive from historical examples are distinct from the locations to which we apply them in determining whether a given restriction today passes constitutional muster. And as is clear from our rejection of portions of Chapter 131, those principles impose meaningful limits on New Jersey's regulation of firearms.

9

fee be deposited in the state's Victims of Crime Compensation Office (VCCO) account. N.J. Stat. Ann. § 2C:58-4(c). It also added the requirement that all Handgun Carry Permit applicants obtain character endorsements from at least "four reputable persons," *id.* § 2C:58-4(b), and mandated that every "private citizen" who carries a handgun in public maintain at least $300,000-worth of liability insurance against potential injuries, deaths, and property damage resulting from the "ownership, maintenance, operation or use of a firearm carried in public," *id.* § 2C:58-4.3(a).

Perhaps most prominently, Chapter 131 contains various new substantive limitations on firearm carry in New Jersey. First, as codified in N.J. Stat. Ann. § 2C:58-4.6(a), it prohibits carrying a firearm in twenty-five "sensitive places," including:

(6)     within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event;

(7)     a school, college, university or other educational institution, and on any school bus;

(8)     a child care facility, including a day care center;

(9)     a nursery school, pre-school, zoo, or summer camp;

10

(10)    a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety;

(11)    youth sports events, as defined in N.J.S.5:17-1, during and immediately preceding and following the conduct of the event, except that this provision shall not apply to participants of a youth sports event which is a firearm shooting competition to which paragraph (3) of subsection b. of section 14 of P.L.1979, c.179 (C.2C:58-6.1) applies;

(12)    a publicly owned or leased library or museum;

. . .

(15)    a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;

. . .

(17)    a privately or publicly owned and operated entertainment facility within this State, including but not limited to a

11

theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held;

(18)  a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property;

. . .

(21)  a health care facility, including but not limited to a general hospital, special hospital, psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, residential health care facility, medical office, or ambulatory care facility;

(22)  a facility licensed or regulated by the Department of Human Services, Department of Children and Families, or Department of Health, other than a health

12

care facility, that provides addiction or mental health treatment or support services;

(23) a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose; [and]

(24) private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6.

Subject to minor exceptions, carrying a firearm in any of these places constitutes a crime of the third degree, which carries a maximum sentence of five years' imprisonment and a presumptive sentence of four years' imprisonment. *Id.* Chapter 131 further prohibits people from carrying a loaded and unsecured firearm "in a vehicle in New Jersey"; those who wish to transport guns must unload their firearms and keep them locked in a secured container or the vehicle's trunk. *Id.* § 2C:58-4.6(b)(1).

## B. Procedural Background

Immediately after New Jersey passed the law, two groups of plaintiffs sued the New Jersey Attorney General and State Police Superintendent in their official capacities under 42 U.S.C. § 1983, alleging that Chapter 131 violates their Second Amendment rights and requesting declaratory and injunctive relief.  The first group, the "Koons Plaintiffs," is made up of several New Jersey residents and firearm advocacy organizations.  The second group, the "Siegel Plaintiffs," is comprised of additional New Jersey residents and the Association of New Jersey Rifle & Pistol Clubs.  The cases were consolidated, and the District Court permitted the President of the New Jersey Senate and Speaker of the New Jersey General Assembly to intervene as Defendants.

Plaintiffs cumulatively challenged many of Chapter 131's provisions, including most of its "sensitive place" restrictions, the prohibition on carrying unsecured firearms in vehicles, the increase in firearm permitting fees, and the $300,000 liability insurance requirement.  They also challenged existing fish and game-related firearm regulations codified at N.J. Admin. Code. § 7:25-5.23(a), (c), (f), (i), and (m), which govern what type of ammunition and weapons can be used to hunt game in the "woods, fields, marshlands, or on the water."[2]

---

[2] Plaintiffs also challenged Chapter 131's prohibition on the "unjustified display of a handgun," its exemption of judges,

After a hearing, the District Court preliminarily enjoined the "sensitive place" restrictions contained in N.J. Stat. Ann. § 2C:58-4.6(a)(6) (within 100 feet of a permitted public gathering), (a)(9) (preschools, summer camps, and zoos), (a)(10) (parks, beaches, and public recreation facilities), (a)(12) (public libraries and museums), (a)(15) (sites where alcohol is served), (a)(17) (entertainment facilities), (a)(18) (casinos), (a)(21) (hospitals and other healthcare facilities), (a)(23) (public movie and television sets), and (a)(24) (private property held open to the public, unless the owner has expressly consented to gun carry), in addition to the prohibition on guns in vehicles and the liability insurance requirement. The State Defendants and Siegel Plaintiffs appealed.[3] This

---

prosecutors, and attorneys general from certain requirements, and its ban on issuing a firearm purchase permit "[t]o any person where the issuance would not be in the interest of the public health, safety or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm" or to any person "known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others," N.J. Stat. Ann. §§ 2C:39-6(a)(12), 2C:58-3(c), 2C:58-4.4(a)(5).

[3] On appeal, the Siegel Plaintiffs appear to abandon their challenges to § 2C:58-4.6(a)(7) (schools and colleges), (a)(8) (child care facilities), and (a)(20) (airports and public transportation hubs). They also abandon their challenges to

Court granted a partial stay of the District Court's injunction, thereby allowing the law to take effect in most of the identified "sensitive places."[4]

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).  We review the District Court's grant or denial of a preliminary injunction for abuse of discretion, but we review *de novo* the underlying legal question—whether the New Jersey law violates the Second Amendment.  *See ADP, LLC v. Rafferty*, 923 F.3d 113, 119 (3d Cir. 2019).

To obtain a preliminary injunction, Plaintiffs must show that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary

_____

portions of § 2C:58-4.6(a)(9) (preschools and summer camps), in addition to their challenges to the law's prohibition on the unjustifiable display of a handgun, § 2C:58-4.4(a)(5), the exemption of judges, prosecutors, and attorneys general, § 2C:39-6(a)(12), and the character-based disqualifications for firearm purchase permits, § 2C:58-3(c).

[4] The preliminary injunction remains in effect for § 2C:58-4.6(a)(23) (public movie and television sets) and (a)(24) (private property held open to the public, unless the owner has expressly consented to firearm carry), in addition to the prohibition on unsecured firearms in vehicles and the liability insurance requirement.

16

relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs must establish the existence of the first two elements; once those two requirements are satisfied, we may balance all the factors in deciding whether to issue an injunction. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).

### III.   Existing Second Amendment Doctrine

In the absence of a "comprehensive[] defin[ition]" from the Supreme Court of what constitutes "sensitive places" where the government may restrict the right to bear arms, *Bruen*, 597 U.S. at 30, this case requires us to navigate the "unchartered frontiers," *Drummond v. Robinson Twp.*, 9 F.4th 217, 222 (3d Cir. 2021), of the Second Amendment. An overview of the state of Second Amendment law guides that journey.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court recognized for the first time an individual right to keep and bear arms "in defense of hearth and home." 554 U.S. 570, 635 (2008). The Court reached that conclusion by consulting "both text and history"—from the English and colonial origins of the "*pre-existing* right" the Second Amendment "codified," to interpretations of the Amendment "immediately after its ratification through the end of the 19th century"—to "determine *the public understanding*"

17

of that right. *Id.* at 592, 595, 605. Accordingly, the *Heller* Court employed an interpretive method rooted in history and tradition, assessing the validity of modern regulations by comparing them to practices that had developed over the preceding centuries.

Applying that history-and-tradition framework, the *Heller* Court struck down a District of Columbia law that "totally ban[ned] handgun possession in the home." *Id.* at 628. While breaking new ground in Second Amendment jurisprudence, the Court emphasized the limits of its holding, noting that "nothing in our opinion should be taken to cast doubt on longstanding . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]" *Id.* at 626. The Court further clarified: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

Soon after *Heller*, the Court held that the individual right to keep and bear arms applied against the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Reasoning that the right to keep and bear arms is "fundamental," the Court decided that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 791 (plurality opinion). Yet the Court "repeat[ed *Heller*'s] assurances" that its holding "did not cast doubt on such longstanding regulatory measures as . . . 'laws forbidding the carrying of firearms in sensitves places such as schools and government buildings[.]'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626–27).

*McDonald* spawned a host of Second Amendment challenges to state laws restricting the ability of law-abiding

Americans to bear arms beyond the "hearth and home." In one such suit, a group of New Jersey plaintiffs sought to invalidate a state statute that required an individual to demonstrate a "justifiable need" in order to obtain a license to carry a handgun in public. *Drake v. Filko*, 724 F.3d 426, 428 (3d Cir. 2013). We rejected that challenge under the two-part constitutional test we discerned from *Heller*, asking whether the challenged law "impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee," and if so, whether the law satisfied "some form of means-end scrutiny." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

More than a decade later, in *Bruen*, the Supreme Court resolved a Second Amendment challenge to the New York "proper cause" licensing statute. *See Bruen*, 597 U.S. at 11 (quoting 1913 N.Y. Laws ch. 608, § 1, p. 1629). In its most extensive exegesis of the Second Amendment since *Heller*, the Supreme Court observed that the Courts of Appeals "ha[d] coalesced around a 'two-step' framework . . . that combines history with means-end scrutiny" and rejected that approach as "one step too many." *Id.* at 17, 19. Instead, the Court explained, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

That inquiry is sometimes "fairly straightforward": "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is

inconsistent with the Second Amendment." *Id.* at 26. But when a contemporary regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," courts must apply "a more nuanced approach." *Id.* at 27. Namely, courts must assess whether the contemporary regulation is "relevantly similar" to a historical restriction, *id.* at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 731, 773 (1993)), by considering "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense," *id.* The Court stressed that this approach "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. As the government must "identify a well-established and representative historical *analogue*, not a historical *twin*," a contemporary regulation that "is not a dead ringer for historical precursors . . . still may be analogous enough to pass constitutional muster." *Id.*

To illustrate the flexibility of its analogical method, the Court examined "*Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id.* (quoting *Heller*, 554 U.S. at 626). According to the Court, while "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses," it also knew "of no disputes regarding the lawfulness of such prohibitions." *Id.* (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–36, 244–47 (2018)). The Court thus deemed it "settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment" and authorized courts to "use analogies to those historical regulations of 'sensitive places' to determine that

modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* It cautioned, however, that those analogies could not be stretched to the point of "eviscerat[ing] the general right to publicly carry arms for self-defense" because the Court rejected the view that the government could "expand[] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement." *Id.* at 31.

Having clarified the governing test, the Court turned to New York's proper-cause licensing law. First, the Court observed that the text of the Second Amendment covered the challengers' "proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 32. So the Court considered whether the historical restrictions put forward by New York demonstrated that the "proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 34.

Although New York "appeal[ed] to a variety of historical sources from the late 1200s to the early 1900s," the Court explained that "when it comes to interpreting the Constitution, not all history is created equal." *Id.* Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," the key periods are when "[t]he Second Amendment was adopted in 1791 [and] the Fourteenth in 1868." *Id.* (quoting *Heller*, 554 U.S. at 634–35). However, "English practices that 'prevailed up to the period immediately before and after the framing of the Constitution'" can help illuminate the traditions our forebearers ratified. *Id.* (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 311 (2008) (Roberts, C.J.,

dissenting)).    Likewise, interpretations of the Second Amendment "from immediately after its ratification through the end of the 19th century" offer a "critical tool of constitutional interpretation," so long as they do not contradict the original meaning of the right to keep and bear arms. *Id.* at 35 (quoting *Heller*, 554 U.S. at 605).    Finally, the Court declined to resolve whether courts should look to the Founding era or Reconstruction era for the prevailing understanding of the Second Amendment, acknowledging the "ongoing scholarly debate" on the subject. *Id.* at 37 (citing Akhil Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998)).    The Court concluded it did not make a difference in *Bruen* because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

The *Bruen* Court proceeded to survey historical sources from medieval England through the early-twentieth century to identify the historical tradition of public carry. *See id.* at 39–70.    That exercise proved illuminating, as it enabled the Court to discern which restrictions were "late-in-time outliers" that deviated from the otherwise-prevailing norm of "the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 70; *see also id.* at 67–68 ("[W]e will not stake our interpretation on a handful of temporary territorial laws that . . . 'contradic[t]    the overwhelming weight' of other, more contemporaneous historical evidence." (quoting *Heller*, 554 U.S. at 632)).    Apart from those outliers, the Court found a robust tradition of general public carry, so the Court struck down New York's proper-cause statute as inconsistent with the Second Amendment. *Id.* at 70.

22

Two terms ago, in *United States v. Rahimi*, the Supreme Court elaborated on *Bruen*. 602 U.S. 680 (2024). There, the Court rejected a challenge to the constitutionality of 18 U.S.C. § 922(g)(8), which bars a person subject to a domestic violence restraining order from possessing a firearm if he is found to pose a credible threat to his partner. In doing so, the Court clarified the methodology for evaluating Second Amendment challenges under *Bruen*. Contrary to how some Courts of Appeals had interpreted it, the Court eschewed the notion that *Bruen*'s test portends "a law trapped in amber." *Rahimi*, 602 U.S. at 691. Instead, the "why and how" analysis operates at the level of "principles underlying the Second Amendment." *Id.* at 692. As such, whether a modern regulation comports with the Second Amendment turns on "whether the challenged *regulation* is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added).

The Court went on to identify historical surety statutes requiring "individuals suspected of future misbehavior" to post a bond before "going armed" and affray laws preventing people from "going armed" when doing so would "disrupt[] the public order," reading from these dissimilar measures the general principle that, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 695–98 (citation omitted). Having distilled this principle, the Court had little difficulty concluding that § 922(g)(8)—which "is by no means identical to these founding era regimes"—"fits neatly within the tradition" of firearm regulation in this country. *Id.* at 698.

\*     \*     \*

23

From this line of cases, we distill the following legal precepts.

First, our analysis of modern regulations and their fit and justification in light of historical principles does not bind legislatures in a "regulatory straightjacket." *Bruen*, 597 U.S. at 30; *see also Rahimi*, 602 U.S. at 739 (Barrett, J., concurring) ("To be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart."). Our society has evolved considerably since the Nation's earliest days. Many of the "general societal problem[s]" that contemporary firearm regulations aim to address did not exist during the Founding and Reconstruction eras.[5] *See Antonyuk*, 120 F.4th at 970 ("[C]ourts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction. To put it plainly, our era does not resemble those."). And as *Rahimi*

---

[5] As firearm technology has advanced and population density increased, gun violence has risen, as has the scale of fatalities. The "first known mass shooting resulting in ten or more deaths"—a phenomenon that now happens tragically on a near-daily basis, *see Past Summary Ledgers*, Gun Violence Archive, https://perma.cc/B9UY-6SDR—"did not occur in this country until 1949." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44 (1st Cir. 2024) (quotation omitted); *see also Range v. Att'y Gen.*, 124 F.4th 218, 250 (3d Cir. 2024) (en banc) (Krause, J., concurring in the judgment) (collecting sources detailing the "brutal gun deaths and horrific mass shootings . . . [that] are a daily occurrence in our schools, our streets, and our places of worship" (footnotes omitted)).

makes clear, our search for historical analogues calls for an inquiry into "principles" that justify modern regulations, not "historical twin[s]" or "dead ringer[s]." *Bruen*, 597 U.S. at 30. So "we cannot look at history through a pinhole," *United States v. Veasley*, 98 F.4th 906, 912 (8th Cir. 2024), and instead we analogize to principles distilled from our Nation's history and tradition as a whole.

Second, in our quest to understand the Second Amendment "according to its public meaning in 1791" and "the understandings of those who ratified it," post-ratification authorities "can be 'a critical tool of constitutional interpretation' because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood."[6] *Lara v. Comm'r*

---

[6] Several Justices have also espoused this view, *see, e.g.*, *Rahimi*, 602 U.S. at 728 (Kavanaugh, J., concurring) ("The Court has repeatedly employed post-ratification history to determine the meaning of vague constitutional text."); *id.* at 738 (Barrett, J., concurring) (explaining that "postenactment history can be an important tool"); *see also Heller*, 554 U.S. at 605–19 (Scalia, J., joined by Roberts, C.J., and Kennedy, Thomas, and Alito, JJ.) (surveying sources "from immediately after [the Second Amendment's] ratification through the end of the 19th century"); *McDonald*, 561 U.S. at 778 (Alito, J., joined by Roberts, C.J., and Scalia and Kennedy, JJ.) (extensively analyzing the views of both the "Framers" and the "ratifiers of the Fourteenth Amendment"), and several of our sister circuits have done the same, *see Wolford v. Lopez*, 116

*Pa. State Police* (*Lara II*), 125 F.4th 428, 441 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 28, 35); *see also United States v. Quailes*, 126 F.4th 215, 222 & n.8 (3d Cir. 2025); *United States v. Moore*, 111 F.4th 266, 271 (3d Cir. 2024). Accordingly, where it aids in our understanding of, and does not conflict with, the original meaning, our survey of history will look to post-ratification history, as well as the Founding era, to identify relevant principles.[7] Even a comparatively rare post-Founding

_____

F.4th 959, 980 (9th Cir. 2024); *Antonyuk v. James*, 120 F.4th 941, 973–74 (2d Cir. 2024); *Hanson v. District of Columbia*, 120 F.4th 223, 236–40 (D.C. Cir. 2024) (per curiam).

[7] The dissent asserts that we rely "heav[ily] and indiscriminate[ly] . . . on questionable Gilded-Age evidence." Dissent at 12. But we rely on 19th century history only where "it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. And our targeted reliance on such authorities to "provide 'confirmation of [what the Founding-era laws] established,'" *United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 37), is entirely consistent with *Lara v. Comm'r Pa. State Police* (*Lara II*), in which we held that post-ratification authorities indeed "can be 'a critical tool of constitutional interpretation'" where such authority does not contradict Founding-era authority. 125 F.4th 428, 441 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 35). So though our dissenting colleague would reject consideration of all post-ratification history that he deems "questionable," Dissent at 12, that is not the law of our Circuit.

practice may shed light on the meaning of the right to keep and bear arms if it is part of a longstanding legal tradition.

While we consider Reconstruction-era history, we nonetheless remain vigilant not to "giv[e] postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. Late-nineteenth century departures from practices at the Founding are the kinds of "outliers" upon which courts may not "stake [their] interpretation[s] of the Second Amendment[.]" *Id.* at 65 (quoting *Heller*, 554 U.S. at 632). Thus, when we look to statutory analogues from the late 1800s, we exercise caution to evaluate them in their historical context, relying on them to the extent they do not "contradict[] earlier evidence." *Lara II*, 125 F.4th at 441.

Finally, we are mindful that legislatures do not always legislate up to the constitutional line. *See Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring) (highlighting the flaws in the assumption "that founding-era legislatures maximally exercised their power to regulate"); *Antonyuk*, 120 F.4th at 969 ("Legislatures past and present have not generally legislated to their constitutional limits."). So while the lack of a historical twin is of course relevant to our distillation of principles under *Bruen* and *Rahimi*, it is not dispositive.[8]

---

[8] Our dissenting colleague suggests that the party-presentation principle forbids courts from conducting "independent judicial research" on historical sources and considering relevantly similar historical analogues not cited by the parties. Dissent at

This case presents our first occasion to answer the "where" question, that is, in which locations the government can permissibly proscribe carrying firearms. We therefore follow the Supreme Court's example in *Heller*, *Bruen*, and *Rahimi*, examining the history of relevant firearm restrictions to discern the principles underlying the traditional scope of

―――――――――――――

11 n.10, 86. That misunderstands both Supreme Court and our own precedent. The Court in *Bruen* observed that courts "are not *obliged* to sift the historical materials for evidence to sustain [a state's] statute," 597 U.S. at 60 (emphasis added), not that they are *prohibited* from doing so, *see id.* at 25 n.6 (explaining that courts are "entitled," not obligated, "to decide a case based on the historical record compiled by the parties"). Indeed, after observing in *Bruen* that both parties had "ignore[d] the 'outpouring of discussion of the [right to keep and bear arms]'" in the Reconstruction era, the Court proceeded to conduct its own "review of the public discourse." *Id.* at 60 (second alteration in original).

We and other Courts of Appeals have likewise held that "we have the discretion"—though not the obligation—"to conduct independent legal research and consider past laws and judicial decisions, regardless of whether they were raised below," *Quailes*, 126 F.4th at 221 n.6 (citing *Bruen*, 597 U.S. at 60); *see also United States v. Williams*, 113 F.4th 637, 645 n.2 (6th Cir. 2024); *Wolford*, 116 F.4th at 976. In short, while it is no doubt Defendants' burden to show that the challenged regulations are consistent with our historical tradition, *Bruen*, 597 U.S. at 60, it is ultimately the obligation of this Court to interpret the Second Amendment accurately.

carry restrictions, their application, and assessing possible analogues to each challenged provision of New Jersey law.

## IV.    <u>The History and Tradition of Carry Restrictions</u>

That history, as it turns out, is long.  For centuries, individuals' right to carry arms has been subject to a variety of well-defined restrictions.  Over time, these carry restrictions have protected discrete locations set aside for specific civic purposes and addressed breaches of the peace or physical safety.  To understand the metes and bounds of those historical laws and the correlative scope of the right to bear arms, we survey the historical record from: (A) early England, (B) the American colonies, (C) the Founding and Early Republic, (D) the antebellum period, and (E) Reconstruction through the *fin de siècle*.  That overview confirms that governments have long limited the carrying of guns in specific kinds of venues commensurate with their peculiar needs and functions.

### A. British Antecedents

As early as the Anglo-Saxon period, English monarchs ensured the orderly functioning of government by enforcing "the king's peace," a concept that had a location-based component; such laws originally forbade assailing a member of the king's household or drawing "a weapon in the king's house."[9]  While disturbing the king's peace was a particularly serious transgression, English custom recognized that a

_____

[9] David Feldman, *The King's Peace, the Royal Prerogative and Public Order: The Roots and Early Development of Binding over Powers*, 47 Cambridge L.J. 101, 105 (1988).

number of other sites also enjoyed their own "peace," from manors and homesteads to churches.[10]  Eventually, as part of the general expansion of royal authority over local powers, the "king's peace" absorbed "the 'peace' of the various customary jurisdictions[.]"[11]  These early obligations to respect order and refrain from violent disruption demonstrate that the protection of government functions was an important—but by no means exclusive—goal of arms regulation, as households and congregations similarly demanded peacefulness.

Preserving the peace and safety at discrete venues performing government functions remained a core focus in ensuing years.  In 1313, to preserve their function,[12] Parliament enacted a statute commanding that, "in all parliaments, treatises, and other assemblies, which should be made in the realm of England for ever, that every man shall come without all force and armour, well and peaceably, to the honour of us, and the peace of us and our realm."[13]

Fifteen years later, during a period of "turmoil," Parliament enacted the Statute of Northampton. *Bruen*, 597 U.S. at 40 (quoting Norman Maclaren Trenholme, *The Risings*

---

[10] A.H.F. Lefroy, *Anglo-Saxon Period of English Law, Part II*, 26 Yale L.J. 388, 388–89 (1917).

[11] *Id.* at 389; *see also Young v. Hawaii*, 992 F.3d 765, 788 n.8 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022).

[12] *See* Kopel & Greenlee, *supra*, at 209–10.

[13] 7 Edw. 2 c. 170 (1313).

*in the English Monastic Towns in 1327*, 6 Am. Hist. Rev. 650, 651 (1901)).  The Statute provided:

> That no Man . . . be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.[14]

---

[14] 2 Edw. 3 c. 3 (1328).  The first portion of the Statute echoes its predecessor, safeguarding "the King's peace," by forbidding "force and arms" when in the presence of the King or the King's Ministers.  The Statute appears to distinguish this first offense from the separate offenses of bringing "force in affray of the peace" (a prohibition that applied everywhere) and traveling armed in fairs, markets, in the presence of justices or ministers, or in similar places.  That is, a person could not bear arms anywhere that the King or his Ministers were physically present; going armed offensively was prohibited in fairs, markets, in the presence of justices or ministers, or in similar places.  This greater restriction in the presence of the King and the representatives of his authority, preceding the restrictions on affray set forth in the Statute, suggest that criminal culpability in this first context required no "intent to terrify" or other specific evil intent.  Merely using force or

The Supreme Court has concluded that the Statute of Northampton was limited to armor and weapons like lances that were "generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace." *Bruen*, 597 U.S. at 41. At common law, affray was considered more serious when "officers of justice [were] disturbed in the due execution of their office" or "where a respect to the particular place ought to restrain and regulate men's behavior, more than in common ones; as in the king's court, and the like." 4 William Blackstone, *Commentaries on the Laws of England* 145 (1769). Similarly, "affrays in a church or church-yard [were] esteemed very heinous offenses, as being indignities to him to whose service those places are consecrated." *Id.* In such circumstances, "mere quarrelsome words, which are neither an affray nor an offense in any other place, are penal."[15] *Id.*

––––––––––––––––––––

carrying arms in a place where the King or his Ministers were present, and presumably engaged in governing, was sufficiently disruptive and undermining of the King's authority as to warrant punishment under the Statute.

[15] *See also* David. B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 203, 205, 212 (2018) (concluding that "[p]rotecting government deliberation from violent interference is the core of the sensitive places tradition," beginning with the Statute of Northampton whose "preeminent purpose was to prohibit arms carrying around the

32

The second portion of the Statute of Northampton added new locations, like fairs and markets, and in the presence of justices or other ministers, and it proscribed bringing force in affray of the peace and going armed.  In discussing the going armed portion of this statute, the Supreme Court has concluded that violating the Statute required both "terrify[ing] the King's subjects" and "evil intent or malice." *Id.* at 44.

Consistent with the principle of restricting arms to protect deliberations in places of civic importance, in 1351, English law prohibited "go[ing] armed" in "the parliaments and councils of our lord the king" as "broils, riots and disputes, have arisen and been moved, for that people have gone to the places . . . armed" within London and the Palace of Westminster.[16] These disturbances resulted in "[impeding] the business of our Lord the King and of his realm" and "the great

---

king's officials" and describing the Statute of Northampton as "serv[ing] several purposes: preventing powerful criminals from armed attacks on the functioning of courts; preventing criminal attacks on other government officials; and preventing armed overthrow of the Queen and her consort.").

[16] 25 Edw. III A.D. 1351, Royal proclamation as to the wearing of Arms in the City and at Westminster; and as to playing at games in the Palace at Westminster, *reprinted in London and London Life, in the XIIIth, XIVth, and XVth Centuries being a Series of Extracts, Local, Social, and Political from the Early Archives of the City of London, A.D. 1276-1419.*

people and others who have come there . . . have been alarmed threat."[17]

Subsequent versions of the Statute of Northampton similarly reveal the kinds of locations that implicated concerns about maintaining peace such that the government restricted arms-bearing. During Owain Glyndŵr's uprising for Welsh independence,[18] King Henry IV extended to Wales a modified version of the Statute that "ordained and established, that from henceforth no Man [shall] be armed nor bear defensible armor to Merchant Towns, Churches, nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people[.]"[19]    Although the English ultimately quelled Glyndŵr's revolt, seventy years later—in a remarkable twist of history—the Welsh-born Harri Tudur deposed King Richard III and became King Henry VII, the first of the Tudor dynasty.[20]  His son, the notorious Henry VIII, sought to integrate Wales into England through a series of statutes,[21] including a revised Statute of Northampton.[22]  That law banned

---

[17] *Id.*

[18] *See* Kopel & Greenlee, *supra* note 15, at 216 n.42.

[19] 4 Hen 4 c. 29 (1403).

[20] *See A Welsh King of England*, Cadw (2023), https://perma.cc/62CQ-WASG.

[21] *See id.*

[22] *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of*

the Welsh from bringing weapons to "any sessions or court to be holden within Wales . . . or to any place within the distance of two miles from the same sessions or court, nor to any town, church, fair, market, or other congregation . . . nor in the highways, in affray of the King's peace or the King's liege people[.]"[23]   Much like the enactment a century prior, this version of the Statute of Northampton evinced a traditional principle of maintaining peace and order in a variety of communal forums.

These location-based restrictions were also adopted to address breaches of the peace in other contexts, such as by hunting with firearms.   A 1485 law was prompted by "unlawful[] hunting . . . with painted faces, some with visors, and otherwise disguised . . . riotously, and in manner of War arrayed . . . by night as by day [in] forests, parks, and warren" which led to "great and heinous rebellions, insurrections, riot, robberies, murders and other inconvenience, to the provocacion and example of riotous and evil disposed persons."[24]   Because such offenders "could not be duly

_____

*Review*, 60 Clev. St. L. Rev. 1, 20 (2012) ("The tenets of the Statute were even extended to Wales in preparation of its England annexation as one of the bas[e]s of its new legal system.").

[23] 26 Hen. 8 c. 6 (1534); *see also* Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 Geo. J.L. & Pub. Pol'y 511, 513 (2008) (emphasizing the "problem that the statute sought to correct was not even Welsh rebellion").

[24] 1 Hen. VII c. 7.

35

punished before this Time" due to their disguises, the law punished as felonious breaches of the peace "unlawful hunting in any legal forest, park, or warren, not being the king's property, by night, or with painted faces". *Id.*; *see also* 4 Blackstone, *Commentaries* *143.

Parliament passed a similar statute in 1723—the Black Act— which tightened restrictions by prohibiting, among other things, "being armed with swords, fire-arms, or other offensive weapons, and having his or their faces blacked, or being otherwise disguised, [and] appear[ing] in any forest, chase, park, paddock, or grounds inclosed . . . wherein any deer have been or shall be usually kept ... or in any high road, open heath, common or down[.]"[25] While the Black Act sought to curtail poaching by organized gangs, it also made this practice an offense against the public peace because "the manner in which that [property] damage is committed . . . with the face blacked or with other disguise, and being armed with offensive weapons, [is] to the breach of the public peace and the terror of his majesty's subjects." 4 Blackstone, *Commentaries* at 143.[26]

Locational restrictions were not the only limitations on arms-bearing. Another line of statutes, relied upon by the

---

[25] 9 Geo. I. c. 22 (1723).

[26] *See also* 9 Geo. 1. c. 22 (seeking to "prevent[ the] wicked and unlawful practices," of people in disguise going "armed with swords, fire-arms, and other offensive weapons," "unlawfully hunt[ing] in forests belonging to his Majesty, and in the parks of divers of his Majesty's subjects . . . to the great terror of his Majesty's peaceable subjects.").

Supreme Court in *Rahimi*, reflects that, at common law, sureties were used to disincentivize future breaches of the peace.[27] *Rahimi*, 602 U.S. at 695. Blackstone explained that a justice of the peace who witnessed an individual "make an affray" or was approached by an individual who demonstrated "just cause to fear" that another would injure him or his property could "demand surety of the peace against such person."[28] The justice of the peace could then require the accused to identify "members of the community who would pledge responsibility for the defendant and risk losing their bond if the defendant failed to 'keep the peace.'"[29] If the accused failed to "find such sureties," the justice of the peace could order him "committed till he [did.]"[30]

## B. Colonial America

The settlers who founded the thirteen colonies brought with them the British notion of a right to bear arms that was

---

[27] *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J.F. 121, 131 (2015).

[28] 4 William Blackstone, *Commentaries on the Laws of England* \*252 (1769); Michael Dalton, *The Country Justice* 37 (1690) ("If an Affray or Assault shall be made upon a Justice of Peace or a Constable, they may not only defend themselves, but may also apprehend and commit the Offenders, until they have found Sureties for the Peace.").

[29] Ruben & Cornell, *supra* note 27, at 131.

[30] 4 Blackstone, *Commentaries* \*252.

not unlimited, including with respect to certain locations.[31] Maryland—following the example of Parliament's 1313 statute—forbade individuals from carrying firearms in legislative assemblies.[32]  Virginia continued to enforce the British prohibition on "rid[ing], or go[ing], offensively armed, in Terror of the People,"[33] whereas Massachusetts and New Hampshire enacted their own versions of the Statute of Northampton and codified the authority of justices of the peace to impose sureties.[34]

————————————————

[31] *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 167 (2021).

[32]  *See* 1647 Md. Laws 216; 1650 Md. Laws 273; 63 proceedings and Acts of the Maryland General Assembly 338, § 5 ("[N]o Person [shall] come into the House of Assembly, while the same is sitting, with Sword or other Weapon.").

[33] George Webb, *The Office and Authority of a Justice of Peace* 92 (1736); *see also Bruen*, 597 U.S. at 49 n.14.

[34] An Act for the Punishment of Criminal Offenders, *reprinted in* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 52–53 (1869) [hereinafter Mass. Act of 1692] ("[E]very justice of the peace in the county where the offence is committed, may cause to be staid and arrested all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively before any of their majesties' justices, or other their officers or ministers doing

The colonies also began to innovate, imposing novel restrictions tailored to the exigencies of the New World.  In response to breaches of the peace and the danger caused by celebratory and drunken shooting, Virginia banned "shoot[ing] any guns at drinking (marriages and funerals only excepted)" upon pain of "forfeit[ing] 100 lb. of tobacco."[35]   Likewise,

their office or elsewhere[;] . . . and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison until he find sureties for the peace and good behaviour, and seize and take away his armour or weapons, and shall cause them to be apprized and answered to the king as forfeited[.]"); An Act for Establishing and Regulating Courts of Public Justice Within this Province, *reprinted in Acts and Laws of His Majesty's Province of New Hampshire: In New England; with Sundry Acts of Parliament* 1–2 (1759) [hereinafter N.H. Act of 1701] ("[E]very justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches: And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence.").

[35] Act of March 10, 1656, act XII [hereinafter Va. Act of 1656], *reprinted in* 1 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (William W. Hening ed., 1823)

citing the "[d]runkenness and other insolence [that] prevail[s] on New Year's and May Days" and the "deplorable accidents such as wounding, which frequently arise" from the "firing of Guns" on those holidays, New Netherland "expressly forb[ade] from this time forth all firing of Guns . . . within this Province . . . . on New Years or May days[.]"[36]  In response to nighttime shooting, New Jersey enacted even tighter controls banning, not the shooting, but the carrying of a gun within two-hundred yards of roads or paths while "watching" for deer at night.[37]

--------

[hereinafter Va. Acts].  During Colonial times, "the traditional method of raising the alarm of an attack after dark involved the firing of several guns in succession." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second* Amendment, 25 L. & Hist. Rev. 139, 162 (2007).  Shooting unnecessarily breached the peace as "the only means for the discovery of [Native American] plotts [to attack] is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking." Va. Act of 1656, at 401–02.

[36] Act of Dec. 31, 1655, *reprinted in Laws and Ordinances of New Netherland, 1638–1674: Compiled and Translated from the Original Dutch Records in the Office of the Secretary of State, Albany, N.Y.* 205 (E.B. O'Callaghan ed., 1868) [hereinafter N.Y. Act of 1655].

[37] An Act for the More Effectual Preservation of Deer in this Colony, *reprinted in Laws of the Royal Colony of New Jersey*

To address concerns raised by armed trespass, the colonies enacted a suite of laws codifying a presumption that one had to obtain consent from the property owner before carrying weapons on their property. While some early laws prohibited *shooting* on others' land,[38] subsequent enactments also restricted *carrying* weapons on others' property.[39] At first, those shooting and carry restrictions required a prior warning

_____

*1760–1769*, at 585 (Bernard Bush ed., 1982) [hereinafter N.J. Act of 1769] (prohibiting "watch[ing] with a gun . . . within two hundred Yards of any Road or Path . . . for shooting at Deer driven by Dogs"); An Act to Continue and Amend an Act, entitled, An Act for Better Settling and Regulating the Militia of the Colony of New Jersey for the Repelling Invasion, and Suppressing Insurrections and Rebellions, *reprinted in Acts of the General Assembly of New Jersey* 347 (Samuel Allinson ed., 1776) (enacted 1771) [hereinafter N.J. Act of 1771] (same).

[38] Acts of General Assembly, Jan. 6, 1639, *reprinted in* Va. Acts 228 [hereinafter Va. Act of 1639]; Acts of General Assembly, Mar. 2, 1642, *reprinted in* Va. Acts 248 [hereinafter Va. Act of 1642]; Acts of General Assembly, Mar. 9, 1657, *reprinted in* Va. Acts at 437 [hereinafter Va. Act of 1657].

[39] An Act for the Speedy Trial of Criminals, and Ascertaining their Punishment, in the County-courts, when Prosecuted there; and for Payment of Fees due from Criminal persons, *reprinted in Acts of Assembly, Passed in the Province of Maryland, from 1692, to 1715*, at 90 (J. Baskett ed., 1723) [hereinafter Md. Act of 1715] (imposing that restriction on individuals convicted of certain crimes or those "that shall be of evil fame, or a vagrant, or dissolute liver").

from the landowner.[40]  But that requirement eventually gave way, as several colonies mandated that individuals obtain an owner's permission before bearing firearms on his lands, whether enclosed or not.[41]  Locationally, these were similar to

_____

[40] Va. Act of 1642, at 248 (hunting or shooting punishable if person failed to get permission from the owner, as well as received a warning not to hunt); Va. Act of 1657, at 437 (same); Md. Act of 1715, at 90.

[41] The specific lands to which these restrictions applied varied. An Act to Prevent the Killing of Deer Out of Season, and against Carrying of Guns or Hunting By Persons Not Qualified, *reprinted in* 3 *The Statutes at Large of Pennsylvania from 1682–1801*, at 255 (James T. Mitchell & Henry Flanders eds., 1896) [hereinafter Pa. Act of 1721] ("improved or inclosed lands of any plantation" and, unless an "owner of fifty acres of land and otherwise qualified," "in the woods or uninclosed lands"); An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns or Hunting by Persons not Qualified, *reprinted in The Acts of the General Assembly of the Province of New Jersey* 123 (W. & A. Bradford eds., 1732) (enacted 1722) [hereinafter N.J. Act of 1722] ("Improved or Inclosed Lands in any Plantation" and, unless an "owner of one Hundred Acres of land or otherwise Qualified," in the "Woods or Uninclosed Lands"); A Supplementary Act to the Act entitled, an Act to prevent the killing of deer out of season, and against carrying of Guns, and hunting by Persons not qualified, *reprinted in The Acts of the General Assembly of the Province of New Jersey* 453 (W.

the English hunting laws noted above. They also shared the recognition that hunting on the lands of others could both harm the owner's property rights and breach the peace.[42]

---------

Bradford ed., 1752) [hereinafter N.J. Act of 1752] (same); Act of Apr. 9, 1760, *reprinted in A Digest of the Laws of Pennsylvania from the Year One Thousand Seven Hundred to the Sixteenth Day of June, One Thousand Eight Hundred and Thirty-Six* 495 (5th ed. 1837) [hereinafter Pa. Act. of 1760] ("any enclosed or improved lands of any of the inhabitants of this province"); An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof, *reprinted in* 2 *Laws of New York 1691–1773*, at 441–42 (Gaine ed. 1774) [hereinafter N.Y. Act of 1763] ("any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof"); N.J. Act of 1769, at 582 ("Lands not his own, (and for which the Owners pay Taxes) or is in his lawful Possession"); *id.* at 585 ("uninclosed land, within two hundred Yards of any Road or path in the Night-time, whether the said Road is laid out by Law or not"); N.J. Act of 1771, at 344 ("any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession"); and *id.* at 347 ("uninclosed Land within two Hundred Yards of any Road or Path in the Night Time, whether the said Road is laid out by Law or not").

[42] N.Y. Act of 1763, at 441 (banning firearms due to "the great Danger of the Lives of his Majesty's Subjects, the Ruin and Destruction of the most valuable Improvement, the grievous

## C. The Founding and Early Republic

As the colonies coalesced into the United States, legislatures struck a delicate balance between continuity in regulation of the right to bear arms and necessary adaptations of those regulations to new, emerging circumstances. Several states relied on English legal roots by enacting versions of the

---

Injury of the Proprietors, and the great Discouragement of their Industry"; Va. Act of 1642, at 248 ("Whereas the rights and interests of the inhabitants are very much infringed by hunting and shooting of diverse men upon their neighbors lands and dividends contrary to the privileges granted to them by their patents, whereby many injuries do daily happen to the great damage of the owners of the land whereon such hunting or shooting is used, It is therefore enacted and confirmed that if any planter or person shall hunt or shoot upon or within the precincts or limits of his neighbor or other dividend without leave first obtained for his so doing, and having been warned by the owner of the land to forbear hunting and shooting as aforesaid, he or they so offending shall forfeit for every such offence four hundred pounds of tobacco."); N.J. Act of 1722, at 123 ("[W]hereas divers abuses have been committed, and great Damages and Inconveniencies arisen by Persons carrying of Guns and presuming to hunt [and] for Remedy whereof for the future."); Churchill, Gun Regulation, *supra* note 35, at 162 ("Colonial governments expressed particular concern over the firing of guns after dark" due to false alarms and the "dangers to lives and property.").

Statute of Northampton;[43] indeed, North Carolina's 1792 statute was so traditional that it retained references to the

---

[43] An Act forbidding and punishing Affrays, *reprinted in Acts Passed at a General Assembly of the Commonwealth of Virginia Begun and Held at the Public Buildings in the City of Richmond, on Monday the Sixteenth Day of October in the Year of Our Lord, One Thousand Seven Hundred and Eighty-Six*, at 35 (Dixon, et al. eds., 1786) [hereinafter Va. Act of 1786]; No Man Shall come Before the Justice, or Go or Ride Armed, *reprinted in A Collection of Statutes of Parliament of England in Force in the State of North Carolina* 60–61 (Francois-Xavier Martin ed., 1792) [hereinafter N.C. Statute of Northampton]; An Act for the Punishment of Certain Crimes and Offences, Within the District of Columbia, *reprinted in Code of Laws for the District of Columbia* 235, 254 (Davis & Force eds., 1819); An Act for repealing an Act, made and passed in the year of our Lord one thousand six hundred and ninety-two, entitled, "An Act for punishing Criminal Offenders," and for re-enacting certain Provisions therein, *reprinted in* 1 *The General Laws of Massachusetts* 454 (T. Metcalf ed., 1823) [hereinafter Mass. Act of 1795] (prohibiting going "armed offensively, to the fear or terror" without reference to fairs and markets); An Act for the restraint of idle and disorderly persons, *reprinted in* 1 *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in This State: From the Year 1715 to the Year 1820, Inclusive* 710 (Heiskell & Brown eds., 1821) (enacted 1801) [hereinafter Tenn. Act of 1801] (same); An Act describing the power of

45

King.[44]  These laws, which originally protected the integrity of "fairs and markets,"[45] extended to a significant portion of the American public.  *See Antonyuk v. Chiumento*, 89 F.4th 271, 358 (2d Cir. 2023) (describing how Virginia and North Carolina alone accounted for over a quarter of the Nation's population at the Founding).  For instance, the City of New Orleans passed an ordinance in 1817 that promoted the Statute of Northampton's longstanding goal of preserving the peace in locations akin to the "Fairs" of prior centuries by decreeing it unlawful "for any person to enter into a public ball-room with any cane, stick, sword, or any other weapon[.]"[46]  This ordinance, however, said nothing of dangerousness, offensive use of arms, affray, or to the terror, suggesting that the intent of the arms-bearer was irrelevant to his culpability.

---

Justices of the Peace in Civil and Criminal Cases, *reprinted in* 1 *Laws of the State of Maine* 352–53 (J. Griffin ed., 1821) [hereinafter Me. Act of 1821] (same).

[44] *See Bruen*, 597 U.S. at 122 (Breyer, J., dissenting).

[45] In some states, the going-armed laws no longer included a location-based element.  *See* Mass. Act of 1795, at 454 (prohibiting "going armed offensively, to the fear or terror" without reference to fairs and markets); Tenn. Act of 1801, at 710 (same); Me. Act of 1821, at 285 (same).

[46] An Ordinance respecting public Balls, *reprinted in A General Digest of the Ordinances and Resolutions of the Corporation of New-Orleans* 371 (1831) [hereinafter 1817 New Orleans Ordinance].

46

Most of these going armed laws also codified the state's ability to impose sureties, adding to the general context of affray the specific context of open or concealed arms carry to the terror of the people.[47]  These new statutes maintained peace

---

[47] Mass. Act of 1795, at 454 (providing that a justice of the peace "may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, . . . and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the peace, and being of the good behaviour; and in want thereof, to commit him to prison until he shall comply with such requisition"); Tenn. Act of 1801, at 710 (providing that "[i]f any person or persons shall publicly ride or go armed to the terror of the people or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behaviour, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law); Me. Act of 1821, at 285 (justices of the peace had power and duty "to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State").

by requiring an individual "to post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55.

Colonial legislatures extended these location-based carry restrictions to new contexts. In keeping with traditional English custom and Colonial-era practice of protecting peaceful operations at locations important to governmental function,[48] New York,[49] Delaware,[50] and Maryland[51] proscribed bearing arms at polling places.

The Nation's new public universities—including the University of Virginia, in a decision rendered by a Board of Visitors that counted Thomas Jefferson, James Madison, and James Breckenridge among its six members[52]—enacted locational restrictions forbidding their students from

―――――――――――――

[48] *See* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 473 (2019).

[49] Act of Jan. 26, 1787, ch. 1, 1787 N.Y. Laws 345 ("[N]o person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election.").

[50] Del. Const. art. 28 (1776).

[51] *Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis in 1774, 1775, & 1776*, at 185 (1836).

[52] *University of Virginia Board of Visitors Minutes* 6–7 (October 4–5, 1824).

possessing firearms.[53]  While the predecessors to these statutes were enacted by private universities,[54] and hence, not state action for purposes of the Second Amendment, the Supreme Court has recognized schools as traditional sensitive places. *Heller,* 554 U.S. at 626.  It also has noted that a paucity of historical analogues does not foreclose a finding that a tradition of regulation in recognized sensitive places, given the lack of objection to such laws. *See Bruen,* 597 U.S. at 30 (no noted objections to sensitive place laws).

---

[53] *Id.*; *see also The Minutes of the Senatus Academicus 1799–1842,* at 86 (Univ. Ga. Libraries 1976) (setting forth the University of Georgia's 1810 ban).

[54] *A Copy of the Laws of Harvard College, 1655,* at 10 (1876) ("[N]oe students shall be suffered to have a gun in his or theire chambers or studies, or keepeing for theire use any where else in the town."); 2 Franklin Bowditch Dexter, *Biographical Sketches of the Graduates of Yale College with Annals of the College History May 1745–May 1763,* at 8 (1896) ("If any Scholar Shall keep a Gun or Pistol, or Fire one in the College-Yard or College, or Shall Go a Gunning . . . he Shall be fined not exceeding Two Shillings.").

Finally, a number of jurisdictions imposed blanket bans on concealed carry;[55] these laws, however, generally exempted travelers.[56]

## D. The Antebellum Period

In the decades leading up to the Civil War, Americans carried on the tradition of imposing carry restrictions to keep peace in important civic forums analogous to fairs, markets, and places of government deliberation, and they did so in analogous contexts that were new to the era. We can discern from these early nineteenth century statutes a continuation of the sorts of proscriptions set forth in the Statute of Northampton, excluding arms from sensitive places that facilitated governmental functions as well as new places analogous to fairs and markets. For example, the 1817 New Orleans Ordinance, discussed above, barred carrying firearms in "a public ball-room;" mere entry into a "public ball-room with any cane, stick, sword or any other weapon" was unlawful, irrespective of the arms-bearer's intent. [57] This suggests that the threat of breached peace and physical danger that could occur in a crowded space like "a public ball-room" was sufficiently obvious as to not require further indicia of evil

---

[55] *See, e.g.*, 1813 Ky. Acts 100; 1813 La. Acts 172; 1819 Ind. Acts 39.

[56] *See* 1813 Ky. Acts 100 (restricting concealed carry "unless when travelling on a journey"); 1819 Ind. Acts 39 ("[T]his act shall not be so construed as to affect travellers.").

[57] 1817 New Orleans Ordinance.

intent or malice aforethought.[58]  New Mexico enacted a law that, like the New Orleans ordinance, banned weapons in "balls or Fandangos."[59]  Like its predecessors, the statute restricted the use of firearms by individuals under the influence of alcohol, and it also proscribed carrying firearms in any "room adjoining said ball where Liquors are sold."[60]  And as the Nation's first public parks emerged,[61] Central Park proscribed "carry[ing] firearms" within its confines to preserve the

---

[58] Joseph Blocker, *Firearm Localism*, 123 Yale L.J. 82, 144 (2013) ("[C]oncealed carry laws were often tailored to heavily populated areas, either in the state laws giving cities and towns the power to restrict concealed carrying (and, sometimes, carrying of any kind), or directly in the acts incorporating municipalities.").

[59] 1852 N.M. Laws 67, 69.

[60] *Id.*

[61] *See* Frank Clark, *Nineteenth-Century Public Parks from 1830*, 1 Garden Hist. 31, 31 (1973) (explaining "[c]ity parks as we know them today first evolved in this country in the nineteenth century," and tracing the development of public parks from the "hygienic and humanitarian" concerns of industrialized Victorian Britain); *see also* Robert Lee & Karen Tucker, *"It's My Park": Reinterpreting the History of Birkenhead Park Within the Context of an Education Outreach Project*, 32 Garden Hist. 64, 65 (2010) (noting Birkenhead Park in England, opened in 1847, was "the world's first public park").

peace.[62]    Public universities likewise continued to forbid students from keeping or bearing weapons.[63]  While concealed carry bans proliferated into new jurisdictions, they continued to exempt travelers.[64]

---

[62] *Fourth Annual Report of the Board of Commissioners of the Central Park* 106 (1861) ("All persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles within it."); *see also* Tricia Kang, *160 Years of Central Park: A Brief History*, Central Park Conservancy Mag. (June 1, 2017), https://perma.cc/85Y2-UZY5 ("[Frederick Law] Olmsted believed Central Park should be a democratic space, a place where people of all backgrounds, rich and poor, women and men, could congregate and enjoy leisurely activities.").

[63] *See Laws and Regulations of the College of William & Mary* 4, 19 (1830); *Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina* 15–16 (1838).

[64] *See* An act to prevent any Person in this Territory from carrying Arms secretly (1835), *reprinted in Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840*, at 423 (John P. Duval ed., 1839); 1837 Ark. Acts 280;  Act Effective 1856, *reprinted in A Digest of the Statutes of Arkansas* 381–82 (Josiah Gould ed., 1858) [hereinafter 1856 Ark. Law]; 1841 Ala. Acts 148–49; *see also Bruen*, 597 U.S. at 52 ("In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons."); 1861

The antebellum period also witnessed the humble beginnings of a revolution in American transportation. Local railroad networks with tracks of "no more than a few miles" emerged, presaging the explosive growth of train connectivity that would follow in the ensuing decades.[65] Indiana responded to this novel technology by adopting the country's first law governing firearm safety on trains. The law forbade "shoot[ing] a gun, pistol, or other weapon . . . against any locomotive, or car, or train of cars containing persons, on any railroad in this State[.]"[66]

Surety regimes continued to bind a person to act peaceably to prevent "all forms of violence," including the "misuse of firearms." *Rahimi*, 602 U.S. at 695–96. Massachusetts's surety law, and the many statutes that emulated it, permitted government officials "on complaint of any person having reasonable cause to fear an injury, or breach of the peace," to require the accused "to find sureties" in order to "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, for violence to his person, or to

---

Ga. Laws 859 (excepting "horseman's pistols"). *But see* 1838 Ark. Law  280 (prohibiting concealed carry without travel exception); 1838 Va. Acts 76 (same); 1859 Ohio Acts 56 (same).

[65] *Rise of Monopolies: History of American Railroads*, Stan. Univ., https://perma.cc/JJ7E-2X77.

[66] 1855 Ind. Acts 153.

his family or property[.]"[67]    This was in contrast to Massachusetts's prior surety law which authorized sureties for those who "ride or go armed offensively, to the fear or terror of the good citizens."[68]    As before, not all of these statutes required a complaint before government authorities could demand sureties for those who publicly carried dangerous and deadly weapons.[69]

### E. Reconstruction and the *Fin de Siècle*

Following the bloodshed of the Civil War, the country grappled with how to secure both liberty and order in a deeply divided, modernizing society.  Amid the tumult and triumphs of our Second Founding, Americans not only turned to longstanding restrictions on carrying firearms but continued to apply traditional frameworks to emerging, but analogous, contexts.

Legislatures continued to enact well-established carry-restriction statutes covering discrete, historically protected locations.  For example, Louisiana, Tennessee, Georgia, Missouri, Texas, Arizona, Oklahoma, and Montana prohibited carrying firearms at places of important governmental

---

[67] Mass. Rev. Stat. ch. 134, § 16 (1836); *see also* 1838 Terr. of Wis. Stat. 381; Me. Rev. Stat. ch. 169, § 16 (1840); Mich. Rev. Stat. ch. 162, § 16 (1846); Terr. of Minn. Rev. Stat., ch. 112, § 18 (1851); 1854 Or. Laws 220; D.C. Rev. Code ch. 141, § 16 (1857); 1860 Pa. Laws 432.

[68] Mass. Act of 1795, at 454.

[69] 1847 Va. Acts 127, 129; W. Va. Code, ch. 153, § 8 (1868).

functions such as polling locations, courts, and public assemblies,[70] for example, to "regulate the conduct and to maintain the purity of elections" and to "prevent, fraud, violence, intimidation, riot, tumult, bribery or corruption at elections."[71] Similarly, four states enacted trespass laws

---

[70] 1870 La. Acts 159–60; 1870 Tex. Gen. Laws 68; Art. 320, Tex. Act of April 12, 1871, *reprinted in* 2 *A Digest of the Laws of Texas, Containing the Laws in Force, and the Repealed Law on Which Rights Rest, from 1754 to 1874, Carefully Annotated* 1322, 1323 (George W. Paschal ed., 4th ed. 1874) [hereinafter Tex. Act of 1871]; 1869 Tenn. Acts 23–24; 1870 Ga. Acts 285; 1874 Mo. Laws 43 (for concealed weapons); 1875 Mo. Laws 50 (revised to eliminate "concealed"); Mo. Rev. Stat. § 1274 (1879); 1883 Mo. Laws 76; 1889 Ariz. Sess. Laws 16–17; 1890 Okla. Acts 496; 1903 Mont. Laws 49 (concealed or partially concealed firearm, except as permitted by a judge upon a showing of "good moral character and peaceable disposition").

[71] 1870 La. Acts 159–60; *see also* 1870 Ga. Laws 421; 1870 Tex. Gen. Laws 63; Riots and Unlawful Assemblies at Elections, Violence Used Towards Electors, Art. 6490, *reprinted in* 3 *A Digest of the Laws of Texas* 1317–18 (G. Paschal ed., 1873) (prohibiting carrying of any gun, pistol or other dangerous weapon "on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election"); 1871 Tex. Gen. Laws 25–27 (banning carry of firearms in certain locations as an "Offense[] Against Public Peace"); 1889 Ariz. Sess. Laws 16; 4 Blackstone, *Commentaries* *145 (breaches of peace include riot,

requiring individuals to secure consent prior to carrying firearms onto the lands of another.[72]

---

tumultuous petition, and affray that "disturbs" officers of justice "in due execution of their office" and conduct that terrorizes in a place "where a respect to the particular place ought to restrain and regulate men's behavior").

[72] *See* 1865 La. Acts 14 (prohibiting "carry[ing] fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor"); 1865 Fla. Laws 27 (forbidding "rang[ing] with a gun within the enclosed land or premises of another without the permission of the owner, tenant, or person having control thereof"); An Act to Prohibit the Discharging of Firearms in Certain Places Therein Named, Art. 6508a, *reprinted in* 4 *A Digest of the Laws of Texas* 1321 (G. Paschal ed., 1873) (enacted 1867) (proscribing "carry[ing] firearms in the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty"); 1876 Iowa Acts 142 (making it a misdemeanor to "enter [an] enclosure [where cattle, hogs, or sheep are being fed] with fire arms," unless with permission from the owner); 1893 Or. Laws 79 ("It shall be unlawful for any person other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."); *see also* 1895 N.J. Law (changing prior requirement that person carrying firearm obtain permission to prohibiting carrying of firearm anytime

Largescale urbanization resulted in a rearranging of the social order and the creation of new physical and technological landscapes.[73]    Parks sprung up across the country and, following Central Park's lead, forbade visitors from carrying firearms.[74]    Travel likewise assumed a recognizably modern

---

owner provides notice not to trespass: prohibiting "trespassing on any lands, carrying a gun, after public notice on the part of the owner, forbidding such trespassing").

[73] *See* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 2 (1986) (describing urbanization as "perhaps the most fundamentally dislocating experience in all of American history").

[74] *E.g., San Francisco Municipal Reports for the Fiscal Year 1874–5, Ending June 30, 1875,* at 887 (1875) (enacted 1872); *Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws* 310 (Consider H. Willett ed., 1876); David H. MacAdam, *Tower Grove Park of the City of St. Louis* 117 (1883); *Comprising the Laws of Illinois Relating to the City of Chicago and the Ordinances of the City Counsel* 391 (Egbert Jamieson & Francis Adams eds., 1881) [hereinafter Chi. Mun. Code]; *The Revised Ordinances of the City of Danville* 83 (Mann et al. eds., 1883); *Annual Reports of the City Officers and City Boards of the City of Saint Paul* 689 (1888); *The Revised Ordinances of Salt Lake City with the City Charter and Amendments Thereto* 248 (1888); *Ordinances and Resolutions of the Borough and City of Williamsport, Pa.* 91 (1891) (enacted 1890); *Compiled*

---

*Ordinances of the City of Grand Rapids* 163 (Colin P. Campbell ed., 1906) (enacted 1891); *Third Annual Report of the Park Commissioners of the City of Lynn, for the Year Ending December 20, 1891*, at 23 (1891); *Park Commissioners' Report, Springfield, Massachusetts* 82 (1897) (enacted 1891); *Laws and Ordinances of the City of Peoria, Illinois* 667 (Wilbert I. Slemmons, et al. eds., 1892); *Municipal Code of the City of Spokane, Washington Together With the City Charter and Amendments, Rules of the City Council, and List of Franchise Ordinances* 123 (E.O. Connor ed., 1903) (enacted 1892); *The Charter of the City of Wilmington* 571 (1893); *Revised Ordinances of the City of Canton, Illinois* 240 (B.M. Chiperfield ed., 1895); *The Local Acts of the Legislature of the State of Michigan Passed at the Regular Session of 1895 With an Appendix* 596 (1895) [hereinafter 1895 Mich. Local Acts]; *The General Ordinances of the City of Indianapolis, Containing, Also, Acts of the Indiana General Assembly So Far as They Control Said City, to Which Is Prefixed a Chronological Roster of Officers from 1832 to 1904, and Rules Governing the Common Council* 648 (Edgar A. Brown & William W. Thornton eds., 1904) (enacted 1896); *A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania* 240 (1897) (enacted 1887); *A Digest of the Acts of Assembly Relating to, and the General Ordinances of the City of Pittsburgh From 1804 to Jan. 1, 1897, with References to Decisions Thereon* 496 (W.W. Thomson ed., 1897) (enacted 1893); *Revised Ordinances of the City of Boulder* 157 (Oscar F.A.

58

form during this period.    After the completion of the transcontinental railroad in 1869,[75] railroad construction "increased dramatically," ushering in an era of unprecedented connectivity.[76]    To accommodate the needs of crowded passenger trains, numerous jurisdictions forbade firing at trains or recklessly handling a firearm while onboard.[77]    Iowa's statute went further by also criminalizing "present[ing] . . . any gun, pistol, or other fire arm at any railroad train, car, or

--------------------

Greene ed., 1899); *City of Trenton, New Jersey, Charter and Ordinances* 390 (1903) (enacted 1890); 1905 Minn. Laws 620 (prohibiting firearms in state parks unless unloaded and sealed by the park commissioner); *Amendments to "The Revised Municipal Code of Chicago of 1905" and New General Ordinances* 40 (1906).  While we remain vigilant not to place more weight on municipal codes than they can rightly bear, we agree with the Ninth Circuit that because "the first modern parks were regulated, as parks are regulated today, primarily by municipalities rather than by States," those historical regulations provide relevant insight despite the fact that "many of the ordinances were local." *Wolford*, 116 F.4th at 983.

[75] *See Completion of the Transcontinental Railroad*, Libr. Cong., https://perma.cc/3QUM-RNTD.

[76] *Railroads in the Late 19th Century*, Libr. Cong., https://perma.cc/3DNP-H87Z.

[77] 1876 Iowa Acts 142; 1879 Wyo. Terr. Sess. Laws 97; 1 Rev. Stat. Ind. 338 (1881); 1889 Tex. Gen. Laws 36; 1891 Nev. Stat. 78; 1895 Ga. Laws 147; 1899 Ala. Acts 154; 1899 Fla. Laws 93.

locomotive engine[.]"[78]    Finally, Americans continued to police the dangerous relationship between firearms and alcohol.  Some statutes focused on intoxicated individuals and forbade them from carrying weapons,[79] while other laws emulated New Mexico's location-based regime by prohibiting weapons in areas that served alcohol.[80]

The most comprehensive carry statutes of this period applied the centuries-old principle of preserving order in the fairs and markets of the day by regulating firearm possession and banning weapons from communal venues, including fairs, race courses, ball rooms, churches, public halls, picnic

---

[78] 1876 Iowa Acts 142.

[79] 1867 Kan. Sess. Laws 25 (prohibiting "any person under the influence of intoxicating drink" from carrying weapons); 1873 Mo. Laws 328 (proscribing carry in the town of Moberly while "intoxicated"); 1879 Mo. Laws 224 (criminalizing carrying weapons "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting "any person in a state of intoxication" from carrying guns).

[80] 1889 Ariz. Sess. Laws 17 (requiring "drinking saloon[s]" to "keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons"); *The Laws and Ordinances of the City of New Orleans* 1 (Edwin L. Jewell ed., 1882) (enacted 1879) [hereinafter 1879 New Orleans Ordinance] ("tavern[s]"); 1890 Okla. Laws 495 ("any place where intoxicating liquors are sold"); *see also* 1881 Nev. Stat. 19–20 (prohibiting firing a gun in any "saloon"); 1883 Wis. Sess. Laws 841 (proscribing firing a gun in "any saloon").

grounds, theatres and other places of public entertainment or amusement, and circuses.[81]  Like the New Orleans ordinance discussed above, prohibitions on carrying arms in discrete

---

[81] *See* 1869–70 Tenn. Pub. Acts 23–24 ("any fair [or] race course"); 1870 Tex. Gen. Laws 63 ("a ball room, social party, or other social gathering, composed of ladies and gentleman"); 1879 New Orleans Ordinance, at 1 ("any theatre, public hall, . . . picnic ground, place for shows or exhibitions, house or other place of public entertainment or amusement"); 1889 Ariz. Sess. Laws 17 (any "place where persons are assembled for amusement . . . any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"); 1890 Okla. Laws 495 (any "place where persons are assembled . . . for amusement . . . any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering"); 1903 Mont. Laws 49 (any "place where persons are assembled for amusement . . . any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering").  Other jurisdictions prohibited brandishing or firing weapons in certain recreational spaces.  *See* Act of 1869, *reprinted in The General Laws of New Mexico* 312–13 (B. Prince ed., 1882) (prohibiting "draw[ing] or us[ing] any deadly weapon in any ball [or] dance") [hereinafter 1869 N.M. Law]; 1881 Nev. Stat. 19–20 ("any theater").

61

locations akin to fairs and markets banned carrying in and of itself as a terror to the people.[82]

Extending the logic of universities' firearm restrictions, several statutes also disallowed weapons in schools and other places with educational or scientific purposes.[83] Additionally,

---

[82] *See, e.g.*, 1871 Tex. Gen. Laws 25–27 ("If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor[.]").

[83] 1870 Tex. Gen. Laws 63 ("any school-room or other place where persons are assembled for educational, literary, or scientific purposes"); 1883 Mo. Laws 76 ("any school room or place where people are assembled for educational, literary or social purposes"); Stockton, Kan. Ordinances, no. 76, § 1, *reprinted in* 8 *Stockton Review and Rooks County Record*

numerous statutes outlawed public carry at *any* public assembly.[84]  In upholding these laws, state supreme courts

_____

(1887) ("any school room or place where people are assembled for educational, literary or social purposes"); 1889 Ariz. Sess. Laws 17 ("any school room, or other place where persons are assembled . . . for educational or scientific purposes"); 1890 Okla. Laws 495 ("any school room or other place where persons are assembled . . . for educational or scientific purposes"); Columbia, Mo. Gen. Ordinances ch. XVII, § 163 (1890) ("any school room or place where people are assembled for educational, literary or social purposes"); 1903 Mont. Laws 49 ("any school room or other place where persons are assembled . . . for educational or scientific purposes"); *see also* 1883 Wis. Sess. Laws 841 (forbidding firing a gun in any "school house").

[84] 1869–70 Tenn. Pub. Acts 23–24 ("any election in this State, or for any person attending any fair, race course, or other public assembly of the people other public assembly of the people"); 1870 Ga. Laws 421 ("any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this State"); 1870 Tex. Gen. Laws 63 ("any election precinct on the day or days of any election, where any portion of the people of this State or collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly"); 1874 Mo. Laws 76 ("any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met

63

emphasized the power of the state to regulate firearm carry and use.[85]

---

for other than militia drill"); 1879 Mo. Laws. 224 (same and "other public assemblage of other persons met for any lawful purpose, other than for militia drill"); 1883 Mo. Laws 76 (same) ("any other public assemblage of persons"); Stockton, Kan. Ordinances, no. 76, § 1 (1887) ("any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons not met for any unlawful purpose"); 1889 Ariz. Sess. Laws 17 ("any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly"); Columbia, Mo. Gen. Ordinances ch. XVII, § 163 (1890) ("any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill"); 1890 Okla. Laws 495 ("any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly"); 1903 Mont. Laws 49 ("any public assembly").

[85] *E.g.*, *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 182 (1871) ("Therefore, a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them, nor necessary in order to his familiarity with them, and his training

\*     \*     \*

_____

and efficiency in their use."); *id.* at 187–88 ("If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence."); *English v. State*, 35 Tex. 473, 478–79 (1871) ("We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."); *Hill v. State*, 53 Ga. 472, 475 (1874) ("The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee."); *id.* at 479 ("To suppose that the framers of the constitution ever dreamed, that in their anxiety to secure to the state a well regulated militia, they were sacrificing the dignity of their courts of justice, the sanctity of their houses of worship, and the peacefulness and good order of their other necessary public assemblies, is absurd. To do so, is to assume that they took it for granted that their whole scheme of law and order, and government and protection, would be a failure, and that the people, instead of depending upon the laws and the public authorities for protection, were each man to take care of himself, and to be always ready to resist to the death, then and there, all opposers.").

65

From this extensive historical review, and consistent with *Bruen*'s and *Rahimi*'s instruction, we discern the following principles that underlie our Nation's regulatory tradition that are relevant to this case: First, legislatures have long enjoyed the authority to restrict the carry of firearms in specific locations central to the operation of government. And the historical record demonstrates that legislatures may also restrict the carry of weapons to protect against misuse in discrete locations set aside for particular civic functions—like the fairs, markets, parliaments, and polling places of old.[86] For example, firearms were deemed inappropriate for educational institutions not only because they can be dangerous, but also because they distracted from the civic mission of educating "responsible public citizens."[87] Likewise, statutes barring firearms from parliament-like locations protected peaceful government functions and the ability of citizens to freely

---

[86] The Supreme Court has similarly noted that carry restrictions in similar sensitive places are within the regulatory tradition of the Second Amendment. *Bruen*, 597 U.S. at 30 ("We therefore can assume it settled that these locations"—specifically, legislative assemblies, polling places, and courthouses—"were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.").

[87] Miller, *supra* note 48, at 470; Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under* Bruen, 98 N.Y.U. L. Rev. 1795, 1807 (2023) ("Education is an activity, like voting and legislating, in which the bonds that constitute democratic community are formed and reproduced. This link between education and democracy was one that the founding generation recognized.").

66

associate and deliberate without fear of violent reprisal.[88]  At bottom, history demonstrates that carry restrictions served to protect against physical danger and alarm in discrete fora historically designated for important civic purposes.

Second, legislatures may impose conditions on the carry of weapons outside the home that are designed to ensure that those who choose to carry such weapons do so safely.  The sources surveyed in *Rahimi* itself provide ample support for this principle.  There, the Court found support for § 922(g)(8) in historical surety laws, a "form of 'preventive justice'" that "could be invoked to prevent all forms of violence."  *Rahimi*, 602 U.S. at 695.  These laws authorized officials to impose bonds on individuals who decided to carry arms as a condition of such carry and as security "for his keeping the peace."  *Id.* at 696 (quoting 1795 Mass. Acts ch. 2, in Acts and Resolves of Massachusetts, 1794–1795, ch. 26, pp. 66–67 (1896)).

We also take this opportunity to respond to the dissent's criticism of both our historical survey and methodology.  The dissent begins by complaining of a purported "source error" that pervades our opinion.  Dissent at 19.  As the dissent sees it, we "blithely assume[] that the fact an ordinance was promulgated somewhere automatically makes it historically and legally relevant."  *Id.* at 20.  But the real problem is the dissent's unwillingness to consider historic regulations inconsistent with its pre-existing assumptions.  As an example, it takes issue with our reference to a Texas statute because, by not aligning with the dissent's own views, "[t]he legislature

---

[88] Miller, *supra* note 48, at 478; Blocher & Siegel, *supra* note 31, at 198.

and Texas Supreme Court ignored the Constitution," when interpreting the state law.[89] *Id.* at 15. But for all the dissent's professed adherence to *Heller*, *McDonald*, *Bruen*, and *Rahimi*, it rejects their teachings when they prove inconvenient for its ahistorical vision of the Second Amendment. A prime example of this dissonance is the dissent's rejection of the Statute of Northampton and its progeny as "provid[ing] little insight into the meaning of the constitutional right to public carry" because they "did not result from any kind of constitutional deliberation." Dissent at 31. That conclusion is hard to square with binding Supreme Court precedent that relies on this line of history, *see, e.g.*, *Rahimi*, 602 U.S. at 694–98, and our sister circuits' recognition of the Statute's enduring importance, *see, e.g.*, *United States v. Allam*, 140 F.4th 289, 296–99 (5th Cir. 2025) (relying almost exclusively on the

_____

[89] The dissent also casts our approach as "a fine example of Second Amendment exceptionalism" before marshalling a list of hypothetical reasons for why any particular historical regulation might not be legally probative. Dissent at 15–16 ("Perhaps, as in 1870s Texas, the legislature ignored or misconstrued constitutional constraints. Perhaps the law could not be, or never was, subject to constitutional scrutiny. Perhaps the law was rarely or never enforced, . . . ." (footnotes omitted)). Apparently, under the dissent's novel—and insurmountable—Second Amendment test, a historical analogue must refute all these possibilities (and, perhaps, others) to retain its value. Even more problematic, those objections would apply equally to arms regulations from the colonial era, preventing us from being able to rely on any historical analogue.

Statute of Northampton to reject constitutional challenge to 18 U.S.C. § 922(q)(2)(A), which proscribes possession of a firearm within 1,000 feet of school grounds).

Likewise, neither the Supreme Court nor we have ever instructed that we may consider only those laws that were actually subjected to Second Amendment scrutiny. Rather, the Supreme Court's and our precedent refute this contention and routinely rely on laws from jurisdictions not subject to the Second Amendment or state equivalents. *See, e.g., Rahimi*, 602 U.S. 694–95 (relying on English history to uphold § 922(g)(8)); *Quailes*, 126 F.4th at 221 (relying on colonial era estate forfeiture laws); *United States v. Harris*, 144 F.4th 154, 158–61 (3d Cir. 2025) (relying on colonial era statutes banning drinking and common law authorities incapacitating the mentally ill). And under *Bruen*'s methodology, we must determine whether relevantly similar historical regulations reflect a historic tradition with which a modern-day regulation is consistent. *See* 597 U.S. at 28–29. Excluding from consideration all historical regulations not subjected to Second Amendment scrutiny would distort the baseline of historic referents and misconstrue the accepted scope of legislative authority at the time of the Founding.

Courts overlook the manifold goals of historical carry restrictions at their peril.[90] One cannot assess "why . . .

_____

[90] *See* Blocher & Siegel, *supra* note 31, at 178 ("[C]ourts are likely to ask the wrong questions and demand the wrong types of evidence if they only recognize the government interest in

regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29, unless one appreciates the ends our forebearers pursued in limiting where individuals could bear arms.[91]  With these principles—and the diverse aims they serve—guiding our analysis, we address each of Plaintiffs' challenges.

## V.    Constitutionality of the Challenged Provisions

Below we address the insurance and permitting aspects of the statute before turning to its description of sensitive places.    Our disposition of the Plaintiffs' first three challenges—to the liability insurance requirement, payment to the Victims of Crime Compensation Office, and the four-reputable-persons requirement—turns on the factual and historical record pertaining to each claim.

---

protecting individuals from physical injury and fail to recognize the government interest in securing public safety as protecting both the individual's and society's ability to engage in valued activities—from child-rearing to education, commerce, worship, voting, and governing—free from weapons threats and intimidation.").

[91] *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 147 (2023) (discussing the numerous ends served by sensitive place restrictions).

## A. Permitting Restrictions and Insurance Requirements

### 1. Liability Insurance

The Siegel Plaintiffs challenge the constitutionality of N.J. Stat. Ann. § 2C:58-4.3, which requires anyone who publicly carries a handgun in New Jersey to "maintain [at least $300,000 in] liability insurance coverage insuring against loss resulting from liability imposed by law for bodily injury, death, and property damages sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public."

As a threshold matter, we reject Defendants' contention that § 2C:58-4.3 falls outside the scope of the Second Amendment's text. Plaintiffs seek to carry handguns in public for self-defense. Section 2C:58-4.3 forbids them from doing so unless they procure liability insurance. Accordingly, § 2C:58-4.3 burdens their right to bear arms. *See Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 915–16 (N.D. Cal. 2022).

We turn, then, to the relevant history and tradition. While the general dangers attendant to unsafe firearm use have existed since the Founding, liability insurance as a medium to motivate safe use did not exist in eighteenth-century America. First-party insurance, which covers losses to the policyholder, dates back to the dawn of the Renaissance in the city-states of

71

Northern Italy.[92]  By contrast, liability insurance, which covers the policyholder against claims by third parties, "was first marketed in the United States in the 1880s, having been imported from Great Britain, where it was also a very recent invention."[93]  Because the Founding generation could not have implemented the type of insurance mandate challenged here, we must analogize to other historical regulations that functioned to address the risk of damage to person and property posed by publicly carrying a firearm.  *See Bruen*, 597 U.S at 27 (unless the regulation is one that "Founders themselves could have adopted to confront that problem," a "more nuanced approach" is appropriate).

The Defendants posit that surety statutes and nineteenth-century strict liability regimes together establish a tradition of firearms regulation and assert that the insurance mandate is consistent with that tradition.  *See* N.J. Att'y Gen. Opening Br. 10–11.  Specifically, they argue that the surety statutes are relevantly similar to the insurance mandate in that they both require handgun carriers to post financial security to protect against the future danger of harm, while strict liability regimes are relevantly similar to the insurance mandate in that

———————————————

[92] *See* W.R. Vance, *The Early History of Insurance Law*, 8 Colum. L. Rev. 1, 6–7 (1908).

[93] Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573, 580 (2005); Brief for Brady Ctr. to Prevent Gun Violence as Amicus Curiae Supporting Defendants-Appellants 17.

they both protect against handgun-inflicted harm without any finding of fault on the part of the firearm bearer. *Id.* at 52–53.

But these proposed analogues fall well short of establishing a sufficiently similar regulatory tradition. First, they differ with how they burden the right to bear arms. Strict liability regimes do not impose an ex ante condition on an individual's right to bear arms. While they do pre-apportion fault to the one with the firearm, a resulting financial burden, if any, is imposed ex post and only when actual harm from the public carrying of firearms has been realized. In contrast, the insurance mandate requires all licensed individuals to purchase insurance as a condition to their public carry of a handgun. Surety statutes come closer, but still miss the mark. Broadly speaking, these statutes and the insurance mandate are both a form of "preventive justice," *Rahimi*, 602 U.S. at 695 (citation omitted), which require individuals to fulfill ex ante financial burdens in order to carry firearms in public.[94] The temporal scope of the burden imposed by the surety statutes, however, is far more limited than that imposed by the insurance mandate, which requires perpetual maintenance of liability insurance. N.J. Stat. Ann. § 2C:58-4.3(a); *Bruen*, 597 U.S. at 55–57 (once a judicial determination of dangerousness was no longer in effect, the surety statute's restriction was lifted); *Rahimi*, 602 U.S. at 699. Thus, neither analogy shares an analogous means as the insurance mandate.

These analogues also differ in their purpose—the "why," as *Bruen* put it. Historical laws required sureties of people when they were "reasonably accused of intending to

---

[94] *See supra* notes 67–69.

injure another or breach the peace," *Bruen*, 597 U.S. at 57, meaning they presented a credible threat of future harm to others. *Rahimi*, 602 U.S. at 688–90. The insurance mandate, on the other hand, imposes a condition on all individuals simply due to New Jersey's perception that carrying a firearm in public presents an unacceptable general threat of future harm to others. *See* N.J. Stat. Ann. § 2C:58-4.3(a) (requiring insurance to compensate for the injuries, deaths, and property damage "sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public"). As for the strict liability laws, they imposed a financial burden on some individuals due to the realization of the general risk of harm to person and property posed by a firearm. The insurance mandate, as the Siegel Plaintiffs concede, is driven by a similar concern in that it addresses the same risk but as posed by any handgun carrier. *See* Siegel Plaintiffs' Answering Br. at 23 (the strict liability decisions cited by Defendants "demonstrate that earlier generations certainly understood that the 'unintentional misuse' of a firearm can cause 'harm'—which is the *raison d'être* for the insurance mandate"). But a similar purpose alone cannot support a regulatory tradition under *Bruen*.

Read together, the surety statutes and strict liability regimes impose a narrower burden on the right to bear arms than the insurance mandate, both in how the mandate burdens that right and the reasons for which it does so. Thus, these historical laws do not establish a historical principle akin to that undergirding the insurance mandate—namely, imposing ex ante financial requirements to address the general risk of future harm to others posed by any individual's publicly carrying a handgun for self-defense. Plaintiffs are likely to succeed on the merits of this challenge because New Jersey has

74

not carried its burden of demonstrating the insurance mandate is consistent with our Nation's regulatory tradition.

## 2. Victims of Crime Compensation Fund

Plaintiffs also challenge the application fee associated with obtaining a Handgun Carry Permit as an "obnoxious exaction" on their Second Amendment rights.  Siegel Plaintiffs' Answering Br. 24 (citation modified) (quoting *Follett v. Town of McCormick*, 321 U.S. 573, 577 (1944)).  Under Chapter 131, applicants for a Handgun Carry Permit must pay a $200 application fee, $150 of which is used "to defray the costs of investigation, administration, and processing of the permit to carry handgun applications." N.J. Stat. Ann. § 2C:58-4(c).  The remaining $50 portion, which Plaintiffs here object to, is "deposited into the Victims of Crime Compensation Office [(VCCO)] account." *Id*.  We agree with Plaintiffs that the fee implicates the text of the Second Amendment—it imposes a condition on the "individual right to possess and carry weapons" that the Second Amendment plainly protects.  *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592).  So we proceed to consider whether the fee accords with our Nation's tradition of firearms regulation.

Drawing on First Amendment principles, Plaintiffs argue that at least the portion of the $200 fee allocated toward the VCCO account offends the Constitution because a state "may not impose a charge" for "the enjoyment of a right granted by the federal constitution" when that charge is used for something other than to "meet the expense incident to the administration of the act" and "maint[ain] public order in the matter licensed." Siegel Plaintiffs' Answering Br. 25–26 (first

75

quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943); then quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)). In other words, Plaintiffs contend, because part of the permit application fee is not used to defray the cost of the permitting scheme itself, the fee is unconstitutional.

We agree with Defendants, and Plaintiffs do not dispute, that determining the constitutionality of permitting fees does not require an assessment of historical analogues because shall-issue licensing regimes and their associated fees, like New Jersey's, remain presumptively constitutional. *See* N.J. Att'y Gen. Answering Br. 67; Siegel Plaintiffs' Reply Br. 14. But we are otherwise unpersuaded by their arguments.

In the First Amendment context, licensing fees do not infringe upon the regulated right when the purpose is "to meet the expense incident to the administration of the [licensing] Act and to the maintenance of public order in the matter licensed." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). *Cox* concerned a license for "perform[ing] or exhibit[ing]" a "theatrical or dramatic representation," holding a "parade or procession upon any public street or way," and hosting a "public meeting upon any ground abutting thereon," *Id.* at 571 (quotation omitted), and the fees imposed were linked to the costs caused by *licensed* conduct, *id.* at 577. Costs associated with unlicensed conduct were addressed through the penalty for non-compliance. *Id.* at 571, n. 1. In that scenario, the Supreme Court concluded that "[t]here is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." *Id.* at 577.

But it is by now pellucid that "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113

(1943). Thus, following *Cox*, the inquiry becomes whether the fee at issue is a reasonable "expense incident to the administration of the Act and to the maintenance of public order in the matter licensed." 312 U.S. at 577. Here, it is not.

New Jersey charges a fee of $50 to be "deposited into the Victims of Crime Compensation Office account." N.J. Stat. Ann. § 2C:58-4(c). The statute does not connect that fee to either the administration of the permitting scheme itself or maintenance of public order created by the licensed conduct. *Contra* N.J. Stat. Ann. § 2C:58-4(c) (designating $150 "to defray the costs of investigation, administration, and processing of the permit to carry handgun applications."). Accordingly, New Jersey's VCCO fee charges applicants for costs neither incidental to nor necessarily caused by their bearing arms. *Cox*, 312 U.S. at 577. For this reason, the Siegel Plaintiffs are likely to succeed in their challenge to it.

### 3.  Endorsements from Four Reputable Persons

The Siegel Plaintiffs next challenge N.J. Stat. Ann. § 2C:58-4(b)'s requirement that Handgun Carry Permit applicants submit endorsements from "four reputable persons who are not related by blood or by law to the applicant and have known the applicant for at least three years preceding the date of application . . . who shall certify . . . that the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others." Plaintiffs assert that this provision, which also requires the "reputable persons" to "provide relevant information . . . including the nature and extent of their relationship with the applicant and information concerning

77

their knowledge of the applicant's use of drugs or alcohol," § 2C:58-4(b), constitutes a "formula for selective disarmament" and an "ill-disguised effort to reintroduce . . . discretion into New Jersey's permitting system," Siegel Plaintiffs' Answering Br. 29.

First, we address whether Plaintiffs have standing to bring this challenge.  To sue in federal court, Plaintiffs must show they suffered an injury in fact that is traceable to the challenged law and that would be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Generally, a plaintiff who challenges the lawfulness of an application process without first submitting herself to that process can establish standing only by showing that she was "able and ready" to apply for a benefit, but that application "would be futile." *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205–06 (3d Cir. 2021) (quoting *Carney v. Adams*, 592 U.S. 53, 66 (2020)).  Plaintiffs here allege plans to apply for a Handgun Carry Permit, but they do not suggest that they would be unable to satisfy the challenged requirement.  They claim to possess standing anyway because "[i]n order to exercise their Second Amendment rights, plaintiffs must affirmatively do something that they maintain the state cannot require them to do—namely, supply the 'endorse[ment]' of at least 'four reputable persons.'"  Siegel Plaintiffs' Reply Br. 12 (quoting N.J. Stat. Ann. § 2C:58-4(b)).

In *Antonyuk v. James*, the Second Circuit confronted nearly identical circumstances and determined that the plaintiff had standing to challenge an allegedly unconstitutional firearm permitting process.  The plaintiff in that case had not yet applied for a firearm carry license because he felt uncomfortable providing the relevant information required by

New York law. 120 F.4th at 977. Acknowledging that the plaintiff's failure to obtain a carry license "stem[med] from his own unwillingness to comply with the challenged requirements," the Second Circuit nonetheless concluded the plaintiff had standing, explaining that the allegedly unlawful application requirements impaired the plaintiff's interest in carrying a firearm "by deterring the plaintiff due to his individual, but reasonable, sensibilities." *Id.* We find *Antonyuk*'s analysis persuasive and conclude it applies with equal force here. If the four-reputable-persons requirement unlawfully impairs Plaintiffs' rights under the Second Amendment, they should not have to subject themselves to its strictures in order to challenge it. *See id.*

As to the merits of Plaintiffs' argument, we agree with the District Court that the four-reputable-persons requirement implicates the text of the Second Amendment, but unlike the District Court, we find it constitutionally permissible. As we stated at the outset, a longstanding principle of our Nation's tradition of firearm regulation is that legislatures may impose conditions on the carry of firearms designed to ensure the safe use of those arms. New Jersey's requirement merely continues this deeply rooted tradition. From the beginning of the Nation, jurisdictions limited the ownership and use of guns to those who were not considered dangerous by their communities. *See Rahimi*, 602 U.S. at 693–98 (summarizing that history). For example, a 1699 New Hampshire law authorized "every justice of the peace within this province" to "stay[] and arrest[] . . . any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches."[95] These

---

[95] 1699 N.H. Laws 1.

justices could "commit the offender to prison" until he produced "sureties for the peace and good behaviour."[96] Massachusetts enacted a similar law,[97] as did several other states in the aftermath of the Revolutionary War.[98] States later expanded these surety requirements to apply to people who were the subject of a "complaint" from "*any* person having reasonable cause to fear an injury, or breach of peace."[99] The four-reputable-persons requirement is simply a modern-day analogue to these historic laws.

*Bruen* confirms as much. There, the Supreme Court addressed laws with provisions akin to the four-reputable-persons requirement and concluded that they passed constitutional muster. Contrasting constitutionally impermissible "may issue" gun laws with constitutionally permissible "shall issue" gun laws, the *Bruen* Court spoke approvingly of states that grant firearm permits based on a circumscribed range of "discretionary criteria." *Bruen*, 597 U.S. at 13 n.1. For example, Connecticut permits the issuance of a firearm permit only to someone deemed to be "a suitable person to receive such permit."[100] Rhode Island has a similar "suitable person" standard.[101] Delaware requires applicants to submit a certificate signed by *five* local citizens confirming

---

[96] *Id.*

[97] Mass. Act of 1692, at 52-53.

[98] Tenn. Act of 1801, at 709; Me. Act of 1821, at 285.

[99] *See supra* note 67.

[100] Conn. Gen. Stat. § 29-28(b).

[101] 11 R.I. Gen. Laws § 11-47-11(a).

"that the applicant bears a good reputation for peace and good order in the community in which the applicant resides."[102] The *Bruen* Court cited each provision with apparent approval. *Id.*

Of course, such provisions, including New Jersey's, may not be used by local authorities to mask invidious discrimination like that which plagued this country's historical disarming of groups that included Native Americans, Black people, and Catholics.[103] Thus, should it come to pass that the four-reputable-persons provision results in a discriminatory licensure regime, an appropriate plaintiff would be well within her rights to bring an as-applied challenge to the law. But we will not invalidate the provision based on facts not presented

───────────────

[102] Del. Code Ann. tit. 11, § 1441(a)(2).

[103] *E.g.*, An Act to Prohibit the Selling of Guns, Gunpowder, or Other Warlike Stores, to the Indians, Pa. Territory Laws, *reprinted in Anno Regni Georgii III, Regis, Magnæ Britanniæ, Franciæ & Hiberniæ, Tertio* 306-07 (B. Franklin ed., 1763) (prohibiting the sale of guns to Native Americans); An Act Concerning Slaves, &c. (1694), *reprinted in Grants, Concessions, and Original Constitutions of the Province of New Jersey* 341–42 (Aaron Leaming & Jacob Spicer eds., 2d ed. 1881) (disarming enslaved people); 52 *Archives of Maryland* 454 (J. Hall Pleasants ed., 1935) (1756 Maryland law disarming Catholics); An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, *reprinted in* 7 *The Statutes at Large: A Collection of All the Laws of Virginia* 35–39 (William W. Hening ed., 1820) (1756 Virginia law disarming Catholics); 7 Del. Laws 125 (1827) (disarming enslaved people).

in this case. As it exists, New Jersey's permitting requirement is a neutral, generally applicable law designed to ensure that firearms end up only with those whom their communities deem to be safe to carry them. *Cf. Antonyuk*, 120 F.4th at 976 ("A reasoned denial of a carry license to a person who, if armed, would pose a danger to themselves, others, or to the public is consistent with the well-recognized historical tradition of preventing dangerous individuals from possessing weapons.").

We conclude that New Jersey's four-reputable-persons provision fits squarely within the principles underlying our Nation's history of firearm regulation, as supported by the legion of relevantly similar historical laws cited above. As such, Plaintiffs cannot demonstrate a likelihood of success on the merits of this claim.

## B. Sensitive Places

We now turn to Plaintiffs' challenges to New Jersey's "sensitive places" regulations. Below, we address each of the challenged locational firearm restrictions and conclude, in light of our history and the principles it embodies, that most— though not all—of those restrictions comport with traditional firearms regulation.

### 1. Public Property

Before subjecting each "sensitive place" to the Second Amendment inquiry required by *Bruen* and *Rahimi*, we first address Defendants' contention that several of the challenged restrictions are constitutional, independent of any "historical grounds," when "the State acts as proprietor rather than as sovereign." N.J. Att'y Gen. Opening Br. 34.

82

According to Defendants, New Jersey, as a proprietor, may, like any private landowner, forbid firearms on state-owned property without triggering *Bruen*'s analogical inquiry. The District Court rejected "the sweeping proposition that carrying for self-defense in public does not extend to any location in which the government owns the land" and affirmed that whether a firearm restriction in a state-owned location comports with the right to keep and bear arms "will turn on whether analogies to historical regulation can justify the challenged law." *Koons v. Platkin*, 673 F. Supp. 3d 515, 605–06 (D.N.J. 2023).

We agree with the District Court that *Bruen*'s framework applies to firearm restrictions even when New Jersey acts as a proprietor. The handful of opinions to which Defendants cite to support their position does not convince us; indeed, half of those opinions support the contrary proposition—that states *qua* proprietors still "must comply with the Constitution." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015); *see also GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1367–68 (N.D. Ga. 2016). The remaining cases rely on *Heller*'s assurances that it did not cast doubt on certain longstanding prohibitions. *See United States v. Class*, 930 F.3d 469, 464 (D.C. Cir. 2019); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc). True, *Heller* described "laws forbidding the carrying of firearms in sensitive places such as . . . government buildings" as "presumptively lawful." 554 U.S. at 626–27 & n.26. But *Bruen* clarified this statement, observing that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." 597 U.S. at 30. The Court's

approach indicates that carry restrictions affecting government property are subject to the same historical inquiry as other firearm regulations, rather than a categorical carveout.

In so concluding, we respectfully part ways with the Ninth Circuit which held, in evaluating similar "sensitive places" laws from California and Hawai'i, "the State, too, may exercise its proprietary right to exclude [the carry of firearms], just as a private property owner may." *Wolford*, 116 F.4th at 970–71. We read *Bruen* to foreclose this argument for the above reasons. But we also recognize that the prospect of enabling the government, in its proprietary capacity, to prohibit the possession or carry of firearms on property it owns would work great damage to individuals' Second Amendment rights. Just as New York's attempt to define the entire island of Manhattan as a "sensitive place" in *Bruen*, permitting the government to end-run the Second Amendment when it acts as a proprietor brings with it the prospect of "eviscerate[ing] the general right to publicly carry arms for self-defense" that *Bruen* articulated.[104]  597 U.S. at 31.

———————————————

[104] In applying *Bruen*'s framework to state-owned property, we do not suggest that the government's role "as proprietor rather than as sovereign" is irrelevant to our analysis. N.J. Att'y Gen. Opening Br. 34. To the contrary, *Bruen* accommodates questions of state versus private property ownership within its principles-based test by asking whether excluding weapons from a particular locale comports with "the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24,

2. Private Property

Section 2C:58-4.6(a)(24) proscribes knowingly carrying a firearm on "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun." The District Court ruled that this restriction "impermissibly burdens Plaintiffs' Second Amendment right to carry for self-defense in public as applied to private property that is held open to the public and for which an implied invitation to enter is extended, but not on private property *not held open to the public*." *Koons*, 673 F. Supp. 3d at 607. Plaintiffs do not challenge the District Court's conclusion, while Defendants challenge the District Court's conclusion as to privately-owned places held open to the public.

Defendants and *amici* contend that the Second Amendment's plain text does not reach carrying a firearm on another's private property, as opposed to in public or in one's own home. But the Supreme Court has held that "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 584). That

_____

meaning we must consider whether a regulation in each location is analogous to laws protecting sovereign functions and officials. What we decline to do is treat simple governmental ownership of property as a shield against Second Amendment scrutiny.

interpretation reaches outside the gunowner's own home. *Id.* at 33 ("After all, the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home." (quoting *Heller*, 554 U.S. at 592)). Even though "the need for armed self-defense" may be greater at home, that does "not suggest that the need [i]s insignificant elsewhere." *Id.* Accordingly, where New Jersey seeks to regulate the carry of firearms on private property held open to the public, its regulation implicates the Amendment's plain text. *Accord Wolford*, 116 F.4th at 993; *Antonyuk*, 120 F.4th at 1044.

Alternatively, Defendants and *amici* suggest § 2C:58-4.6(a)(24) is not a state-imposed restriction at all, as it merely "effectuate[s]" private landowners' decisions regarding guns on their property. N.J. Att'y Gen. Opening Br. 38–39. But we cannot characterize § 2C:58-4.6(a)(24) as nothing more than a conduit for private decision-making without altering the default public access to privately-owned places held open to the public and "construing the sound of silence" differently than the law had previously. *Koons*, 673 F. Supp. 3d at 613. Instead, § 2C:58-4.6(a)(24) constitutes state action and thus falls within the scope of the Second Amendment.

Accordingly, we must decide whether Defendants can "justify [that] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Section 2C:58-4.6(a)(24) "addresses a general societal problem that has persisted since the 18th century"—namely, the threat to persons and belongings from individuals carrying firearms on the property of others opened to the public—so Defendants must identify "a distinctly similar historical regulation addressing that problem." *Id.* at 26.

86

As discussed above, the historical record contains several laws regulating the carrying of arms on another's land without the owner's permission.  In the eighteenth century, Pennsylvania, New Jersey, New York, and Massachusetts all enacted statutes requiring an individual to procure a landowner's consent before carrying firearms on his land.[105] And after the Civil War, Louisiana, Florida, Texas, and Oregon enacted similar measures.[106]  So just like § 2C:58-4.6(a)(24), these statutes altered the default rule on private property to a presumption against carrying on another's land.

But § 2C:58-4.6(a)(24) sweeps far broader than New Jersey's proffered historical analogues, as it encompasses all "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property."  Historical examples were seemingly

---

[105] Pa. Act of 1721, at 255–56; N.J. Act of 1722, at 123; 1751 N.J. Laws 448, 451; Pa. Act. of 1760, at 495; N.Y. Act of 1763, at 441–42; N.J. Act of 1769, at 582; 1771 N.J. Laws 343, 344; An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Islands, and on Nennemesset Island; and Several Small Islands Contiguous, Situated in the County of Dukes County, *in Acts and Laws Passed by the General Court of Massachusetts* 437–38 (1789).  Moreover, these statutes represented a logical evolution of even earlier laws forbidding armed trespass after neglecting to obtain permission and receiving a warning from a landowner. *See* Va. Act of 1642, at 248; Va. Act of 1657, at 437; Md. Act of 1715, at 90.

[106] *See supra* note 72.

limited to private property that was not impliedly held open to the public, such as plantations and estates. Otherwise, "it was standard practice for landowners to give the public formal notice in local newspapers that firearms were not permitted on their property."[107] This distinct "how" precludes us from finding that New Jersey's proffered historical analogues are "relevantly similar" to subsection (a)(24)'s application to privately-owned spaces held open to the public. The Defendants offer no other analogues that establish a historic principle of firearm regulation protecting against the manner of physical encroachment and appropriation of private property that owners have held open to the public.

Section 2C:58-4.6(a)(24) certainly resembles regulations of old, but its "how" and "why"—its broad scope to include property held open to the public and particular purpose—are not sufficiently rooted in the principles underlying this Nation's history and tradition to pass constitutional muster. We therefore conclude that Plaintiffs are likely to succeed on the merits of this claim and will affirm the preliminary injunction as to its enforcement.

### 3. Permitted Public Gatherings

Plaintiffs challenge § 2C:58-4.6(a)(6)'s ban on carrying firearms "within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit

---

[107] Patrick J. Charles, *The Second Amendment and* Heller's *"Sensitive Places" Carve-Out Post-*Rahimi*: A Historiography, Analysis, and Basic Framework*, 58 UIC L. Rev. 813, 865 (2025).

is required, during the conduct of such gathering, demonstration or event." The District Court concluded that provision was not sufficiently rooted in the American tradition of firearm regulation to withstand scrutiny under *Bruen*.

Plaintiffs' desire to bear arms at public gatherings falls within the plain text of the Second Amendment. And the "general societal problem" that § 2C:58-4.6(a)(6) addresses—the risks posed by firearms at public assemblies—has been a concern since the colonial period, albeit not to the same extent as today.[108] As a result, Defendants must offer analogous historical regulations to justify § 2C:58-4.6(a)(6)'s strictures.

After the Civil War, Tennessee, Georgia, Texas, Missouri, Arizona, Oklahoma, and Montana all forbade firearms at public assemblies and gatherings.[109] These historical prohibitions are strikingly similar to § 2C:58-4.6(a)(6). And although they emerged in the latter half of the nineteenth century, these regulations are not outliers that undermine prior understandings of the right to bear arms. To the contrary, these statutes represent a more recent application of the centuries-old practice of proscribing weapons at discrete locations—from courts to legislative

_____

[108] *See infra* Part VI.

[109] *See supra* note 84. Additionally, New Mexico imposed a similar, though less restrictive, prohibition on "draw[ing] or us[ing] any deadly weapon in any . . . public gathering of the people[.]" 1869 N.M. Law 313.

bodies to polling places[110]—set aside for the purposes of governmental services and peaceful assembly. The permitted public gatherings, demonstrations, and events that § 2C:58-4.6(a)(6) protects fit comfortably within these historically designated locations.

In reaching the opposite conclusion, the District Court deemed the Georgia, Texas, and Missouri statutes inapt. Observing that the Georgia law proscribed public carry at "any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering,"[111] the District Court applied the interpretive canon of *ejusdem generis*—construing a general term by reference to the specific terms that precede it—and ruled that the statute reached gatherings related to "the performance of a civic duty, such as voting, or exercising First Amendment religious rights, such as attending religious services, or accessing the courts," but did not extend to "other types of public gatherings, such as political conventions or protests." *Koons*, 673 F. Supp. 3d at 631.

The first issue with this reasoning comes from history: The Supreme Court of Georgia rejected the restrictive interpretation given to the statute by the District Court in *Wynne v. State*, explaining "[t]he wholesome purpose of this

---

[110] *See* 7 Edw. 2 c. 170 (1313); 26 Hen. 8 c. 6 (1534); 1647 Md. Laws 216; 1650 Md. Laws 273; 1776 Del. Const. art. 28; *Proceedings of the Conventions of the Province of Maryland, supra* note 51, at 185; 1870 La. Acts 159–60; Tex. Act of 1871, at 1322.

[111] 1870 Ga. Laws 421.

statute would be much limited by putting a narrow construction upon the expression 'any public gathering.' A barbecue on the 4th of July, at which the public is assembled in considerable numbers constitutes a public gathering within the meaning of the statute." 51 S.E. 636, 637 (Ga. 1905). While the District Court's reading of the Georgia law might be plausible absent contrary evidence, it is untenable in light of *Wynne*. Second, the District Court fell prey to a common misunderstanding of *Bruen* that *Rahimi* clarified: "our inquiry into *principles* that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors." *Pitsilides v. Barr*, 128 F.4th 203, 210 (3d Cir. 2025). Instead, we look to the tradition of firearm regulation as a whole, evaluating historical analogues and their "how" and "why," to distill the animating principles from that history and to consider whether a modern law fits within those principles. In light of *Rahimi*, the District Court employed a far too exacting test to determine whether proffered historical analogues were relevantly similar. Given the plain text of the statute that covers "any other public gathering," coupled with the Georgia Supreme Court's interpretation of the statute, we have little difficulty concluding that Georgia's public gathering statute is indeed "distinctly similar" to § 2C:58-4.6(a)(6). *Bruen*, 597 U.S. at 26.

As for both the Georgia and the Texas law, the District Court emphasized that those state supreme courts endorsed a militia-based interpretation of the right to bear arms in upholding the statute. *See Koons*, 673 F. Supp. 3d at 629–30 (discussing *Hill v. State*, 53 Ga. 472 (1874)); *id.* at 632 (discussing *English v. State*, 35 Tex. 473 (1871)). But the District Court's reading of the Georgia law is untenable as

*Nunn v. Georgia*, 1 Ga. (1 Kel.) 243 (1846) was decided decades before *Hill* and held that the right to bear arms was an individual right. And for Texas, any error in the Texas Supreme Court's reading of the Second Amendment does not wholly undermine the probative value of the statute, which demonstrates that the Texas *legislature* believed it could ban firearms from public gatherings,[112] offering another historical data point that such prohibitions comport with our Nation's tradition.

The District Court also reasoned that the Missouri statute was not a "reliable historical analogue" based on its view that the Missouri Supreme Court suggested the statute violated Missouri's state constitution. *Koons*, 673 F. Supp. 3d at 633. However, that decision concerned a prior version of the statute that forbade only concealed carry at public assemblies. *State v. Reando* (Mo. 1878). The Missouri Supreme Court upheld the concealed-carry law under the state's right to bear arms. *Id.* In doing so, the Court warned that an absolute ban on keeping and bearing arms would violate the state constitution, but the Court stressed that it was not addressing the validity of a ban on carrying firearms, whether concealed or openly, at a public assembly or any other sensitive location:

---

[112] The carry restriction was not included in the chapter addressing the militia, *see* 1870 Tex. Gen. Laws 11–16, but in a separate chapter; furthermore, the statute's carve-out, allowing arms possession at gatherings in "locations subject to Indian depredations," suggests the legislature recognized an individual right to carry for self-defense, *id.* at 63.

> We do not say nor do we wish to be understood as saying that the legislature might not prohibit a person from bearing arms, even openly, in such places as are mentioned in the statute, without such prohibition to constitutional objections. No such enactment as this is before us and, we apprehend, never will be, for the moral sense of every well-regulated community would be so shocked by any one who would so far disregard it, as to invade such places with fire arms and deadly weapons exposed to public view on his person that it would very rarely, if even, occur.

*Id.* The *Reando* Court did not face a challenge to the open carry statute and explicitly underscored that fact. We therefore disagree with the District Court's inference that the Missouri legislature defied the state constitution when enacting the open carry statute after *Reando*. Instead, that statute offers probative evidence of the American tradition of firearm regulation.

Finally, the District Court remarked that several colonial-era statutes *required* colonists to bring firearms to church services.[113]  *Koons*, 673 F. Supp. 3d at 628.  Yet an

---

[113] As the District Court recognized, these laws were enacted to ensure colonists were ready for violent clashes with Native Americans and enslaved people. Accordingly, some courts have concluded "these statutes are rooted in racism not the Second Amendment." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023); *see also Range.*, 124 F.4th at 229

93

obligation to bear arms in *certain* locations is distinct from a license to do so at will in *any*.  Indeed, one can easily draw the opposite conclusion from these colonial statutes—that "[w]hen the government imposes such a duty it assumes that it has the power to regulate the public carrying of weapons; whether it forbids them or commands them, the government is *regulating* the practice of public carrying."  *Young v. Hawaii*, 992 F.3d 765, 819 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022).  Given the ambiguity inherent in statutory duties to bear arms, we decline to treat those laws as evincing a limitless license to carry weapons.

These historical examples offer persuasive evidence of the principles underlying our Nation's regulatory tradition of firearm regulation.  As we articulated at the outset, we read history—including the historical laws proffered by New Jersey—to include a principle that legislatures may constitutionally prohibit the carry of firearms at and around discrete locations set aside for civic and government functions. Armed with this historical pedigree, modern-day legislatures, consistent with the Second Amendment, may enact analogous laws proscribing the carry of firearms at locations set aside for the same historically protected functions.  New Jersey's regulation prohibiting the carry of firearms within 100 feet of any gathering for which a governmental permit is required carries on this deeply rooted history by protecting locations of public gathering and demonstration from the historically recognized disruptive presence of firearms.  As such,

_____

(Hardiman, J.) (expressing concerns with relying on historical practices "based on race and religion" to discern the scope of the Second Amendment).

Defendants have shown that § 2C:58-4.6(a)(6) comports with our national tradition of bearing arms and thus complies with the Second Amendment.

4. Public Parks, Beaches, Recreation Facilities, Playgrounds, Zoos, and Youth Sports Events

According to the District Court, Defendants failed to establish that parts of § 2C:58-4.6(a)(9) (prohibiting carrying firearms at zoos) and most of § 2C:58-4.6(a)(10) (prohibiting carrying firearms at "a park, beach, [or] recreation facility . . . owned or controlled by a State, county or local government unit") are consistent with our national tradition of firearm regulation. It did hold, however, that public playgrounds, § 2C:58-4.6(a)(10), as well as at youth sports events, § 2C:58-4.6(a)(11), "fall within the sphere of schools," and are thus valid sensitive locations. *Koons*, 673 F. Supp. 3d at 643 (quotation omitted).

As with the other regulations, we conclude carrying a firearm for self-defense at these locations falls within the plain text of the right to keep and bear arms. As a result, Defendants bear the burden of demonstrating that the relevant portions of § 2C:58-4.6(a)(9)–(11) satisfy *Bruen*'s history-and-tradition test. To decide what level of analogy is appropriate, we must determine if the risks posed by guns at public parks, beaches, recreation facilities, playgrounds, zoos, and youth sports events have "persisted since the 18th century" or represent a modern concern. *Bruen*, 597 U.S. at 26.

Prior to the mid-nineteenth century, the concept of a park referred to privately owned, enclosed lands where wild

game roamed.[114]  What communal green space did exist, like the Boston Common, was devoted primarily to grazing cattle.[115]  The public parks we know today did not emerge until after the onset of mass urbanization and were developed to provide a reprieve from industrialization and foster democratic solidarity across social classes.[116]  Crucially, these parks were created in response to the increasing alienation of urban dwellers, designed in part to sustain the existing "social order" and "promote the highest potential of civilization in America."[117]  They also housed the country's first zoos, which opened in the 1870s in New York and Philadelphia.[118]  Simply

---

[114] *See Park*, Noah Webster's Am. Dictionary of the English Language (1828) ("A large piece of ground inclosed and privileged for wild beasts of chase, in England, by the king's grant or by prescription.  To constitute a *park* three things are required; a royal grant or license; inclosure by pales, a wall or hedge; and beasts of chase, as deer, etc.").

[115] *See* Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517, 1556–57 (2020).

[116] *See supra* notes 61–62 and accompanying text; *see also* Frederick Law Olmsted, *The Justifying Value of a Public Park* 7 (1881) ("Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else."); Shoked, *supra* note 115, at 1557 (describing the advent of parks in the nineteenth century); Schuyler, *supra* note 73, at 1–10 (same).

[117] Schuyler, *supra* note 73, at 6.

[118] *See History of Zoos in Parks*, NYC Parks, https://perma.cc/E3LB-XC46.

put, "examples [of parks] from the Founding were not relevantly similar to parks in their modern form." *Wolford*, 116 F.4th at 982. We therefore agree with the Second and Ninth Circuits that the "relative novelty of public parks as institutions . . . justifies a flexible approach under *Bruen*." *Antonyuk*, 120 F.4th at 1022 n.86; *accord Wolford*, 116 F.4th at 982; *cf. LaFave*, 2025 WL 2458491, at *4 (rejecting facial challenge to ordinance banning firearm possession in public parks where it would be constitutional in at least some applications).

Similarly, although America has always enjoyed a magnificent coastline, the modern notion of a recreational beach first appeared in the nineteenth century. Whereas the coast was "synonymous with dangerous wilderness" in the seventeenth and eighteenth centuries, Europeans and Americans began to view the beach as a salutary escape from industrial urban centers during the mid-to-late-nineteenth century.[119] Public recreation facilities—such as gymnasia, pools, and athletics fields—likewise originated in the latter half

---

[119] Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*, Smithsonian Mag. (June 23, 2016), https://perma.cc/46EG-MR6U; *see also* Karl F. Nordstrom, *Beaches and Dunes of Developed Coasts* 8 (2000) ("There was little or no interest in direct use of the exposed part of the coastal zone in many countries up to the mid nineteenth century due to the difficulty of traversing lagoons and marshes and the occurrence of malaria. The second half of the nineteenth century saw the beginning of relatively large-scale coastal tourism and development of seaside resorts in many locations." (citations omitted)).

of the nineteenth century,[120] as organized sport spread from the aristocratic traditions of the upper class to the American people as whole.[121]  These locations, too, lack a relevantly similar Founding-era analogue, calling for the same flexible approach under *Bruen* and *Rahimi* that we afford regulations governing parks.

Sections 2C:58-4.6(a)(9)–(11) seek to maintain peace and curb disturbances posed by firearms at New Jersey's public parks, beaches, zoos, and recreation facilities, with an additional, more specific goal of protecting the children who frequent these locations.  These legislative goals find support in the historic principle, established through several analogous historical laws, which forbade guns from centers of community

---

[120] *See* Steven A. Reiss, *Sport in Industrial America 1850–1920*, at 6 (2d ed. 2013) ("Social reformers and boosters pressured municipalities to secure and develop public space for recreation.  Cities, led by the example of New York's Central Park in 1858, established beautiful suburban public parks after the Civil War.  By the early 1900s, municipalities also developed inner-city sites for small parks and playgrounds, baths, recreational piers, and schoolyards."); Miriam A. Cherry, *Exercising the Right to Public Accommodations: The Debate over Single-Sex Health Clubs*, 52 Me. L. Rev. 97, 114 (2000) ("Gymnasiums were not common in the United States until the middle of the nineteenth century.").

[121] *America at Leisure*, Libr. Cong., https://perma.cc/GJT9-PVM9 (describing the rise of sports as a leisure activity and the opening of public gymnasia, courts, and fields after the Civil War).

life, such as fairs and markets, to ensure visitors could participate without the risks and anxieties associated with deadly weapons. Further support can be found in the later application of this historic principle to new contexts such as recreational areas and places of amusements, particularly in natural settings. Throughout the second half of the nineteenth century, parks and the recreation facilities within them— including zoos—banned firearms.[122] Indeed, the emergence of the modern park brought with it virtually instantaneous prohibition of firearms in those spaces. *See Wolford*, 116 F.4th at 982–83; *Antonyuk*, 120 F.4th at 1022–26.

Examples abound. As the Ninth Circuit observed, New York City's Central Park is a prime example. "[P]erhaps the Nation's first modern public park," when it opened "[i]n 1858 . . . New York prohibited the carrying of firearms in Central Park." *Wolford*, 116 F.4th at 982. The Second Circuit recently marshaled additional evidence of legislatures "regulating firearms in public forums and quintessentially crowded places," of which parks are but one example. *Antonyuk*, 120 F.4th at 1019. That court traced the lineage of regulation of weapons in public fora to the Statute of Northampton, passed in 1328, and found that "at least two states—Virginia and North Carolina—passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.*, the traditional, crowded public forum." *Id.* at 1018–20 (footnotes omitted). At the time of their

---

[122] *See supra* note 74; *Fourth Annual Report of the Board of Commissioners of the Central Park* 106 (1861); *Acts of Assembly Relating to Fairmount Park* 18 (1870); Chi. Mun. Code 391.

passage, these Virginia and North Carolina statutes "applied to over a quarter of the Nation's population," with "an additional three states and two territories" enacting similar laws by 1891 which, combined, regulated over 10 million Americans. *Id.* at 1021–22. And while parks and firearm prohibitions in them flourished throughout the mid- to late-nineteenth century, "the constitutionality of those laws was not in dispute." *Wolford*, 116 F.4th at 983; *see also Antonyuk*, 120 F.4th at 1022.

In addition to parks, legislatures extended this historical principle by applying several of those prohibitions to public beaches.[123] Other laws proscribed guns in locations dedicated to amusement,[124] and they treated sites of education and youth presence with particular sensitivity.[125] Although some of these analogues appeared between the 1860s and the first decade of the twentieth century, they are nevertheless probative of the American tradition of firearm restrictions, as they developed out of earlier statutes regulating the carrying of arms in bucolic

---

[123] *E.g.*, *San Francisco Municipal Reports for the Fiscal Year 1874–5, Ending June 30, 1875*, at 887 (1875) (enacted 1872) (Golden Gate Park); Chi. Mun. Code 391 (Chicago's parks, including Lincoln Park); 1895 Mich. Local Acts 596 (Belle Isle Park); *Amendments to "The Revised Municipal Code of Chicago of 1905" and New General Ordinances* 40 (1906) (applying specifically to Chicago's beaches).

[124] *See supra* note 81.

[125] *See supra* note 83.

estates[126] and schools,[127] as well as at older sites of recreation like fairs and markets,[128] aimed at preventing breaches of the peace. Taken together, this history evidences a "long, unbroken line," *Bruen*, 597 U.S. at 35, of firearm regulation at recreational venues indicative of consistency with our Nation's history. Thus, consistent with this long and undisputed history of regulating parks, we join the Second and Ninth Circuits in concluding that our Nation's history of firearm regulation embraces regulating the carry of firearms in parks and similar locations of recreation and amusement. *See Antonyuk*, 120 F.4th at 1025–26; *Wolford*, 116 F.4th at 983.

The District Court expressed concern that historical statutes and ordinances banning firearms in parks may have served to protect wildlife, "not parkgoers." *Koons*, 673 F. Supp. 3d at 642. But many of these carry restrictions appeared in the same subsection as prohibitions against "throwing stones and other missiles" and discharging fireworks and guns into or over the park,[129] indicating that they targeted disorderly

———————————

[126] *See supra* note 41; *see also* 1865 La. Acts 14; 1865 Fla. Laws 27; Tex. Act of 1871, at 1321–22; 1893 Or. Laws 79.

[127] *See supra* notes 52–54.

[128] *See* 2 Edw. 3 c. 3 (1328); 26 Hen. 8 c. 6 (1534); 1786 Va. Acts 35; N.C. Statute of Northampton 60–61.

[129] *Fourth Annual Report of the Commissioners of the Central Park* 106 (1861) ("All persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles within [the

park]”); *Acts of Assembly Relating to Fairmount Park* 18 (1870) (“No persons shall carry firearms, or shoot birds, in the Park, or within 50 yards thereof, or throw stones or other missiles therein”); *Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws* 310 (Consider H. Willett ed. 1876) (“All persons are forbidden to carry fire arms, or to throw stones or other missiles within said park”); Chi. Mun. Code 391 (“All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other construction or other property within or upon any of the said parks.”); *The Revised Ordinances of the City of Danville* 83 (Mann et al. eds., 1883) (“Whoever shall carry any fire-arms into said parks, or shall fire off or discharge the same in, or into said parks, or any of them; or whoever shall shoot, fire or discharge any kind of fire-works therein[.]”); *The Revised Ordinances of Salt Lake City with the City Charter and Amendments Thereto* 248 (1888) (“No person shall, within Liberty Park, cut, break, or in any way injure or deface any tree, shrubs, plants, buildings, fences, or property of any kind; or indulge in noisy, boisterous, riotous, or indecent behavior, or use any boisterous or offensive language; or, except authorized by the Mayor: . . . 3 – Carry or discharge firearms.”); *Ordinances and Resolutions of the Borough and City of Williamsport, Pa.* 91 (1891) (enacted 1890) (“No person shall carry fire-arms or shoot in the park, or discharge

behavior that disrupted not only wildlife but also patrons. *Id.* And we see no tension between that goal and the aims of § 2C:58-4.6(a)(9)–(11). Just as these nineteenth-century analogues, New Jersey's restriction aims at addressing the same breaches of peace and threats to parks, beaches, and zoos with which legislatures have wrestled throughout history. Additionally, even accepting that some historical regulations

---

any fire-works, or throw stones or missiles therein."); 1895 Mich. Local Acts 596 ("No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib, or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe."); *Revised Ordinances of the City of Boulder* 157 (Oscar F.A. Greene ed., 1899) (misdemeanor to "take or carry or cause to be taken or carried in to any of the parks belonging to the City of Boulder, any gun, pistol, revolver, or other firearm, or who shall shoot any firearm at or towards or over or into or upon any of said parks"); *City of Trenton, New Jersey, Charter and Ordinances* 390 (1903) (enacted 1890) ("No person shall carry firearms or shoot birds in said park or squares, or within fifty yards thereof, or throw stones or other missiles therein."); *Amendments to "The Revised Municipal Code of Chicago of 1905" and New General Ordinances* 40 (1906) ("All persons are forbidden to carry firearms or to throw stones or other missiles within any of the Parks, Public Play Grounds or Bathing Beaches of the City[.]").

focused their prohibitions on protecting wildlife, we have no difficulty concluding—in the face of the legion examples we have recounted—that "the Nation's historical tradition includes regulating firearms in parks," *Wolford*, 116 F.4th at 983, and in "places that serve as public forums," *Antonyuk*, 120 F.4th at 1023.

As our history furnishes a laundry list of analogues to § 2C:58-4.6(a)(9)–(11), New Jersey's prohibition on firearms at public parks, beaches, playground, recreation facilities, and youth sports events ably fits within the principles animating that tradition of firearm regulation.  As such, Plaintiffs fail to show a likelihood on the success of this claim.

### 5.  Public Libraries and Museums

Plaintiffs aver that New Jersey's ban on carrying firearms at "a publicly owned or leased library or museum," N.J. Stat. Ann. § 2C:58-4.6(a)(12), violates their right to keep and bear arms, and the District Court agreed.

As an initial matter, the text of the Second Amendment encompasses Plaintiffs' desire to carry handguns in public libraries and museums for self-defense.  Accordingly, we must assess whether the problem § 2C:58-4.6(a)(12) addresses—the danger, disruption, and distraction of firearms in public libraries and museums—is one that "has persisted since the 18th century," *Bruen*, 597 U.S. at 26, or is of more recent vintage.

America's free public libraries emerged after the Founding and proliferated throughout the 1850s and 1870s.[130] Likewise, though Americans opened two museums in the eighteenth century—the Charleston Museum in 1773 and Charles Willson Peale's Philadelphia Museum in 1785, prior to its failure a few years later[131]—modern museums arrived in

---

[130] *Before 1876*, Am. Libr. Ass'n, https://perma.cc/VU8W-4FBQ ("The first free modern public library was opened in 1833.  The Peterborough (N.H.) Town Libraries was the first institution funded by a municipality with the explicit purpose of establishing a free library open to all classes of the community. . . . [T]he Boston Public Library . . . was the first free municipal library in a large community and was founded in 1848[.]"); Kathleen de la Peña McCook & Jenny S. Bossaller, *Introduction to Public Librarianship* 30 (3d ed. 2018); *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 238 (2003) (Souter, J., dissenting) (describing "the mid-19th-century development of public libraries").  The District Court remarked that Benjamin Franklin founded the Library Company of Philadelphia in 1731, but the Library Company used a private, subscription-based model that sharply distinguishes it from the openness of public libraries, *see* Edwin Wolf, *At the Instance of Benjamin Franklin: A Brief History of the Library Company of Philadelphia* 5 (1995) ("Fifty subscribers invested forty shillings each and promised to pay ten shillings a year thereafter to buy books and maintain a shareholder's library.").

[131] *See* John Edward Simmons, *History of Museums*, *in* Encyclopedia of Libr. & Info. Sciences 1812, 1818 (4th ed. 2017).

the United States in the nineteenth century with the Founding of the Smithsonian Institution in 1846 and the American Museum of Natural History, the Metropolitan Museum of Art, and the Museum of Fine Arts around 1870.[132]

The risks from firearms at public libraries and museums thus only became widespread in the second half of the nineteenth century, permitting our use of *Bruen*'s more flexible, relevantly-similar test. Defendants ably satisfy this test and have provided the requisite historical analogues for both the "how" and the "why." That is, New Jersey identifies historical statutes that resemble § 2C:58-4.6(a)(12), both in the means they deployed—forbidding firearms at locations where individuals congregated for educational and cultural purposes—and the ends they served—preventing the dangers and disruptions from firearms at those locations. Nor are these enactments outliers, as they are consistent with the longstanding tradition of restricting firearms at the predecessors of public libraries and museums[133]:

---

[132] *See* Edward P. Alexander et al., *Museums in Motion: An Introduction to the History and Functions of Museums* 7 (3d ed. 2017).

[133] In addition to books, Elihu Yale donated a portrait of King George I to the Collegiate School that remains in the hands of the Yale University Art Gallery today. *See King George I of Great Britain and Ireland*, Yale Univ. Art Gallery, https://perma.cc/8G3R-QTJX. Yale also opened the "first gallery affiliated with a college or university in America" in 1832. Erik Vogt, *The Trumbull Gallery*, 2000 Yale U. Art Gallery Bull. 26, 27.

universities.[134]   Indeed, New Jersey's law enjoys a uniquely deeply rooted historical pedigree premised on the principle that legislatures may permissibly regulate the carrying of firearms in places of amusement and education. *See Wolford*, 116 F.4th at 987.   As the Ninth Circuit observed, places like casinos, stadiums, amusement parks, zoos, museums, and libraries share similar characteristics, insofar as they serve as "modern social gathering place[s] . . . visited for both amusement and educational purposes." *Id.*   That Court went on to recognize that "[c]onvincing evidence supports the conclusion that prohibitions on firearms at places of amusement fall within the national historical tradition of prohibiting firearms at sensitive places." *Id.*

Libraries hold a place of special solicitude in this regulatory tradition.   Their educational mission is vital to communities' and our Nation's democratic project, and legislatures protected these spaces from their emergence. Throughout our history, "[m]any libraries [were] housed in schools and courthouses, for example, and regulation of firearms in those places is plainly constitutional and within the Nation's historical tradition." *Id.* at 988.   Additionally—and consistent with their designated educational missions— libraries and museums often serve as spaces frequented by children, a "vulnerable population" that history shows legislatures may constitutionally enact firearm regulations to protect. *See Antonyuk*, 120 F.4th at 1011 n.70 (finding historical support for a similar regulation because "these laws tended to not only prohibit guns in school rooms, *i.e.*, spaces frequented by vulnerable children, but also anywhere people

---

[134] *See supra* notes 52–54.

'assemble[] for educational, literary or social purposes'" (quoting 1870 Tex. Gen. Laws 63, ch. 46) (alteration in original)); *cf. infra* Section V.B.9.

Equipped with these principles and analogues, Defendants have satisfied their burden of establishing that § 2C:58-4.6(a)(12) is consistent with our national tradition of firearm regulation. New Jersey's prohibition on firearms at public libraries and museums comports with the Second Amendment, and Plaintiffs fail to demonstrate a likelihood of success on the merits.

### 6. Bars and Other Locations that Serve Alcohol

Plaintiffs' challenge to N.J. Stat. Ann. § 2C:58-4.6(a)(15) (proscribing firearms in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises") fares no better.

The plain text of the Second Amendment covers Plaintiffs' proposed course of conduct, namely, carrying handguns for self-defense in locations where alcohol is sold for consumption on the premises. And the dangers posed by combining firearms and alcohol have existed since colonial times, as early American settlers enjoyed a variety of intoxicating beverages—from "beers and ciders, to wines[,] mixed concoctions . . . [and] rum."[135] Accordingly, Defendants

---

[135] Steven Struzinski, *The Tavern in Colonial America*, 1 Gettysburg Hist. J. 29, 33 (2002).

must identify "distinctly similar historical regulation[s] addressing that problem." *Bruen*, 597 U.S. at 26.

Just as the Second and Ninth Circuits concluded in evaluating nearly identical laws, we hold that New Jersey's statute is entirely consistent with the principle that legislatures may prohibit the carry of firearms in locations where they may be especially susceptible to misuse. *See Antonyuk*, 120 F.4th at 1031 ("Whereas the crowded space analogues justify prohibiting firearms in heavily trafficked places, the intoxicated-persons analogues justify prohibiting firearms to intoxicated persons who cannot be trusted with weapons. Together, these statutes justify regulating firearms in crowded spaces in which intoxicated persons are likely present."); *Wolford*, 116 F.4th at 986 ("[W]e conclude that [the proffered historical] laws establish that bars and restaurants that sell alcohol are among the Nation's 'sensitive places' where firearms may be prohibited.").

As we recently recognized, "the Founders . . . understood that drinking could provoke people to act dangerously." *United States v. Harris*, 144 F.4th 154, 158 (3d Cir. 2025). For instance, a Rhode Island law banned firing guns at night and in taverns.[136] Other legislatures authorized the confinement of drunks until they became sober and imposed surety regimes requiring drunkards to post security for their peaceable behavior—all in recognition of the

---

[136] *See* Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations 120 (Newport, R.I., Hall 1767).

109

dangerous combination that firearms and alcohol present. *See id.* at 159.

In the colonial era, Delaware prohibited the sale of "strong Drink" at any "Places of [militia] Muster."[137] Likewise, "Dr. Benjamin Rush, a signer of the Declaration of Independence, delegate to the Continental Congress, and preeminent Founding-era medical authority, noted that intoxication breeds crime, including '[f]ighting,' '[b]urglary,' and '[m]urder,'" reflecting the Founders' disposition towards alcohol and drunkenness. *Id.* at 158 (quoting Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind* 2 (8th ed., Boston, James Loring 1823)).

But even against the backdrop of these Founding-era laws, we should not assume that they represent "founding-era legislatures maximally exercis[ing] their power to regulate." *Id.* (quoting *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring)). Instead, the Supreme Court has observed that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868" and instructed that, in the face of "unprecedented societal concerns," we take "a more nuanced approach" to finding similar historical regulations even without a "distinctly similar historical regulation" in the Founding era. *Bruen*, 597 U.S. at 26–27.

───────────────

[137] 1756 Del. Acts 175, *reprinted in* 2 *Military Obligation: The American Tradition Part 3: Delaware Enactments* 6 (Arthur Vollmer ed., 1947).

Such is the case here, as in the nineteenth century and beyond, "[d]rinking became detached from earlier safeguards" and grew even more closely linked to social danger and disorder.   Paul Aaron & David Musto, *Temperance and Prohibition in America*, in *Alcohol and Public Policy: Beyond the Shadow of Prohibition* 137 (Mark H. Moore & Dean R. Gerstein eds., 1981).  In response, the temperance movement bloomed, and legislatures started to experiment with even more alcohol-related gun reforms, such as restrictions on carrying firearms while drinking, *see* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 Notre Dame J. Leg. 223, 300, 320, 323, 331 (2024)), and more prevalent regulation of firearms where alcohol was imbibed.

In New Mexico, Arizona, Oklahoma, and New Orleans, for example, legislatures forbade carrying firearms at locations that sold alcohol.[138]   Other statutes—one of which was explicitly upheld by the Missouri Supreme Court—barred

---

[138] 1852 N.M. Laws 67, 69 (prohibiting "enter[ing] said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons, whether they be shown or concealed upon their persons"); 1879 New Orleans Ordinance (providing "it shall not be lawful for any person to carry a dangerous weapon, concealed or otherwise, into any . . . tavern"); 1889 Ariz. Sess. Laws 17 (requiring "drinking saloon[s]" to "keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons"); 1890 Okla. Laws 495 (proscribing carrying weapons "to any place where intoxicating liquors are sold").

111

intoxicated individuals from bearing guns[139] and penalized discharging firearms at saloons[140] and selling guns to intoxicated persons.[141]  *See State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) ("The mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments.").

These regulations, "[t]aken together," *Rahimi*, 602 U.S. at 698, support the common-sense notion that intoxicated people "cannot necessarily be trusted with firearms" and may "be unable to defend themselves effectively," *Antonyuk*, 120 F.4th at 1031.  Given the sum total of regulations throughout our Nation's history addressing alcohol, as well as protecting discrete locales set aside for recreation and amusement, like fairs and markets, from breaches of the peace, we conclude that Defendants are likely to prevail in demonstrating a historical tradition of protecting against the dangers posed by the combination of alcohol and firearms, and prohibiting individuals from carrying firearms at locations that serve or

———————————————

[139] *See supra* note 79.

[140] 1881 Nev. Stat. 19–20 (prohibiting "maliciously, wantonly or negligently discharg[ing]" firearms in any "saloon"); 1883 Wis. Sess. Laws 841 (proscribing firing a gun in "any saloon").

[141] 1878 Miss. Laws 175 (prohibiting "sell[ing] to any . . . person intoxicated, knowing him to be . . . in a state of intoxication, any weapon . . . or any pistol cartridge").

dispense alcohol is consistent with that tradition.[142]    *Cf.* *Rahimi*, 602 U.S. at 698 (looking to disparate historical regulations that, when "[t]aken together," yield a principle supporting the modern day regulation).

In ruling that § 2C:58-4.6(a)(15) runs afoul of the right to keep and bear arms, the District Court emphasized that regulations applicable to intoxicated individuals differ from § 2C:58-4.6(a)(15)'s locational regime.  That observation is true as far as it goes, but it accounts for neither the historical regulations that imposed location-based carry restrictions on places that sold alcohol, nor the relevance of restrictions directed toward intoxicated individuals as historical support for § 2C:58-4.6(a)(15): *Bruen* insists on *similar* regulations, not *identical* ones.  597 U.S. at 26.  To ignore our forebearers' recognition of the dangers of carrying while intoxicated "would be as mistaken as applying the protections of the [Second Amendment] right only to muskets and sabers." *Rahimi*, 602 U.S. at 692.  Restrictions as closely related as those disarming drunk individuals and those banning firearms at the locations where individuals become drunk speak to a common public understanding of the contours of Americans' right to bear arms, so Defendants have carried their burden to establish a historical tradition that supports § 2C:58-4.6(a)(15).

---

[142] Va. Act of 1656, at 401–02 (punishing "shoot[ing] any gunns at drinkeing (marriages and ffuneralls onely excepted)").

113

### 7. Entertainment Facilities

Based on its review of the historical record, the District Court ruled that New Jersey violated the Second Amendment by banning firearms from any "privately or publicly owned and operated entertainment facility within this State." N.J. Stat. Ann. § 2C:58-4.6(a)(17). While that restriction implicates the text of the Second Amendment, contemporary entertainment venues involve a scale and density that was unknown at the Founding. *See Bruen*, 597 U.S. at 114 (Breyer, J., dissenting) (remarking that "nightclubs, movie theaters, and sports stadiums" have "no obvious 18th- or 19th-century analogue"); *see also* N.J. Att'y Gen. Opening Br. 18 ("Nor could the Founders have imagined a place like MetLife Stadium, with seating capacity roughly the size of Boston's population in 1830."). Accordingly, we resort to *Bruen*'s "relevantly similar" framework to evaluate the analogues Defendants offer in support of § 2C:58-4.6(a)(17).

New Jersey convincingly offers numerous analogues to support its regulation. Throughout the nineteenth century, states such as New Mexico, Texas, Georgia, Missouri, Arizona, Oklahoma, and Montana forbade carrying firearms at entertainment facilities and recreational gatherings to prevent the dangers of guns in crowded venues and preserve Americans' ability to enjoy those amusements in peace.[143]

---

[143] 1817 New Orleans Ordinance ("a public ball-room"); 1852 N.M. Laws 67, 69 (a "Ball or room adjoining said ball where Liquors are sold"); 1870 Tenn. Pub. Acts 23–24 ("any fair, race

Related statutes proscribed using firearms in such facilities.[144] The roots of these restrictions stretch back centuries, as Anglo-American law has long sought to curb the dangers from weapons in locations of public amusement—much like the

---

course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63 ("a ball room, social party, or other social gathering, composed of ladies and gentleman"); 1870 Ga. Laws 421 ("any other public gathering in this State"); 1879 New Orleans Ordinance 1 ("any theatre, public hall, tavern, picnic ground, place for shows or exhibitions, house or other place of public entertainment or amusement"); 1883 Mo. Laws 76 (any "place where people are assembled for . . . social purposes"); 1889 Ariz. Sess. Laws 17 (any "place where persons are assembled for amusement . . . any circus, show or public exhibition of any kind or into a ball room, social party or social gathering"); 1890 Okla. Laws 495 (any "place where persons are assembled . . . for amusement . . . any circus, show or public exhibition of any kind, or into any ball room, or to any party or social gathering"); 1903 Mont. Laws 49 (any "place where persons are assembled for amusement . . . any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering").

[144] 1869 N.M. Law 313 (forbidding "draw[ing] or us[ing] any deadly weapons in any ball, dance, or other public gathering of the people"); 1881 Nev. Stat. 19–20 (outlawing discharging a firearm "in any theater, hall, store, hotel, saloon or any other place of public resort").

fairs and markets of old.[145]   Thus, "[t]he State's proffered analogues set forth a tradition of regulating firearms in . . . spaces that are (1) discrete in the sense that they contain crowds in physically delineated or enclosed spaces, *e.g.*, circuses, ball rooms, fairs, and markets, and (2) 'where persons are assembled for amusement[.]'"   *Antonyuk*, 120 F.4th at 1038 (quoting 1889 Ariz. Sess. Laws 17); *Wolford*, 116 F.4th at 987 (collecting historical examples and concluding that "[c]onvincing evidence supports the conclusion that prohibitions on firearms at places of amusement fall within the national historical tradition of prohibiting firearms at sensitive places").

While our forebearers may have enjoyed waltzes in ballrooms instead of Taylor Swift concerts in sports arenas, Americans' desire for physical safety and peace of mind during leisure has endured, forging a national tradition that supports § 2C:58-4.6(a)(17).   Because New Jersey's protection of entertainment spaces is relevantly similar to numerous

------

[145] *See supra* note 128; *see also* Blocher & Siegel, *supra* note 31, at 165.   The District Court's contrary view rested on mistaken premises.   Its narrow reading of Georgia's 1870 statute as extending only to civic and religious gatherings, as opposed to sites of recreation, is inconsistent with the Georgia Supreme Court's own construction of the statute in *Wynne v. State*.   51 S.E. at 637.   And the single case the District Court cited for the proposition that Missouri's statute conflicted with its state constitution, *State v. Reando*, does not support the Court's concerns.   *See supra* Section V.B.3.

historical statutes, Defendants have met their burden under *Bruen* as to § 2C:58-4.6(a)(17).

### 8. Casinos

Plaintiffs also seek to invalidate New Jersey's prohibition on carrying firearms in "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property." N.J. Stat. Ann. § 2C:58-4.6(a)(18).

Because the text of the Second Amendment covers Plaintiffs' proposed conduct—carrying handguns in casinos for self-defense—Defendants must demonstrate that the prohibition complies with the American tradition of firearm regulation. The District Court found that "this Nation has a long history of gambling establishments," and thus concluded that § 2C:58-4.6(a)(18) addresses a problem that has persisted since the eighteenth century. *Koons*, 673 F. Supp. 3d at 646. But our review of the record convinces us that gambling's history in the colonies and United States was far more checkered than the District Court acknowledged: Massachusetts, Pennsylvania, New Hampshire, and New Jersey banned gambling during the colonial period.[146] Other

---

[146] *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 Gaming Res. & Rev. J. 65, 66 (1996); G. Robert Blakey & Harold A. Kurland, *The Development of the Federal Law of Gambling*, 63 Cornell L. Rev. 923, 1015 & n.430